# EXHIBIT B

# TRADEMARK SUB-LICENSE AGREEMENT

**THIS TRADEMARK SUB-LICENSE AGREEMENT** (this "**Agreement**") is made and entered into this 17 day of August , 2011 (the "**Effective Date**") by and between:

**MARGARITAVILLE OF BOSSIER CITY, LLC,**
a limited liability company formed pursuant to the
laws of the State of Delaware

("**Sub-Licensor**");

– and –

**BOSSIER CASINO VENTURE, LLC,**
a limited liability company formed pursuant to the
laws of the State of Louisiana.

("**Sub-Licensee**").

## RECITALS

A.    Margaritaville Enterprises, LLC is a limited liability company formed pursuant to the laws of the State of Delaware (the "**Licensor**"), which owns or controls certain trademarks, including the word "Margaritaville," and trade dress that comprise the Margaritaville Intellectual Property (as hereinafter defined);

B.    In connection herewith, Sub-Licensee and Sub-Licensor are entering into that certain License Agreement with Jimmy Buffett in the form attached hereto as **Exhibit A** (the "**Buffett Agreement**") pursuant to which Jimmy Buffett agrees to license certain intellectual property rights, including rights relating to Buffett Music Material (as hereinafter defined), and publicity rights to Sub-Licensor for use connected with the Project, and Sub-Licensor agrees to license all such rights to Sub-Licensee;

C.    Sub-Licensee plans to develop, construct and operate a "Margaritaville"-branded casino and hotel, with a retail store, other amenities and four restaurants, including a restaurant branded with the Margaritaville Intellectual Property, in Bossier City, Louisiana (collectively, the "**Project**");

D.    Sub-Licensor wishes to sub-license to Sub-Licensee, and Sub-Licensee wishes to sub-license from Sub-Licensor, the Margaritaville Intellectual Property in conjunction with the Project, as more specifically set forth in this Agreement;

E.    Pursuant to the Trademark License Agreement attached hereto as **Exhibit B** (the "**License Agreement**"), Licensor has licensed the Margaritaville Intellectual

Trademark Sub-License Agreement

Property to Sub-Licensor, along with the right to grant the sub-license provided for herein;

F.    In connection herewith, Sub-Licensee is entering into that certain Non-Disturbance Agreement with Guggenheim Corporate Funding, LLC ("**Guggenheim**") in the form attached hereto as **Exhibit C** (the "**Non-Disturbance Agreement**") pursuant to which Guggenheim agrees not to take any action regarding the security interest granted to it by Sub-Licensor, which would interfere with or disturb the rights granted to Sub-Licensee herein; and

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual promises contained in this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1    DEFINITIONS.**

Notwithstanding any contrary meaning outside out of this Agreement, the following words and terms shall have the respective meanings ascribed to them below and grammatical variations of such words and terms shall have corresponding meanings.

(a)    "**Adjusted Gross Sales**" – shall mean, for each twelve-month period following the Opening Date, all revenue, income and proceeds of every nature and kind derived directly or indirectly by Sub-Licensee from operations of the Project, minus the following:

(i)      customer winnings;

(ii)     free or discounted rooms and upgrades at the Hotel and other "comps" that are debited to the Casino and credited to the Hotel, for which no revenue or in-kind value is collected by the Project;

(iii)    federal, state or municipal excise, room, sales or use taxes, similar impositions collected directly from patrons or guests or included as part of the sales price for any goods or services, and which must be remitted to a governmental authority;

(iv)     gratuities, service charges or other similar receipts collected for payment to and paid to staff and complimentary food, beverage and retail store merchandise;

Trademark Sub-License Agreement

(v)    volume discounts, rebates, credits, slot machine and table game progressives and the like;

(vi)    royalties, residuals, license fees, sub-licensee fees and other amounts paid to Persons other than Affiliates of Sub-Licensor or Sub-Licensee connected with the use of intellectual property or publicity rights connected with the Project; and

(vii)    any other adjustments to revenue in conformance with GAAP.

(b)    **"Affiliate(s)"** – shall mean, regarding a specified Party, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Party. The term "Affiliate" as applied to Sub-Licensor shall be deemed to exclude Jimmy Buffett and include, without limitation, Margaritaville Enterprises, LLC, Margaritaville Holdings LLC, and all entities that either Sub-Licensor, Margaritaville Enterprises, LLC, or Margaritaville Holdings LLC Controls;

(c)    **"Agreement"** – shall mean this Trademark Sub-License Agreement, including all exhibits and schedules hereto, as originally executed and as amended, modified, supplemented or restated from time to time;

(d)    **"Applicable Law"** – shall have the meaning set forth in Section 15.7(b);

(e)    **"Approved Plan of Use"** – shall have the meaning set forth in Section 3.1 (d);

(f)    **"Buffett Agreement"** – shall have the meaning set forth in the Recitals;

(g)    **"Buffett Music Material"** – shall mean any that portion of musical composition written or recorded by Jimmy Buffett, including music, lyrics, song titles, sound recordings, audio-visual recordings, or concert videos but shall be deemed to exclude each item of Margaritaville Intellectual Property;

(h)    **"Casino"** – shall mean the casino portion of the Project;

(i)    **"Claims"** – shall mean any and all losses, damages, costs, expenses, fees, claims, demands, proceedings, actions and causes of action;

(j)    **"Confidential Information"** – shall have the meaning set forth in Section 13.1;

(k)    **"Control"** – shall mean the ownership of voting securities of a Person, whether directly or indirectly, sufficient to elect a majority of the board of directors, managing members or the trustees of such Person;

Trademark Sub-License Agreement

(l)　　**"De-Branding Actions"** – shall have the meaning set forth in Section 10.4;

(m)　　**"Effective Date"** – shall mean the date set forth in the Preamble of this Agreement;

(n)　　**"Encumbrances"** – shall mean any encumbrance, lien, charge, hypothecation, pledge, mortgage, security interest of any nature, right of first or last negotiation, offer or refusal, option, cloud on title, or any agreement (whether written or oral) to create any of the foregoing;

(o)　　**"Event of Default"** – shall have the meaning set forth in Section 10.2(c);

(p)　　**"Force Majeure"** – shall mean any bona fide delay or state of affairs beyond the control of a Party (other than as a result of financial incapacity of such Party), which shall cause or contribute towards such Party being unable to fulfill or being delayed or restricted in the fulfillment of such Party's obligations as a result of:

> (i)　　the non-supply, non-provision or non-delivery of, or inability to obtain any, material service, goods, equipment, utility or labor or the doing of any material work or the making of any material repairs;
>
> (ii)　　any Applicable Law;
>
> (iii)　　any strikes, lockouts, slowdowns or other combined action of workers or labor disputes; or
>
> (iv)　　acts of God, insurrection, war, riots or civil commotions;

(q)　　**"Gaming Authorities"** – shall mean any federal, state, tribal, and/or local gaming regulatory agency;

(r)　　**"Governmental Authority"** – shall mean any governmental or regulatory authority, department, ministry, agency, court, tribunal, bureau, commission, governmental arbitrator or arbitration board or other similar body, whether federal, state or municipal, including, without limitation, the Patent and Trademark Office and Trademark Trial and Appeal Board (TTAB);

(s)　　**"Hotel"** – shall mean the hotel portion of the Project;

(t)　　**"Indemnified Party"** – shall mean any Sub-Licensee Indemnified Parties or Sub-Licensor Indemnified Parties that are entitled to receive indemnification pursuant to this Agreement;

(u)    "**Indemnifying Party**" – shall mean any Party obligated to indemnify an Indemnified Party pursuant to this Agreement;

(v)    "**Internet Site**" – shall mean any worldwide Web site or other online service that is generally accessible by the public;

(w)    "**LGCB**" – shall mean the Louisiana Gaming Control Board;

(x)    "**Margaritaville Artwork**" – shall have the meaning set forth in Section 4.1(a);

(y)    "**Margaritaville Intellectual Property**" – shall mean the Sub-Licensed Marks and Sub-Licensed Trade Dress, and any names, trademarks or service marks or trade dress developed by Sub-Licensor subsequent to execution of this Agreement that incorporate an element of any Sub-Licensed Mark or Sub-Licensed Trade Dress, which subsequently developed name, trademark, service mark or trade dress shall be deemed to be included as Margaritaville Intellectual Property;

(z)    "**Marketing Library**" – shall have the meaning set forth in Section 3.1;

(aa)    "**Marketing Materials**" – shall mean all advertising, press releases, promotions, promotional and marketing materials, signs and displays, which are displayed or communicated in print, electronic, or optical medium, and other materials associated with sales, marketing, promotional or advertising efforts;

(bb)    "**Mediator**" – shall have the meaning set forth in Section 14.1(a)(ii);

(cc)    "**Opening Date**" – shall mean the date the Project is first open to the general public;

(dd)    "**Party**" – shall mean Sub-Licensor or Sub-Licensee;

(ee)    "**Person**" – shall mean any individual, corporation, partnership, limited liability company, trust, or other entity;

(ff)    "**Primary Restaurant**" – shall mean, subject to Section 2.1(d), a restaurant that, at Sub-Licensor's option, is: (i) branded with the MARGARITAVILLE trademark and operated in accordance with the system and concept embodied in the Margaritaville restaurant in Orlando, Florida; or (ii) branded with another trademark and system controlled by Licensor and consistent with the general look and feel and theme of the Margaritaville Intellectual Property

(gg)    "**Project**" – shall have the meaning set forth in the Recitals;

Trademark Sub-License Agreement

(hh)   **"Required Approvals"** – shall have the meaning set forth in Section 8.1;

(ii)   **"Retail Store"** – shall mean a retail store branded with the MARGARITAVILLE trademark or another trademark controlled by Licensor from which is sold retail merchandise bearing the brands included within the Margaritaville Intellectual Property;

(jj)   **"Secondary Restaurants"** shall mean the restaurants identified in Sections 2.1(f)(v)[B]-[D];

(kk)   **"Senior Management"** – shall have the meaning set forth in Section 14.1(b)(i);

(ll)   **"Sub-License Fee"** – shall have the meaning set forth in Section 5.1;

(mm)   **"Sub-Licensed Marks"** – shall mean, subject to the terms of this Agreement, including without limitation Article 3, and subject to the agreements referred to in the summaries contained in Schedule 2, the registered and unregistered trademarks, if any, and service marks, including logos, designs, emblems, stylized lettering and other indicia of source, and all applications for registration therefor, which are listed in Schedule 1 attached hereto, in the classes and fields of use as set forth in Schedule 1 (as such Schedule 1 may be modified from time to time under this Agreement);

(nn)   **"Sub-Licensed Trade Dress"** – shall mean, subject to the terms of this Agreement, including without limitation Article 3, and subject to the agreements referred to in the summaries contained in Schedule 2, the combination of elements of physical appearance (other than the Sub-Licensed Marks) which, taken together, identify the Project as a "Margaritaville"-branded property, which combination of elements would give rise to a reasonable likelihood of confusion by the public as to whether the property is sub-licensed by, affiliated with, or operated by, Sub-Licensor or any of its Affiliates, including, without limitation, the following words and images taken in their totality:

(i)   words or phrases that include lyrics in songs Jimmy Buffett has written or performed in the past, present or future;

(ii)   words that are evocative of Jimmy Buffett, Licensor, Sub-Licensor or any of their Affiliates, including, without limitation, "cheeseburger," "fins," "jolly," "latitude," "longitude," "paradise," "parrot," "shark," "telegraph" and "wasted away"; and

(iii)   images, in any form and media, that are evocative of Jimmy Buffett, Licensor, Sub-Licensor or any of their Affiliates, including, without limitation, blenders, cheeseburgers, fins, flip-flops, hammocks,

latitude/longitude maps, salt shakers, tequila bottles, margarita glasses, manatees, parrots, parakeets and seaplanes;

(oo)   **"Sub-Licensee"** – shall have the meaning set forth in the Preamble;

(pp)   **"Sub-Licensee Artwork"** – shall have the meaning set forth in Section 4.1(e);

(qq)   **"Sub-Licensee Indemnified Parties"** – shall have the meaning set forth in Section 12.2;

(rr)   **"Sub-Licensee Unsuitability Event"** – shall mean an Unsuitability Event as applied to Sub-Licensee;

(ss)   **"Sub-Licensor"** – shall have the meaning set forth in the Preamble;

(tt)   **"Sub-Licensor Indemnified Parties"** – shall have the meaning set forth in Section 12.1;

(uu)   **"Sub-Licensor Unsuitability Event"** – shall mean an Unsuitability Event as applied to Sub-Licensor;

(vv)   **"Term"** – shall have the meaning set forth in Section 10.1(a);

(ww)   **"Trademark Usage Guidelines"** – shall have the meaning set forth in Section 3.1;

(xx)   **"Unsuitability Event"** – shall mean a final determination by the LGCB, after the expiration of any applicable cure periods, that a Party is unsuitable under Louisiana laws to hold a gaming license or be associated with a gaming enterprise.

## ARTICLE 2
## GRANT OF LICENSE

**2.1    GRANT.**

Subject the terms of this Agreement, including without limitation, Section 2.1(e), Section 2.2 and the agreements referred to in Schedule 2, Sub-Licensor hereby grants to Sub-Licensee the right and sub-license during the Term and, to the extent permitted under Section 10.4, following the Term, to use the Margaritaville Intellectual Property:

(a)   at, and in connection with, developing, constructing, and operating the Casino, including without limitation, in table games, slot machines and decor; and

Trademark Sub-License Agreement

- 7 -

(b)     at, and in connection with, developing, constructing, and operating the Hotel, including without limitation, in an enclosed showroom, meeting rooms, fitness center, gift shop and other customary hotel amenities; and

(c)     at, and in connection with, developing and constructing the Retail Store, to be operated by Sub-Licensor, if it so elects, or if not, by Sub-Licensee; and

(d)     at, and in connection with, developing and constructing the Primary Restaurant, to be operated by Sub-Licensor, if it so elects, or if not, by Sub-Licensee; and

(e)     for the purpose of marketing and promoting the Project during the Term, including the right to develop and operate one or more Internet Sites using the word "Margaritaville" in its domain name, in each case in accordance with the terms and conditions of this Agreement.

(f)     The Parties acknowledge that protecting the Margaritaville Intellectual Property is very important and the rights granted under this Agreement are therefore granted based upon the Parties' mutual understanding that:

(i)     the Casino shall contain approximately 1,500 gaming positions;

(ii)    the Hotel shall contain 400 rooms with suites;

(iii)   the Project shall include an enclosed showroom to accommodate approximately 1,000 seats;

(iv)    the Project shall include approximately 1,500 surface parking spaces;

(v)     the Project shall include at least four restaurants, specifically:

[A]     a Primary Restaurant with 300-350 seats;

[B]     a buffet with 250-300 seats;

[C]     a seafood/steak restaurant with 80-100 seats; and

[D]     a coffee/dessert bar with 20-35 seats;

(vi)    The Project shall contain additional amenities such as a gift shop, fitness center, meeting rooms, and other amenities consistent with industry standards in similar markets; and

(vii)   The Project shall be located in Bossier City, Louisiana, adjacent to the existing Bass Pro Shop facility.

Trademark Sub-License Agreement

- 8 -

## 2.2   CONTINGENCIES.

All rights granted by Sub-Licensor to Sub-Licensee under this Agreement are subject to the following conditions precedent:

(a)   <u>Financing</u>.  Sub-Licensee agrees that the estimated Project cost shall be $175 Million.  Sub-Licensee shall be responsible for raising all equity and debt, including the amount required to commence construction of the Project by March 30, 2012.  Sub-Licensor shall not be required to contribute equity or debt or assist in raising any equity or debt for the Project.

(b)   <u>Construction and Opening</u>.  Sub-Licensee agrees to: (i) commence construction of the Project by March 30, 2012; and (ii) open the Project by June 30, 2013.  Notwithstanding the foregoing, it shall not be a breach of this Agreement if Sub-Licensee's failure to commence construction or open the Project by the dates provided is caused by Sub-Licensor, Licensor, their Affiliates, or a Force Majeure Event.

(c)   <u>Required Approvals</u>.  Sub-Licensee shall obtain the Required Approvals by March 30, 2012.

If any of the above conditions precedent does not occur within the specified time frame, then Sub-Licensor at its sole option may terminate this Agreement immediately upon notice to Sub-Licensee. If terminated by Sub-Licensor pursuant to the foregoing, this Agreement shall be null and void and neither Sub-Licensor nor Sub-Licensee shall have any claims against each other under the terms of this Agreement.

## 2.3   EXCLUSIVITY.

(a)   Provided this Agreement has not been terminated and subject to Section 2.3(b), for ten (10) years after the Opening Date, neither Sub-Licensor nor any of its Affiliates shall, without Sub-Licensee's consent (which may be withheld in its sole and absolute discretion):

(i)   license the Margaritaville Intellectual Property to any other Person, for the purpose of owning or operating a casino or gaming-related operation within two hundred (200) miles of the Project, including the Dallas-Fort Worth Metropolitan Area; or

(ii)   directly or indirectly, own or operate any other casino or gaming-related operation within two hundred (200) miles of the Project, including the Dallas-Fort Worth Metropolitan Area.

(b)   The restrictions in Section 2.3(a) shall not apply to:

Trademark Sub-License Agreement

*ATL 18,212,122v2 8-12-11*

(i)     restaurants and retail stores featuring the Margaritaville Intellectual Property that are not connected to or affiliated with a casino or gaming-related operation;

(ii)    hotels featuring the Margaritaville Intellectual Property that are not connected to or affiliated with a casino or gaming-related operation;

(iii)   the restaurant concept commonly known as "Cheeseburger in Paradise"; or

(iv)    use of the Margaritaville Intellectual Property on slot machines in either non-"Margaritaville"-branded casinos or non-"Margaritaville"-branded gaming-related operations.

**2.4    NEW USES.**

(a)     Notwithstanding anything to the contrary set forth above, Sub-Licensee shall not be permitted to use the Margaritaville Intellectual Property for any purpose that Sub-Licensor has not previously utilized the Margaritaville Intellectual Property, except for those activities expressly permitted hereunder (*e.g.*, gaming), unless the purpose is one which is customary in the gaming business or consistent with activities conducted at other Sub-Licensor-branded properties elsewhere in the United States.

(b)     If Sub-Licensee seeks to utilize the rights generally set forth in Section 2.1 for a new use under Section 2.4(a), then Sub-Licensor shall not object, unless it is commercially reasonable to do so. If, acting in a commercially reasonable manner, Sub-Licensor objects to such use and the Parties cannot agree on whether the proposed use would violate Section 2.4(a), then they shall submit the matter for dispute resolution in accordance with Article 14 hereof.

## ARTICLE 3
## USE OF SUB-LICENSED MARKS AND PROJECT PROMOTION

**3.1    PLAN OF USE AND MARKETING LIBRARY.**

(a)     Sub-Licensee and its Affiliates shall advertise or cause to be advertised and market or cause to be marketed in a commercially reasonable manner, at Sub-Licensee's sole cost and expense, the Project and related services in compliance with Applicable Law.

(b)     Sub-Licensor shall provide Sub-Licensee with written guidelines that both describe and illustrate the ways in which Margaritaville Intellectual Property and the Buffett Music Material may be used in connection with the Project (the "**Trademark Usage Guidelines**"). Those aspects of the Trademark Usage Guidelines which are

Trademark Sub-License Agreement

*ATL 18,212,122v2 8-12-11*

relevant to the design phase of the Project shall be provided not later than sixty (60) days after the Effective Date of this Agreement. Other aspects of the Trademark Usage Guidelines, such as uses in printed items and promotional materials, merchandise and on the Internet, shall be provided no later than nine (9) months after the Effective Date of this Agreement.

(c) At least 120 days prior to the Opening Date, Sub-Licensee shall prepare and provide to Sub-Licensor:

> (i) a plan which describes the manner in which Sub-Licensee proposes to use the Margaritaville Intellectual Property connected with the Project and Marketing Materials and the general strategy to be used to promote the Project; and

> (ii) sample illustrations of how Margaritaville Intellectual Property will be incorporated into or on Marketing Materials.

(d) Sub-Licensor shall have five (5) business days after receipt thereof to review and in good faith object to the proposed uses of Margaritaville Intellectual Property and sample illustrations that differ in any material respect from the Trademark Usage Guidelines. All such proposed uses and sample illustrations to which Sub-Licensor does not, within five (5) business days after receipt thereof, object shall become part of what is referred to as the "**Approved Plan of Use**" and "**Marketing Library**," respectively.

(e) In order to object to any proposed use or sample illustration, Sub-Licensor shall deliver to Sub-Licensee a written notification setting forth the specific objection, reasons for the objection, and way in which the proposed use or sample illustration could be modified to address such objection.

(f) For the avoidance of doubt, Sub-Licensee shall not use the Buffett Publicity Rights (as such term is defined in the Buffett Agreement) without Sub-Licensor's prior written consent and license which it may withhold in its sole and absolute discretion.

(g) All proposed uses and sample illustrations which conform to the Trademark Usage Guidelines or incorporate the modifications described in clause (e) above, shall also become part of the Approved Plan of Use and Marketing Library, respectively.

(h) The Approved Plan of Use and the illustrations described above shall be consistent in general with the quality and methods of operation utilized by Sub-Licensee and its Affiliates in other casinos. In addition, the Plan of Use in the illustrations described above shall be consistent with Section 2.4.

(i)     Sub-Licensee (including its Affiliates) shall not utilize any Marketing Materials using any Margaritaville Intellectual Property, unless they conform in all material respects to the Trademark Usage Guidelines, Approved Plan of Use or Marketing Library without Sub-Licensor's prior written consent. In order to seek such consent, Sub-Licensee shall first provide Sub-Licensor with a description and illustrations, if applicable, of the proposed uses. Sub-Licensor shall have five (5) business days after the receipt thereof to review and comment on the proposed uses. Sub-Licensee will, in good faith, consider the incorporation of changes commercially reasonably requested by Sub-Licensor. Sub-Licensor's failure to comment on such descriptions and illustrations within five (5) business days after receipt thereof shall be understood by Sub-Licensee to mean that Sub-Licensor has no comments with respect thereto and that Sub-Licensee is not obligated to consider any changes to such descriptions or illustrations.

(j)     For clarification, after Sub-Licensor and Sub-Licensee have completed the steps set forth in Sections 3.1(a) through (i), if the Sub-Licensee complies with the Approved Plan of Use and the Trademark Usage Guidelines, nothing in this Section 3.1 shall give Sub-Licensor the right to exert control over Marketing Materials, the Approved Plan of Use or the Marketing Library. Sub-Licensee shall retain commercially reasonable control over the manner in which it elects to use Margaritaville Intellectual Property, subject to this Agreement, including Section 3.1 and Section 6.1.

(k)     Except to the extent that existing contracts, and subsequent contracts, including renewal of them, prevent the Sub-Licensor or its Affiliates from granting rights to depictions of Margaritaville Intellectual Property, such depictions are hereby deemed part of the Marketing Library and therefore do not require independent submission to Sub-Licensor for review and comment, regarding the requirement in Section 3.1(c)(ii), although the remainder of the Section 3.1 must be complied with in order for such depictions to become part of the "Approved Plan of Use" (as opposed to the "Marketing Library").

(l)     If, in any particular instance, the Parties cannot agree as to whether Sub-Licensee's proposed usage of Margaritaville Intellectual Property complies with the terms of this Section 3.1, the Parties shall submit such matter for dispute resolution in accordance with Article 14 hereof.

(m)     Every two (2) years from the Opening Date, representatives of the Parties will meet and review the then current Approved Plan of Use and Marketing Library. Sub-Licensee shall in good faith review and consider any suggestions or recommendations that Sub-Licensor may have regarding any proposed changes to the Approved Plan of Use and Marketing Library or other matters contemplated in this Agreement, to the extent such suggestions are not inconsistent with the terms of this Agreement.

Trademark Sub-License Agreement

- 12 -

**3.2    RIGHT TO INSPECT.**

Upon reasonable notice, and except as limited by Applicable Law, Sub-Licensee shall permit Sub-Licensor or its authorized agents to enter those areas of the Project which are open to the general public and any areas of the Project which are related to preparation of food and beverage, to inspect and review the Project regarding Sub-Licensee's use of the Margaritaville Intellectual Property for the purpose of verifying that Sub-Licensee's use of the Margaritaville Intellectual Property conforms to the provisions of this Agreement, and review books and records necessary for Sub-Licensor to verify it has been paid accurate amounts owed hereunder.

(a)    With commercially reasonable advance notice and during normal business hours, and subject to being accompanied by a representative of Sub-Licensee, Sub-Licensor may inspect those areas of the Project which are not open to the general public for the sole purpose of verifying that Sub-Licensee's use of the Margaritaville Intellectual Property conforms to the provisions of this Agreement.

(b)    Any and all costs and expenses incurred by Sub-Licensor or its agents during such inspections shall be the sole responsibility of Sub-Licensor, unless the review demonstrates that the payments by Sub-Licensee are at least five (5) percent less than the payments should have been.  If that occurs, Sub-Licensee shall pay the commercially reasonable costs of inspection, the amount of the underpayment and interest at ten (10) percent per annum on the amount of the underpayment.

(c)    If the inspection reveals an overpayment, then Sub-Licensor shall pay Sub-Licensee the amount of the overpayment and interest at ten (10) percent per annum on such amount.

## ARTICLE 4
## INTELLECTUAL PROPERTY MATTERS

**4.1    OWNERSHIP OF ARTWORK.**

(a)    The defined term **"Margaritaville Artwork"** shall mean all depictions of the Margaritaville Intellectual Property incorporated in designs, logos, or any other creative rendering in any and all media now known or hereafter invented:

> (i)    which depictions do not include any intellectual property rights of Sub-Licensee or Sub-Licensee's Affiliates or any Sub-Licensee Artwork (as hereafter defined);

> (ii)    which depictions do not include any intellectual property rights of Sub-Licensor or its Affiliates already licensed pursuant to the

agreements summarized in Schedule 2 or licensed in the future, subject to Section 2.4; and

(iii)     which depictions have not been used and are not in the future used by other licensees of Sub-Licensor or its Affiliates for service or products.

(b)     As between Sub-Licensor and Sub-Licensee, the copyright in all Margaritaville Artwork shall be solely and exclusively owned by Sub-Licensor or its Affiliates.

(c)     Subject to pre-existing contracts, including their renewal, which may preclude the sub-licensing of Margaritaville Intellectual Property incorporated into Margaritaville Artwork, Sub-Licensor has sub-licensed Margaritaville Artwork solely for purposes of this Agreement.  If for any reason the Sub-Licensor cannot do so and Jimmy Buffett can do so, Jimmy Buffett has sub-licensed such Margaritaville Artwork to Sub-Licensee.

(d)     Notwithstanding Sub-Licensor's ownership or its Affiliates' ownership of all Margaritaville Artwork, Sub-Licensor agrees and acknowledges that neither Sub-Licensor nor its Affiliates shall in any way use or permit others to use any Margaritaville Artwork, unless such use is not in combination with any intellectual property owned by Sub-Licensee or any of Sub-Licensee's Affiliate, without Sub-Licensee's prior written consent.

(e)     Sub-Licensor further agrees and acknowledges that neither Sub-Licensor nor any Sub-Licensor Affiliate has or, by reason of this Agreement, will acquire, any right in or to any artwork developed by Sub-Licensee that does not include any Margaritaville Intellectual Property ("**Sub-Licensee Artwork**") and as between Sub-Licensor and Sub-Licensee the copyright therein in all Sub-Licensee Artwork shall be solely and exclusively owned by Sub-Licensee, or its Affiliates.

(f)     Sub-Licensee has no right to incorporate any Margaritaville Intellectual Property or Margaritaville Artwork into Sub-Licensee Artwork without Sub-Licensor's prior written consent.  Sub-Licensor has no right to incorporate any trademarks, service marks, logos, trade dress or other indicia of origin belonging to Sub-Licensee or any of Sub-Licensee's Affiliates into Margaritaville Intellectual Property or Margaritaville Artwork without Sub-Licensee's prior written consent.

(g)     To the extent that Sub-Licensor or Sub-Licensee combines Margaritaville Artwork and Sub-Licensee Artwork, then, as between Sub-Licensor and Sub-Licensee, such Margaritaville Artwork shall remain the sole and exclusive property of

Sub-Licensor and such Sub-Licensee Artwork shall remain the sole and exclusive property of Sub-Licensee.

(h)     During the Term and thereafter, Sub-Licensor shall not, anywhere in the world, and shall ensure that Sub-Licensor's Affiliates do not:

      (i)     apply for or obtain any registration for, any copyright, trademark or other intellectual property which would adversely affect the rights regarding or the ownership of the intellectual property by Sub-Licensee, or any of its Affiliates, nor file any document with any governmental authority to take any action which would adversely affect such ownership;

      (ii)     challenge the validity of any trademarks owned by Sub-Licensee, or any of its Affiliates which are already filed or, in the case of intellectual property owned by Sub-Licensee or any of its Affiliates as of the Effective Date, are in the future filed, with the United States Patent and Trademark Office or any foreign trademark office; or

      (iii)     register or attempt to register any such trademark, service mark, trade dress or other intellectual property which is the same as or confusingly similar to any such trademark, service mark, trade dress or other intellectual property owned by Sub-Licensee or any of its Affiliates.

## 4.2     OWNERSHIP OF MARGARITAVILLE INTELLECTUAL PROPERTY.

(a)     Sub-Licensee acknowledges that, as between it, on the one hand, and Sub-Licensor or any other Sub-Licensor Affiliate, on the other hand, Licensor, Sub-Licensor, or such Affiliate is the owner of all rights in the Margaritaville Intellectual Property and the goodwill associated therewith throughout the world.  Sub-Licensee agrees that its use of the Margaritaville Intellectual Property shall inure to the benefit of Sub-Licensor, Licensor, or any such other Sub-Licensor Affiliate as Sub-Licensor may designate.

(b)     During the Term and thereafter, Sub-Licensee shall not, anywhere in the world, and shall ensure that Sub-Licensee's Affiliates do not:

      (i)     apply for or obtain any registration for, any copyright, trademark or other intellectual property which would adversely affect the rights regarding or the ownership of the Margaritaville Intellectual Property by Licensor, Sub-Licensor, or any of their Affiliates, nor

file any document with any governmental authority to take any action which would adversely affect such ownership; or

(ii)   challenge the validity of any trademarks owned by Sub-Licensor, Licensor, or any of their Affiliates which are already filed or, in the case of any intellectual property owned by Licensor or its Affiliates as of the Effective Date, are in the future filed, with the United States Patent and Trademark Office or any foreign trademark office; or

(iii)   register or attempt to register any such trademark, service mark, trade dress or other intellectual property which is the same as or confusingly similar to any such trademark, service mark, trade dress or other intellectual property owned by Sub-Licensor or any of its Affiliates.

## 4.3   REGISTRATION AND MAINTENANCE OF MARGARITAVILLE INTELLECTUAL PROPERTY.

(a)   Sub-Licensor shall obtain at its own cost and in Licensor's or Sub-Licensor's own name or the name of an Affiliate, appropriate copyright and trademark protection for the Margaritaville Intellectual Property throughout the United States.  Sub-Licensee shall cooperate with Sub-Licensor and its Affiliates in protecting the Margaritaville Intellectual Property.  For that purpose, Sub-Licensee will supply to Sub-Licensor from time-to-time and at no charge samples, containers, labels and similar material, and information regarding the goods or services offered under this Agreement, as may be commercially reasonably required.

(b)   Sub-Licensee will execute and deliver to Sub-Licensor, at any time, whether during or after the term of this Agreement and without further consideration, such instruments of transfer and other documents as Sub-Licensor may prepare and commercially reasonably request in order to confirm Sub-Licensor's or such other Sub-Licensor Affiliate's copyright or trademark ownership rights.

(c)   To the extent that Sub-Licensed Marks become registered, Sub-Licensor shall take commercially reasonable steps to maintain any and all such registrations during the Term at its sole cost and expense (except as otherwise provided in this Section 4.3), unless it is not legally feasible to do so.

## 4.4   NOTIFICATION OF LEGAL PROCEEDINGS.

Each Party shall promptly notify the other Party in writing, if such Party learns that any other Person infringes or misappropriates any Margaritaville Intellectual

Property or initiates before any Governmental Authority any proceedings relating to any Margaritaville Intellectual Property which infringement, misappropriation or proceedings would on a commercially reasonable basis be expected to have an adverse effect on either Party's rights or obligations under this Agreement.

**4.5     RIGHT TO DEFEND LEGAL PROCEEDINGS.**

(a)     Sub-Licensor shall have the first opportunity, at its sole cost and expense, to defend against or settle any proceedings before any Governmental Authority initiated by any third parties regarding or relating to the Sub-Licensed Marks or Sub-Licensed Trade Dress as soon as reasonably possible and to initiate, defend and maintain proceedings before the applicable Governmental Authority against third parties as required to protect and defend Sub-Licensor's interest in and to the Sub-Licensed Marks and Sub-Licensed Trade Dress in the relevant jurisdiction.

(b)     Regarding a proceeding to enforce or defend Sub-Licensed Marks or Sub-Licensed Trade Dress, the invalidity, infringement, misappropriation of which could materially, adversely impact the Project, if Sub-Licensor has failed to take commercially reasonable action within a commercially reasonable time of becoming aware of any such infringement, misappropriation or proceeding regarding or relating to the Sub-Licensed Marks or Sub-Licensed Trade Dress, which infringement, misappropriation or proceedings would on a commercially reasonable basis be expected to have a material adverse effect on Sub-Licensee's rights under this Agreement, Sub-Licensee may at Sub-Licensee's sole cost and expense and upon delivery of written notice to Sub-Licensor, initiate and maintain proceedings before the applicable Governmental Authority in its own name and/or the name of Sub-Licensor or any Sub-Licensor Affiliate and join Sub-Licensor and/or any Sub-Licensor Affiliate as a party thereto or participate in the defense and settlement of any proceeding; *provided, however*, that Sub-Licensor shall be entitled to participate in the defense and settlement of such proceeding if it so wishes, at Sub-Licensor's sole cost and expense, and Sub-Licensee shall not settle any proceeding or take any position detrimental to Sub-Licensor without Sub-Licensor's prior written consent not to be unreasonably withheld, based on a commercial reasonableness standard.   Sub-Licensor shall cooperate with and provide requested information to Sub-Licensee in any such proceeding at Sub-Licensee's sole cost and expense.

(c)     Any damage or settlement award received connected with any infringement claim described in this Section 4.5, after reimbursement (*pro rata*) to Sub-Licensor and Sub-Licensee of their respective commercially reasonably incurred attorneys' fees and expenses and other costs of maintaining any such action, shall be divided in proportion to the injury or damage caused by the infringement and incurred by the Sub-Licensor and the Sub-Licensee.

(d)     Any damages and monetary or settlement awards levied against Sub-Licensor shall be paid by and the sole responsibility of Sub-Licensor.

**4.6     EXISTING SECURITY INTEREST.**

Sub-Licensor represents and warrants that the only lien or encumbrance against the Sub-Licensed Marks and Sub-Licensed Trade Dress is that security interest granted to Guggenheim Corporate Funding, LLC ("**Guggenheim**"), pursuant to a security agreement dated as of December 20, 2006 ("**Guggenheim Security Interest**"). Sub-Licensor represents and warrants that, within 30 days of this Agreement, it shall have obtained from Guggenheim and delivered to Sub-Licensee a Non-Disturbance Agreement in the form of **Exhibit C**, which agreement shall become effective concurrent with the effectiveness of this Agreement.

<div align="center">

**ARTICLE 5**
**FEES AND REPORTS**

</div>

**5.1     SUB-LICENSE FEE.**

(a)     Conditioned upon and at all times subject to the terms and conditions of Article 8, in consideration for the rights granted under this Agreement, Sub-Licensee shall pay Sub-Licensor regarding each quarter of the Term following the Opening Date (or prorated portion thereof) a license fee payment (the "**Sub-Licensee Fee**") equal to:

  (i)     three percent (3%) of the Adjusted Gross Sales, on a year-to-date basis, up to and including $100 Million;

  (ii)    four percent (4%) of the Adjusted Gross Sales, on a year-to-date basis, from $100 Million up to and including $200 Million; and

  (iii)   five percent (5%) of Adjusted Gross Sales, on a year-to-date basis, in excess of $200 Million;

*provided that*, in no event shall the Sub-Licensee Fees be less than $5 Million in any particular twelve-month period following the Opening Date.

(b)     The Sub-License Fee shall be due and payable within thirty (30) days following the end of each quarter of the Term following the Opening Date or, if the Term is terminated early in accordance with this Agreement, within sixty (60) days of such termination. Sub-Licensee shall, within thirty (30) days after the end of each twelve-month period of the Term following the Opening Date, deliver to Licensor written or electronic reports of the Adjusted Gross Sales from the Project for the preceding twelve-month period showing the computation of the Sub-License Fee associated therewith.

(c)     In no event shall the Sub-License Fee be subordinated, pledged or in any other way encumbered by or to any of Sub-Licensee's obligations, including but not limited to any repayment obligations regarding debt raised for the Project.

## 5.2     PAYMENT LIMITATIONS

Upon expiration or earlier termination of this Agreement, no Sub-Licensee Fee shall be owed except all amounts due and payable under this Agreement at the time of expiration or earlier termination, unless prohibited under Applicable Law. If Applicable Law prohibits Sub-Licensee from paying Sub-Licensor the Sub-Licensee Fee, then after expiration of all available cure periods, if Sub-Licensee elects not to terminate the Term, Sub-Licensor may do so.

## ARTICLE 6
## STANDARDS OF QUALITY AND OPERATION

### 6.1     SUB-LICENSEE'S OBLIGATIONS RELATING TO QUALITY AND OPERATION.

Throughout the Term, Sub-Licensee shall furnish, maintain and equip the Project, and operate the Hotel, Casino and Secondary Restaurants in a manner that does not and will not be expected, on a commercially reasonable basis, to have a material adverse effect on the value, integrity or goodwill of the Margaritaville Intellectual Property.

### 6.2     SUB-LICENSOR'S OBLIGATIONS RELATING TO QUALITY AND OPERATION.

Throughout the Term, Sub-Licensor shall maintain the high standard of quality associated with the "Margaritaville" brand and all elements of the Margaritaville Intellectual Property.  Without limiting Sub-Licensee's termination rights under Article 10 below, Sub-Licensee may terminate the Term of this Agreement if Sub-Licensor or any Affiliate of Sub-Licensor takes any action, or if any event or circumstances occur which would, on a commercially reasonable basis:

(a)     cause its association with any of the Margaritaville Intellectual Property to reflect in a materially adverse manner on Sub-Licensee or any Affiliate of Sub-Licensee;

(b)     constitute or result in a significant change in the types of goods or services with which the Margaritaville Intellectual Property is associated if such a change materially adversely affects the Project; or

(c)     constitute or result in a significant change in the image projected by the Margaritaville Intellectual Property or audience to which the Margaritaville Intellectual Property is primarily directed if such a change materially adversely affects the Project.

Trademark Sub-License Agreement

ATL 18,212,122v2 8-12-11

## ARTICLE 7
## OPERATIONS AND CONSULTATION

**7.1     EXECUTIVE COMMITTEE.**

(a)     During the Term, an Executive Committee shall review the quality of the architectural and interior design of the Project, and after opening, on a continuous basis, the quality of the operation of the Project to assure that Sub-Licensee's operations remain, at all times, consistent with the quality standards applicable to Margaritaville's comparable operations.

(b)     The Executive Committee shall be comprised of three members, two of whom shall be designated by Sub-Licensee in its sole discretion, and one of whom shall be designated by Sub-Licensor in its sole discretion.

(c)     Those matters that are material to assuring that the architectural styles and interior finishes of the Project, and after completion, the operation of the Project is at all times consistent with the standards applicable to Margaritaville's comparable operations and the terms and conditions of this Agreement shall require the unanimous approval of the Executive Committee.  Examples of such matters include, but are not be limited to, the following:

　　　(i)     The architectural and interior design elements of the Project and each component thereof;

　　　(ii)     plans and specifications for the Project and each component thereof;

　　　(iii)     review of the performance of the General Manager and the Food and Beverage Director;

　　　(iv)     significant marketing efforts for the Project and each component thereof; and

　　　(v)     supervising the development and implementation of the brand strategy by the General Manager.

This right shall be effected through monthly meetings of the Executive Committee and the General Manager during the first year. Thereafter, it shall be effected when meetings are called by either Party, which meetings the other Party will use commercially reasonable efforts to attend.

(d)     If the Executive Committee cannot agree unanimously on a particular matter, or whether a particular matter is material, the matter shall be submitted for dispute resolution according to Section 14 of this Agreement.

Trademark Sub-License Agreement

ATL 18,212,122v2 8-12-11

(e)     Neither Sub-Licensee nor Sub-Licensor may unilaterally terminate the General Manager or any department head, except that Sub-Licensor shall have the right to require that Sub-Licensee terminate the initial and any subsequent General Manager or Director of Food and Beverage Operations, for their repeated and uncured failure to meet certain criteria as set forth in **Exhibit D.**

(f)     For clarification, Sub-Licensee alone shall have sole responsibility for the day-to-day employment, compensation, direction and supervision of the General Manager, other managers and department heads and employees of the Project, and the overall day-to-day business activities, including the casino operation of the Sub-Licensee.

## 7.2     UTILIZATION OF OPERATING MANUALS.

(a)     Sub-Licensor and Sub-Licensee agree it would be mutually beneficial to mutually adopt and subsequently revise on an annual basis, to the extent necessary, operating manuals for the component parts of the Project.

(b)     The existing operational manuals used by Affiliates of Sub-Licensor shall be used, and updated annually, for the Retail Store and Primary Restaurant, unless the Primary Restaurant uses a trademark that is not controlled by Licensor.

(c)     The operating manuals for the Casino, Hotel and Secondary Restaurants shall be prepared by Sub-Licensee, in consultation with the Sub-Licensor, subject to Applicable Laws.

## 7.3     DESIGN AND ARCHITECTURE OF THE PROJECT

(a)     In the interest of maintaining a clear and continuing interpretation of the final design of the Project, Sub-Licensee will hire, for a commercially reasonable fee, the McBride Company (or in the event that McBride Company is unable to act, another service provider of like quality designated by Sub-Licensor) to act as the lead designer of the Project.  As lead designer, the McBride Company (or Sub-Licensor's designated substitute service provider, as applicable) shall design or approve the design of all aspects of the Project, including without limitation, the exterior and interior components.  The Project's design shall also conform at all times in all material respects to Sub-Licensor's commercially reasonable standards and be subject to Sub-Licensor's commercially reasonable approval.

(b)     Designs created by the McBride Company, or the designated substitute as applicable, for use connected with the Project shall be owned by Sub-Licensee.  For purposes of this paragraph, "Designs" shall mean and include all interior decorative designs, exterior landscape and structural architecture designs, and any other artistic design which is ultimately fixed in a tangible medium and used in connection with

Trademark Sub-License Agreement

*ATL 18,212,122v2 8-12-11*

development of, or implemented in, the Project. Notwithstanding anything to the contrary, Sub-Licensee agrees that Sub-Licensor shall own any design elements that incorporate the Margaritaville Intellectual Property and any designs created specifically for the Primary Restaurant and Retail Store, with the proviso that designs created specifically for the Primary Restaurant and/or Retail Store which do not incorporate the Margaritaville Intellectual Property, and all designs which are material to the structural or functional integrity of any building, swimming pool or other sport or recreational facility, casino floor, parking facility or landscape element which is included in the Project, shall be and are hereby perpetually, non-exclusively licensed to Sub-Licensee in perpetuity and on a full-paid up basis, but only for use in the Project which is the subject of this Agreement.

(c)     Regardless of ownership, upon the expiration or earlier termination of this Agreement, Sub-Licensee shall modify the design and/or structure of the Project to remove all elements consisting of or referring to:

    (i)     the Concept;

    (ii)     Jimmy Buffett;

    (iii)     the Margaritaville Intellectual Property; and

    (iv)     any Jimmy Buffett-related icons or designs associated with Jimmy Buffett.

Sub-Licensor and/or Licensor shall in their sole discretion make the final determination regarding what elements require modification as noted above, provided that, in all instances, such determination shall be made in a commercially reasonable manner.

(d)     If any designs which are to be owned or controlled by Sub-Licensor according to Section 7.3(b) above are created in connection with the Project other than by the McBride Company or its substitute designated by Sub-Licensor as applicable, the result shall be the same as if the McBride Company had created the design. Therefore, if any designs are created by any person or entity controlled by the Sub-Licensee, then the Sub-Licensee shall obtain assignment agreements from such persons or entities that transfer ownership of any copyrights or any other intellectual property rights in the design to the Sub-Licensor, if the Sub-Licensor owns or controls that intellectual property. Sub-Licensor shall execute the agreements within ten (10) days of Sub-Licensor's receipt of the agreement(s), or as soon as is reasonably possible following receipt of the agreements by Sub-Licensor. For avoidance of doubt, no designs shall be used in connection with the Project, or anything relating to the Project, without the express prior written approval of Sub-Licensor, which shall not be unreasonably withheld.

(e)     Sub-Licensee shall bear all costs and expenses associated with the design of the Project, including any and all fees to the McBride Company, or the Sub-Licensor designated substitute therefore, as applicable. Sub-Licensee shall pay such fees directly to the McBride Company or the Sub-Licensor designated substitute therefore, as applicable.

(f)     Sub-Licensee and Sub-Licensor shall agree on the design, architecture, construction and fit-out of the interiors of the Project. All architects, engineers and contractors hired by Sub-Licensee for the purposes relating to the construction and development of the Project shall be paid directly by Sub-Licensee. The Sub-Licensee's actual expenditure for the design, architecture, construction and fit-out of the interiors of the Project will be the amount required to build the Project in conformance with the Project design and specification reasonably provided and approved by the McBride Company, or the Sub-Licensor designated substitute therefore, as applicable.

## 7.4     MARKETING OF THE PROJECT

(a)     Sub-Licensor shall provide Sub-Licensee with commercially reasonable access to Sub-Licensor's customer database at no cost to Sub-Licensee. Sub-Licensee may use the information obtained from Sub-Licensor's customer database solely connected with advertising and marketing the Project in accordance with Applicable Law. Sub-Licensee shall maintain the confidentiality of Sub-Licensor's database according to Section 13 of this Agreement.

(b)     The Parties agree to cooperate on joint marketing efforts to improve the sales of the Project and the image of both Parties.

## 7.5     MANAGEMENT AGREEMENTS

(a)     If Sub-Licensor elects to operate the Primary Restaurant and/or the Retail Store, Sub-Licensor and Sub-Licensee shall negotiate in good faith and enter into one or more separate management agreements governing such operations. But, in all instances such agreement(s) shall provide that: (i) the manager(s) of the Primary Restaurant and/or Retail Store shall report directly to the General Manager of the Project; (ii) all expenses associated therewith and revenues derived therefrom shall be the obligation and property of Sub-Licensee exclusively; and (iii) Sub-Licensor shall not incur a loss, or obtain a profit, as a result of its operating such Primary Restaurant and/or Retail Store.

(b)     If there is a dispute regarding the negotiation of or the enforcement of the terms of any proposed or fully-executed management agreement referred to in Section 7.5(a), the dispute shall be arbitrated pursuant to the applicable provisions of this Agreement.

## ARTICLE 8
## REGULATORY REQUIREMENTS

### 8.1 REQUIRED APPROVALS

(a)     At their respective sole cost and expense, Sub-Licensor and Sub-Licensee shall each use commercially reasonable efforts consistent with efforts generally required for an applicant to obtain a gaming license, alcohol beverage license and similar licenses in Louisiana to obtain the appropriate, required gaming licensure with the LGCB and any other applicable licensing authority (collectively, the "**Required Approvals**") as quickly as commercially reasonable after the Effective Date. Without limiting the foregoing, Sub-Licensor and Sub-Licensee shall at all times (unless and until the LGCB denies the Required Approvals), demonstrably, clearly and actively pursue the Required Approvals.

(b)     It is agreed and acknowledged by and between the Parties that:

(i)      Sub-Licensee's receipt of the Required Approvals by March 30, 2012 shall be and is a condition precedent for this Agreement pursuant to Section 2.2;

(ii)     Sub-Licensor's receipt of the Required Approvals shall be and is a condition that must be met before Sub-Licensee can comply with any portion of this Agreement for which such Required Approvals are a condition precedent under Applicable Law; and

(iii)    a final determination by the LGCB, after the expiration of any applicable cure periods, not to issue the Required Approvals, will be deemed an Unsuitability Event.

(c)     Each Party shall give the other Party prompt notice of any LGCB communication or other information such Party or its Affiliates receives that could commercially reasonably be interpreted to cast doubt on whether the Required Approvals will be received by such Party.

### 8.2 APPROVAL OF AGREEMENT.

This Agreement shall be executed subject to all required approvals and authorizations, if any, by all applicable Governmental Authorities.  The Parties shall cooperate in all such undertakings or dealings with Governmental Authorities, and each Party shall provide commercially reasonable notice to the other Party prior to all meetings with any Government Authority for such purpose.  If any Gaming Authority requires approval of this Agreement or its terms, it is agreed and acknowledged by and between the Parties that such approval shall be obtained prior to the performance of any part of this Agreement for which such approval is required.

# ARTICLE 9
# REPRESENTATIONS AND WARRANTIES

## 9.1   REPRESENTATIONS AND WARRANTIES OF SUB-LICENSOR.

Sub-Licensor represents and warrants to Sub-Licensee as follows and acknowledges that Sub-Licensee is relying on such representations and warranties in entering into this Agreement:

(a)   <u>Organization and Authority</u>.   Sub-Licensor is a limited liability company validly existing under the laws of the State of Delaware and has the power to own, sub-license or lease its property (including, as of the date hereof, the Margaritaville Intellectual Property listed on Schedule 1), to carry on its business as now being conducted by it, to enter into this Agreement and to perform its obligations hereunder;

(b)   <u>Authorization</u>.   This Agreement has been duly authorized, executed and delivered by Sub-Licensor and is a legal, valid and binding obligation of Sub-Licensor, enforceable against Sub-Licensor by Sub-Licensee in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency and similar laws affecting the rights of creditors generally and except that equitable remedies may be granted only in the discretion of a court of competent jurisdiction;

(c)   <u>No Conflict</u>.   The execution, delivery and performance of this Agreement by Sub-Licensor shall not, directly or indirectly (with or without notice or lapse of time):

 (i) contravene, conflict with or result in a violation of (A) any provision of the charter or bylaws of Sub-Licensor or any Affiliate of Sub-Licensor, (B) any resolution or other action adopted or taken by the board of directors, managing members, members, owners, partners or the shareholders of Sub-Licensor or any Affiliate of Sub-Licensor, or (C) any Applicable Law applicable to Sub-Licensor or any Affiliate of Sub-Licensor;

 (ii) contravene, conflict with or result in a violation of, or give any Governmental Authority or other Person the right to challenge any of the transactions contemplated by this Agreement, or to exercise any remedy or obtain any relief under, any Applicable Law;

 (iii) contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify, any permit that is held by Sub-Licensor or any Affiliate of Sub-Licensor or that otherwise relates to the Project; or

(iv) contravene, conflict with or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any contract to which Sub-Licensor or any Affiliate or Sub-Licensor is a party or by which it or any of the Margaritaville Intellectual Property is bound.

(d)   Rights to Sub-Licensed Marks.  Sub-Licensor represents that, as of the date hereof, subject to the terms of this Agreement, including without limitation the Guggenheim Security Interest and the matters described in Schedule 2, the use of an allowed and/or registered Sub-Licensed Mark by Sub-Licensee pursuant to this Agreement does not infringe or otherwise violate a third party's intellectual property rights in the class of goods or services for which it is registered.  For purposes of this Subsection, "allowed for registration" means approved by the United States Patent and Trademark Office and past any opposition period without being opposed.

## 9.2   REPRESENTATIONS AND WARRANTIES OF SUB-LICENSEE.

Sub-Licensee represents and warrants to Sub-Licensor as follows and acknowledges that Sub-Licensor is relying on such representations and warranties in entering into this Agreement:

(a)   Organization and Authority.  Sub-Licensee is a limited liability company validly existing under the laws of the State of Louisiana and has the corporate power to own, sub-license, operate or lease its property (including the Project), to carry on its business as now being conducted by it, to enter into this Agreement and to perform its obligations hereunder.

(b)   Authorization.  This Agreement has been duly authorized, executed and delivered by Sub-Licensee and is a legal, valid and binding obligation of Sub-Licensee, enforceable against Sub-Licensee by Sub-Licensor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency and similar laws affecting the rights of creditors generally and except that equitable remedies may be granted only in the discretion of a court of competent jurisdiction.

(c)   No Conflict.  The execution, delivery and performance of this Agreement by Sub-Licensee shall not, directly or indirectly (with or without notice or lapse of time):

(i) contravene, conflict with or result in a violation of (A) any provision of the charter or bylaws of Sub-Licensee or any Affiliate of Sub-Licensee, (B) any resolution or other action adopted or taken by the board of directors, managing members, members, owners, partners or the shareholders of Sub-Licensee or any Affiliate of

Sub-Licensee, or (C) any Applicable Law applicable to Sub-Licensee or any Affiliate of Sub-Licensee;

(ii)    contravene, conflict with or result in a violation of, or give any Governmental Authority or other Person the right to challenge any of the transactions contemplated by this Agreement, or to exercise any remedy or obtain any relief under, any Applicable Law;

(iii)    contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify, any permit that is held by Sub-Licensee or any Affiliate of Sub-Licensee or that otherwise relates to the Project; or

(iv)    contravene, conflict with or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any contract to which Sub-Licensee or any Affiliate or Sub-Licensee is a party or by which it is bound.

## ARTICLE 10
## TERM, RENEWAL AND TERMINATION

**10.1 TERM; RENEWAL.**

(a)    The term of this Agreement shall begin on the date hereof and, unless terminated earlier in accordance with this Agreement or extended as hereafter provided, end on the fortieth (40th) anniversary of the Effective Date ("**Term**"). At the option of Sub-Licensee, the Term may be extended once for an additional twenty (20) years commencing on the fortieth (40th ) anniversary of the Effective Date, upon written notice from Sub-Licensee to Sub-Licensor given at a time that this Agreement remains in effect and given at least ninety (90) days prior to the fortieth (40th) anniversary of the Effective Date.

(b)    Following the Term, Sub-Licensee shall have no further rights to use the Margaritaville Intellectual Property except as set forth in Section 10.4.

**10.2 EVENTS OF DEFAULT.**

(a)    Subject to Section 10.3, Sub-Licensor may (but shall not be obligated to) terminate the Term upon prior written notice to Sub-Licensee, upon the occurrence of any of the following (all of which shall constitute an Event of Default by Sub-Licensee under this Agreement):

Trademark Sub-License Agreement

(i)     any material representation or warranty made by Sub-Licensee in the Agreement proves to have been incorrect in any material respect when made and such incorrectness would on a commercially reasonable basis be expected to have a material adverse effect on Sub-Licensor or Sub-Licensor's Affiliates or the Margaritaville Intellectual Property;

(ii)    Sub-Licensee breaches or fails to perform or observe any material covenant, duty or obligation contained in this Agreement in any material respect and any such failure which, if curable, remains uncured for thirty (30) days after Sub-Licensee receives notice of such failure from Sub-Licensor, *provided, however*, that if Sub-Licensee has commenced to diligently and expeditiously cure such failure within such thirty (30)-day period, such initial thirty (30)-day period shall be extended for a period of time as is reasonable under the circumstances as long as Sub-Licensee is diligently and expeditiously pursuing a cure;

(iii)   Sub-Licensee fails to make any payment when due and owed and any such failure remains uncured for thirty (30) days after Sub-Licensee receives written notice of such failure from Sub-Licensor;

(iv)    Sub-Licensee admits its insolvency or makes a general assignment for the benefit of creditors or any proceeding is instituted by Sub-Licensee seeking relief or giving notice of its intention to seek relief on its behalf as debtor, or to adjudicate it bankrupt or insolvent, or seeking liquidation, winding-up, re-organization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or re-organization or relief of debtors, or seeking appointment of a receiver, receiver and manager, trustee, custodian or other similar official for it or any substantial part of its property and assets or Sub-Licensee takes any corporate action to authorize any of the foregoing;

(v)     any proceeding is instituted against Sub-Licensee seeking to have an order for relief entered against it as a debtor or to adjudicate it bankrupt or insolvent or seeking liquidation, winding-up, re-organization, arrangement, adjustment or composition of it or its debts under any law relating to a bankruptcy, insolvency or re-organization or relief of debtors, or seeking appointment of a receiver, receiver and manager, trustee, custodian or similar official for it or any substantial part of its property and assets and such

proceedings are not or are no longer being contested in good faith by appropriate proceedings but in no event longer than forty-five (45) days from the institution of such first-mentioned proceedings; or

(vi)   a Sub-Licensee Unsuitability Event.

(b)   Subject to Section 10.3, Sub-Licensee may (but shall not be obligated to) terminate the Term, upon prior written notice to Sub-Licensor upon the occurrence of any of the following (all of which shall constitute an Event of Default by Sub-Licensor under this Agreement):

(i)   any material representation or warranty made by Sub-Licensor in the Agreement proves to have been incorrect in any material respect when made and the incorrectness would on a commercially reasonable basis be expected to have a material adverse effect on Sub-Licensee, Sub-Licensee's Affiliates or the Project;

(ii)   Sub-Licensor breaches or fails to perform or observe any material covenant, duty or obligation contained in this Agreement in any material respect and any such failure which, if curable, remains uncured for thirty (30) days after Sub-Licensor receives notice of such failure from Sub-Licensee, *provided, however,* that if Sub-Licensor has commenced to diligently and expeditiously cure such failure within such thirty (30)-day period then such initial thirty (30)-day period shall be extended for a period of time as is commercially reasonable under the circumstances as long as Sub-Licensor is diligently and expeditiously pursuing a cure;

(iii)   Sub-Licensor admits its insolvency or makes a general assignment for the benefit of creditors or any proceeding is instituted by Sub-Licensor seeking relief or giving notice of its intention to seek relief on its behalf as debtor, or to adjudicate it bankrupt or insolvent, or seeking liquidation, winding-up, re-organization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or re-organization or relief of debtors, or seeking appointment of a receiver, receiver and manager, trustee, custodian or other similar official for it or any substantial part of its property and assets or Sub-Licensor takes any corporate action to authorize any of the foregoing;

(iv)   any proceeding is instituted against Sub-Licensor seeking to have an order for relief entered against it as a debtor or to adjudicate it bankrupt or insolvent or seeking liquidation, winding-up,

Trademark Sub-License Agreement

re-organization, arrangement, adjustment or composition of it or its debts under any law relating to a bankruptcy, insolvency or re-organization or relief of debtors, or seeking appointment of a receiver, receiver and manager, trustee, custodian or similar official for it or any substantial part of its property and assets and such proceedings are not or are no longer being contested in good faith by appropriate proceedings but in no event longer than ninety (90) days from the institution of such first-mentioned proceedings;

(v)     any breach of the Buffett Agreement by Jimmy Buffett in any material respect; or

(vi)    a Sub-Licensor Unsuitability Event.

(c)     The actions or events described in the foregoing clauses (a) and (b) shall each constitute an "**Event of Default**" under this Agreement.

(d)     SUB-LICENSOR ACKNOWLEDGES AND AGREES THAT SUB-LICENSEE HAS MADE NO REPRESENTATIONS AND WARRANTIES REGARDING THE FINANCIAL PERFORMANCE OR INCOME PROJECTIONS OF THE PROJECT SEPARATE AND APART FROM ITS OBLIGATIONS UNDERTAKEN IN SECTION 5.1(a) ABOVE, AND THAT IN NO EVENT SHALL SUB-LICENSEE BE DEEMED IN DEFAULT OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR APPLICABLE LAW SOLELY BY REASON OF: (i) THE FAILURE OF THE FINANCIAL PERFORMANCE OF THE PROJECT TO MEET ANY EXPECTATIONS OR INCOME PROJECTIONS; OR (ii) ANY OTHER ACTS OR OMISSIONS NOT OTHERWISE CONSTITUTING A DEFAULT OF SUB-LICENSEE'S OBLIGATIONS UNDER THIS AGREEMENT.

(e)     SUB-LICENSEE ACKNOWLEDGES AND AGREES THAT SUB-LICENSOR HAS MADE NO REPRESENTATIONS AND WARRANTIES REGARDING THE FINANCIAL PERFORMANCE OR INCOME PROJECTIONS OF THE PRIMARY RESTAURANT AND RETAIL STORE AND THAT IN NO EVENT SHALL SUB-LICENSOR BE DEEMED IN DEFAULT OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR APPLICABLE LAW SOLELY BY REASON OF: (i) THE FAILURE OF THE FINANCIAL PERFORMANCE OF THE PRIMARY RESTAURANT AND RETAIL STORE TO MEET ANY EXPECTATIONS OR INCOME PROJECTIONS; OR (ii) ANY OTHER ACTS OR OMISSIONS NOT OTHERWISE CONSTITUTING A DEFAULT OF SUB-LICENSOR'S OBLIGATIONS UNDER THIS AGREEMENT.

**10.3   TERMINATION UPON AN EVENT OF DEFAULT.**

If any Event of Default shall have occurred, the non-defaulting Party shall have the right to exercise against the defaulting Party any rights and remedies available to the non-defaulting Party under this Agreement at law or in equity, except that Sub-Licensor shall not be liable for the cost of re-branding the Project under another trademark or trade dress; *provided, however*, except connected with each Party's election to terminate connected with an Unsuitability Event, neither Party shall have the right to terminate this Agreement by reason of the occurrence of any Event of Default, unless: (a) an Event of Default is material in amount or in its adverse effect on the operation, ownership, performance or possession of the Project or right to use the Margaritaville Intellectual Property; or (b) the Event of Default constitutes intentional misconduct, reckless behavior or repeated Events of Default of a similar nature by the defaulting Party.

**10.4   SUB-LICENSEE'S   OBLIGATIONS   UPON   TERMINATION   OR EXPIRATION.**

At the end of Term of this Agreement for any reason, the Sub-Licensee shall have the obligation to, as soon as it is commercially reasonable to do so thereafter, stop holding the Project out to the public as a "Margaritaville" establishment or as operated or sub-licensed by Sub-Licensor and commence such de-branding actions as are required to preclude a reasonable likelihood of confusion on the part of the public as to whether the Project is a "Margaritaville" establishment (the "**De-Branding Actions**"), including:

(a)   removing all exterior and interior signage featuring the Margaritaville Intellectual Property;

(b)   changing any staff uniforms to remove all Margaritaville Intellectual Property; and

(c)   discontinuing the use or display of the Margaritaville Intellectual Property, including all usage of the Margaritaville Intellectual Property connected with the advertisement and promotion of the Project and on any Internet Site.

<div align="center">

**ARTICLE 11**
**ASSIGNMENT AND ENCUMBRANCES**

</div>

**11.1   ASSIGNMENT BY SUB-LICENSOR.**

As long as there is no existing, uncured Event of Default by Sub-Licensor under this Agreement and, if applicable, the assignee complies with Article 8:

(a)   Sub-Licensor shall be permitted to assign its rights or delegate its obligations under this Agreement only to:

Trademark Sub-License Agreement

- 31 -

<div></div>

      (i)    any Affiliate or secured lender; or

      (ii)   any Person other than an Affiliate or a secured lender that can otherwise comply alone or in combination with Sub-Licensor and its Affiliates with all requirements as set forth in this Agreement.

    (b)    Notwithstanding Sections 11.1(a)(i) and (ii):

      (i)    such assignee must agree in writing for Sub-Licensee's benefit: [I] to the extent Sub-Licensor and its Affiliates fail to comply with the requirements of this Agreement, to stand in Sub-Licensor's stead and be bound by this Agreement; and [II] not to take any action which is contrary to the rights granted to Sub-Licensee under this Agreement; and

      (ii)   Any assignment by Sub-Licensor to an assignee that results in a Sub-Licensor Unsuitability Event or otherwise not in compliance with this Section 11.1 shall be void and of no force and effect.

    (c)    Sub-Licensor shall not otherwise assign its rights or delegate its obligations under this Agreement without Sub-Licensee's prior written consent, which consent shall not be unreasonably denied.  For the avoidance of doubt, a delegation of obligations under this Agreement by Sub-Licensor shall not release Sub-Licensor regarding any such obligations.

## 11.2   ASSIGNMENT BY SUB-LICENSEE.

    As long as there is no existing, uncured Event of Default by Sub-Licensee under this Agreement and, if applicable, the assignee complies with Article 8, Sub-Licensee shall have the right, without Sub-Licensor's consent, to freely Transfer its rights and obligations under this Agreement, in whole or in part, only to:

    (a)    any Affiliate or secured lender; or

    (b)    any Person that acquires, whether by purchase of stock, assets, merger, consolidation or reorganization, all or any portion of the business and assets of:

      (i)    Sub-Licensee;

      (ii)   any Person owning a direct or indirect ownership interest in Sub-Licensee; or

(iii)     any Affiliate of Sub-Licensee as a going concern, provided that such Person or Persons are not Persons who will result in a Sub-Licensee Unsuitability Event.

## 11.3   ASSIGNMENT AS BREACH.

Any assignment of the rights or obligations of this Agreement by either Party in violation of the terms of this Article 11 shall be void and of no force and effect and shall constitute a material breach of this Agreement.

## ARTICLE 12
## INDEMNIFICATION

## 12.1   INDEMNIFICATION BY SUB-LICENSEE.

Subject to Sections 12.3 and 12.4 hereof, Sub-Licensee shall defend, indemnify, and hold harmless Sub-Licensor and its Affiliates, and their respective owners, members, partners, trustees, beneficiaries, directors, officers, employees and agents, and the successors and assigns of each of the foregoing (collectively, the "**Sub-Licensor Indemnified Parties**") for, from and against any and all Claims, including the commercially reasonable costs of De-Branding Actions if and to the extent arising out of:

(a)     any Event of Default by Sub-Licensee, or a default of Sub-Licensee hereunder that would, with the giving of notice or the passage of time, become an Event of Default by Sub-Licensee (*provided that*, for purposes of this exception under this Section 12.1, Sub-Licensee shall have given any such notice promptly upon having actual knowledge of any such default and if Sub-Licensee fails to give notice upon having actual knowledge Sub-Licensor shall have been prejudiced by such failure);

(b)     any alleged or actual infringement or violation at or connected with marketing of the Project of any intellectual property right, publicity right or proprietary right owned or controlled by any other Person except as otherwise provided in Section 12.2(b);

(c)     any representation or warranty made by Sub-Licensee in this Agreement that proves to be incorrect when made, in any material respect;

(d)     any default or breach by Sub-Licensee of its obligations under or pursuant to this Agreement; or

(e)     Sub-Licensee's negligence or more culpable conduct.

## 12.2    INDEMNIFICATION BY SUB-LICENSOR.

Subject to Sections 12.3 and 12.4 hereof, Sub-Licensor shall defend, indemnify, and hold harmless Sub-Licensee and its Affiliates and their respective shareholders, members, partners, trustees, beneficiaries, directors officers, employees and agents, and the successors and assigns of each of the foregoing (collectively, the "**Sub-Licensee Indemnified Parties**") for, from and against any and all Claims if and to the extent arising out of:

(a)    any Event of Default by Sub-Licensor, or a default of Sub-Licensor hereunder that would, with the giving of notice or the passage of time, become an Event of Default (*provided that*, for purposes of this exception under this Section 12.2, Sub-Licensor shall have given any such notice promptly upon having actual knowledge of any such default and if Sub-Licensor fails to give notice upon having actual knowledge Sub-Licensee shall have been prejudiced by such failure);

(b)    the infringement or alleged infringement of another's trademark as a result of Sub-Licensee's use of the Sub-Licensed Marks according to this Agreement, which are either registered in or allowed for registration in the class of goods or services of the infringement or alleged infringement; for purposes of this Subsection, "allowed for registration" means approved by the applicable government-controlled trademark office and past any opposition period without being opposed;

(c)    any representation or warranty made by Sub-Licensor in this Agreement that proves to be incorrect when made, in any material respect;

(d)    any default or breach by Sub-Licensor of its obligations under or pursuant to this Agreement;

(e)    Sub-Licensor's negligence or more culpable conduct; or

(f)    the breach by Jimmy Buffett of any provision of the Buffett Agreement or failure to grant Sub-Licensee the direct sub-license contemplated thereunder.

## 12.3    INDEMNIFICATION PROCEDURES.

(a)    Any Indemnified Party shall be entitled, upon written notice to the Indemnifying Party, to the timely appointment of counsel by the Indemnifying Party for the defense of any Claim, which counsel shall be subject to the approval of the Indemnified Party.  If, in the Indemnified Party's commercially reasonable judgment, a material conflict of interests exists between the Indemnified Party and the Indemnifying Party at any time during the defense of the Indemnified Party, the Indemnified Party may appoint independent counsel of its choice for the defense of the Indemnified Party as to such Claim.

Trademark Sub-License Agreement

(b)     Regardless of whether the Indemnified Party has appointed counsel or selects independent counsel:

(i)     the Indemnified Party shall have the right to participate in the defense of any Claim and approve any proposed settlement of such Claim (unless such settlement involves only the payment of money, the Indemnifying Party pays all amounts due in connection with or by reason of such settlement and, as part thereof, the Indemnified Party is unconditionally released from all liability regarding such Claim, in which case such approval shall not be required); and

(ii)    all reasonable costs and expenses (including attorneys' fees and costs) of the Indemnified Party shall be paid by the Indemnifying Party.

(c)     If the Indemnifying Party fails to timely pay such costs and expenses (including attorneys' fees and costs), the Indemnified Party shall have the right, but not the obligation, to pay such amounts and be reimbursed by the Indemnifying Party for the same, together with interest thereon until paid in full.  The amounts due under this Section 12.3 shall bear interest at the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank as its prime rate in effect at its principal office in New York City connected with extensions of credit in U.S. funds to its U.S. customers, plus two percent (2%) per annum, calculated and compounded annually.  The Parties hereby acknowledge that it shall not be a defense to a demand for indemnity that fewer than all Claims asserted against the Indemnified Party are subject to indemnification.

(d)     If a Claim is covered by the Indemnifying Party's liability insurance, the Indemnified Party shall not knowingly take or omit to take any action that would cause the insurer not to defend such Claim or to disclaim liability in respect thereof.

**12.4    LIMITATIONS.**

(a)     Subject to and without limiting either Party's right to seek and obtain injunctive relief pursuant to Section 14.1(d), the indemnification rights set forth in Sections 12.1 and 12.2 above shall be each Party's sole and exclusive remedy as to Claims against the other or any Affiliate of the other, arising under or related to this Agreement.

(b)     Limitation on Sub-Licensee's Liability.

(i)     In no event shall Sub-Licensee's indemnification obligation under Section 12.1 exceed the aggregate amount that should have been paid to Sub-Licensor under this Agreement during the preceding two

years, except: [A] connected with Claims by third parties against Sub-Licensor or its Affiliates, but only to the extent such Claims are caused by the Sub-Licensee's negligence or more culpable conduct; and [B] Claims that arise from a breach by Sub-Licensee of any of its representations and warranties under Section 9.2(a), 9.2(b) or 9.2(c) of this Agreement. Sub-Licensee's indemnification obligation regarding Claims described in this Section 12.4(b)(i)[A]-[B] shall be uncapped.

(ii)     For purposes of Section 12.4(a)(i), a breach of Section 9.2(a), 9.2(b) or 9.2(c) that is also a Sub-Licensee Unsuitability Event, absent fraud, will be deemed to be a Sub-Licensee Unsuitability Event only and any Claims based on such breach shall be subject to the limitations on Sub-Licensee's indemnification obligations under Section 12.4(a)(i).

(c)     <u>Limitation on Sub-Licensor's Liability.</u>

(i)     In no event shall Sub-Licensor's indemnification obligation under Section 12.2 exceed the aggregate amounts that should have been paid to Sub-Licensor during the preceding two years, except: [A] connected with Claims by third parties against Sub-Licensee or its Affiliates, but only to the extent that such Claims are caused by the Sub-Licensor's negligence or more culpable conduct; [B] for Claims that arise under Section 4.6; [C] for Claims that arise under 12.2(b) above, or [D] for Claims that arise from a breach by Sub-Licensor of any of its representations and warranties under Section 9.1(a), 9.1(b), 9.1(c), or 9.1(d) of this Agreement. Sub-Licensor's indemnification obligation regarding Claims described in this Section 12.4(c)(i)[A]-[D] shall be uncapped.

(ii)     Sub-Licensee shall be entitled to retain and apply against its indemnification right, all amounts then accrued but not yet paid to Sub-Licensor, and Sub-Licensor shall be obligated to pay any difference.

(d)     NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, IN ANY LAW SUIT, LEGAL ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING FROM OR RELATING TO THIS AGREEMENT, THE PARTIES UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW ALL RIGHTS TO ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE

Trademark Sub-License Agreement

*ATL 18,212,122v2 8-12-11*

DAMAGES (EXCEPT FOR A CLAIM FOR RECOVERY OF ANY SUCH DAMAGES THAT THE CLAIMING PARTY IS REQUIRED BY A COURT OF COMPETENT JURISDICTION OR AN ARBITRATION PANEL TO PAY TO A THIRD PARTY) AND ACKNOWLEDGE AND AGREE THAT THE RIGHTS AND REMEDIES IN THIS AGREEMENT, AND ALL OTHER RIGHTS AND REMEDIES AT LAW AND IN EQUITY, WILL BE ADEQUATE IN ALL CIRCUMSTANCES FOR ANY CLAIMS THE PARTIES MIGHT HAVE WITH RESPECT THERETO.

**12.5 SURVIVAL.** This Article 12 shall survive the expiration or any termination of the Term or of this Agreement.

<div align="center">

**ARTICLE 13**
**CONFIDENTIALITY**

</div>

**13.1 CONFIDENTIAL INFORMATION.**

Connected with the performance of this Agreement, Sub-Licensor and Sub-Licensee shall have access to certain confidential and proprietary information of the other Party, including, but not limited to, business plans, proposed advertising, designs, sales records, financial data and manufacturer's know-how ("**Confidential Information**").

(a)     Recognizing that such Confidential Information represents valuable assets and property of the disclosing Party, and the harm that may befall such Party if any of such information is disclosed, the recipient agrees to hold all such information in strict confidence. The receiving Party of any confidential information shall not disclose or use for its own benefit or any third party's benefit the Confidential Information of the disclosing Party, except with the disclosing Party's prior written consent.

(b)     Confidential Information shall be revealed by a receiving Party to its employees and representatives only to the extent reasonably necessary to enable the receiving Party to exercise the full rights granted hereunder. For the avoidance of doubt, under no circumstances shall Confidential Information be disclosed to the receiving Party's vendors, independent consultants or contractors without first obtaining the prior written consent of the disclosing Party.

(c)     The obligation of confidentiality created herein shall survive the expiration or termination of this Agreement.

(d)     The obligations of confidentiality created herein shall cease to apply to:

(i)     information which falls into the public domain, provided it did not fall into the public domain through the unauthorized acts of the receiving Party;

Trademark Sub-License Agreement

(ii)     information which was in the receiving Party's possession prior to its disclosure, or was later disclosed to the receiving Party by a third party who is lawfully in possession of such;

(iii)    information which is required to be disclosed by law, including subpoena or other legal process, but only to the extent so required and only upon prior written notice to the other Party hereto; and

(iv)    information of Sub-Licensee which Sub-Licensor may be required to disclose in order to enforce its rights under this Agreement.

## ARTICLE 14
## DISPUTE RESOLUTION

**14.1   DISPUTE RESOLUTION.**

(a)      The Parties acknowledge that it is in their collective interests to resolve disputes arising out of the relationship created pursuant to this Agreement through mutual agreement, without the assistance of the arbitration process, whenever reasonably possible.

(b)      The Parties agree that, as a condition precedent to the institution of any arbitration of issues among or between them arising out of this Agreement, the following efforts will be undertaken:

(i)     Disputes that are not promptly resolved by Sub-Licensee's employee charged with responsibility for the day-to-day operation of the business to be operated at the Project and Sub-Licensor, then Sub-Licensor's and/or Licensor's designated representative(s) shall be immediately submitted for review and discussion to Sub-Licensee's president or authorized delegate and Sub-Licensor's or Licensor's representative(s) (as appropriate) having full authorization to make decisions necessary to resolve the dispute (collectively, "**Senior Management**"); and

(ii)    In the event the dispute is not resolved through the efforts of Senior Management within seven (7) days following submission of the issue to Senior Management, either Party may invoke mandatory mediation of the dispute utilizing the services of an independent mediator (the "**Mediator**"). The Mediator shall be selected by mutual agreement of the Parties. The costs of the Mediator shall be shared equally between the Parties to the particular dispute. The mediation shall take place in Wilmington, Delaware. Senior

Management shall personally participate in the mediation proceedings contemplated herein and shall endeavor to achieve a resolution of the dispute through mutual agreement. Senior Management, who shall have full authority to decide on behalf of and bind their respective Party, will allocate at least one full business day of their time for the mediation process on any issue submitted to mediation hereunder.

(c)    If the Parties are not able to appoint a Mediator or, if they have appointed one, fail to reach a mutual agreement based on the steps set forth above, within seven (7) days following the Parties' decision to mediate, any Party may then submit the dispute for binding arbitration to the American Arbitration Association (AAA) office in Wilmington, Delaware. The rules of the AAA shall, except as set forth below, be utilized in resolving the dispute:

(i)    Each Party shall select one independent and impartial arbitrator from Wilmington, Delaware. Within ten (10) days of the date upon which the last of those two (2) arbitrators is selected, the two (2) arbitrators shall select a third arbitrator by mutual agreement;

(ii)   If the third arbitrator cannot be selected in the manner described in Subparagraph (i), above, then each Party shall submit to the AAA in Wilmington, Delaware the name of one (1) additional arbitrator, and AAA, in its sole discretion, shall select one of those two (2) proposed arbitrators as the third arbitrator;

(iii)  The arbitration shall take place in Wilmington, Delaware at a location to be decided by majority vote of the arbitrators;

(iv)   The arbitrators must conduct the arbitration and render their decision or award within sixty (60) calendar days of their selection;

(v)    The arbitration shall be binding and not subject to reversal by any court except for acts of misconduct by an arbitrator, and the arbitrators' decision must be in writing; and

(vi)   Either Party to this Agreement may apply to any court of competent jurisdiction to enforce an arbitration order.

(d)    If the arbitration panel does not have the power or does not decide the dispute, then either Party to this Agreement may apply to any court of competent jurisdiction for equitable relief, after complying with the procedure set forth in Sections 14.1(a)-(c).

Trademark Sub-License Agreement

*ATL 18,212,122v2 8-12-11*

(e)     Any litigation permitted in this Section 14.1 shall occur in Wilmington, Delaware, if jurisdiction and venue requirements for such location can reasonably be met. If jurisdiction and venue requirements can not reasonably be met for Wilmington, Delaware, then litigation shall occur in Orlando, Florida.

<div align="center">

**ARTICLE 15**
**MISCELLANEOUS**

</div>

**15.1   NOTICES.**

Any notice, demand, request, consent, agreement or approval which may be or is required to be given pursuant to this Agreement shall be in writing and shall be sufficiently given or made if delivered by (a) certified mail, expedited delivery or by messenger service, with each of the foregoing providing for a written confirmation of delivery or (b) via facsimile provided the transmission report shows a successful transmission

**Sub-Licensor, addressed to it at:**

Margaritaville of Bossier City, LLC
256 Worth Avenue, Suite Q-R
Palm Beach, FL  33480

Facsimile:  (561) 835-9584
Attention:  Mr. John Cohlan

And:

Margaritaville of Bossier City, LLC
6800 Lakewood Plaza Drive
Orlando, FL  32819

Facsimile:  (407) 224-3229
Attention:  Mr. Eric Forward

With copies to:

Greenberg Traurig, LLP
3290 Northside Parkway
Suite 400
Atlanta, GA  30327
U.S.A.

Facsimile:  (678) 553-2212
Attention:  Mr. Jeffrey M. Smith

**Sub-Licensee, addressed to it at:**

Bossier Casino Venture, LLC
P.O. Box 92610
Lafayette, LA 70509
U.S.A.

Facsimile:  (337) 266-2167
Attention:  Mr. Paul Alanis

With copies to:

Silver Slipper Gaming, LLC
150 S. Los Robles Ave., #665
Pasadena, CA 91101
U.S.A.

and

McGlinchey Stafford PLLC
601 Poydras Street
12th Floor
New Orleans, LA  70130
U.S.A.

Facsimile:  (504) 596-2800
Attention:  Ms. Deborah Harkins

or to such other address or in care of such other officers as a Party may from time to time
advise to the other Party by notice in writing in accordance with this Section 15.1.  The

Trademark Sub-License Agreement

- 41 -

date of receipt of any such notice, demand, request, consent, agreement or approval shall be deemed to be the date of delivery thereof (or if such day is not a business day or service, delivery or transmission, as applicable, is made after 5:00 p.m. at the place of receipt, on the next following business day), or if mailed as aforesaid, the date of delivery by a postal authority; *provided, however*, that if at the time of mailing or within three business days thereafter there is or occurs a labor dispute or other event which might reasonably be expected to disrupt the delivery of documents by mail, any notice or other communication under this Agreement shall be delivered or transmitted by means of facsimile or email as aforesaid.

## 15.2   RELATIONSHIP OF THE PARTIES.

The relationship between Sub-Licensor and Sub-Licensee hereunder shall at all times be that of independent contractors, and nothing contained in this Agreement shall render or constitute Sub-Licensor and Sub-Licensee joint venturers, partners, or agents of each other or allow a Party to legally bind the other Party regarding any third party.

## 15.3   MODIFICATION AND CHANGES.

This Agreement cannot be changed or modified except by another agreement in writing signed by the Parties.

## 15.4   SEVERABILITY.

If any provision of this Agreement is determined to be invalid, illegal or unenforceable as written, such provision shall be enforced to the maximum extent permitted by Applicable Law.

## 15.5   SUCCESSORS AND ASSIGNS.

The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and permitted assigns.

## 15.6   HEADINGS.

The section headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement.

## 15.7   GOVERNING LAWS.

(a)   Except for gaming law issues that are required to be resolved under Louisiana law, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed in

Trademark Sub-License Agreement

ATL 18,212,122v2 8-12-11

Delaware and cannot be modified without the express written consent of all of the Parties.

(b)     All public laws, statutes, ordinances, codes, acts, bylaws, rules, regulations, decrees and orders of any Governmental Authority which now or hereafter may be applicable to and enforceable against the relevant work or activity in question or any part thereof shall be referred to as "**Applicable Law**".

## 15.8   WAIVER.

No waiver by any Party of a breach or a default hereunder shall be deemed a waiver by such Party of a subsequent breach or default of a similar nature.

## 15.9   COUNTERPARTS.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and which shall together constitute one and the same agreement.  This Agreement may be delivered by either Party by facsimile and, if so executed and delivered, shall be legally valid and binding on the Party executing in such manner.

## 15.10  FURTHER ASSURANCES.

The Parties shall do and cause to be done all such acts, matters and things and shall execute and deliver all such documents and instruments as shall be required to enable the Parties to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

## 15.11  ENTIRE AGREEMENT.

This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral.  No undertaking, promise, duty, obligations, covenant, term, condition, representation, warranty, certification or guaranty shall be deemed to have been given or be implied from anything said or written in negotiations between the Parties prior to the execution of this Agreement, except as expressly set forth in this Agreement.

## 15.12. COVENANT OF GOOD FAITH AND FAIR DEALING.

Each Party agrees to act in good faith and fair dealing connected with all of its performance and enforcement of this Agreement.

## 15.13. COMMERCIALLY REASONABLE STANDARD.

Trademark Sub-License Agreement

ATL 18,212,122v2 8-12-11

This Agreement shall be interpreted to require that all actions and non-actions must be undertaken on a commercially reasonable basis, unless sole discretion is specified. The fact that some provisions use the phrase "commercially reasonable" while other provisions do not use that phrase shall not affect the standard set forth above.

## 15.14 NO FRANCHISE RELATIONSHIP.

The Parties agree that nothing in this Agreement is intended to create a franchise relationship. Notwithstanding the foregoing, if the relationship established between the Parties is deemed to be a franchise, the Parties acknowledge that the transaction evidenced by this Agreement qualifies for the "large initial investment" exemption from the disclosure requirements under the federal franchise law. Specifically, the sale is for more than $1 million - excluding the cost of unimproved land and any financing received from Sub-Licensor or an affiliate - and thus is exempted from the Federal Trade Commission's Franchise Rule disclosure requirements, pursuant to 16 CFR 436.8(a)(5)(i). Sub-Licensee hereby represents that at least one (1) individual investor in Sub-Licensee will invest at least $1 million ($1,000,000) towards the establishment of the Project, exclusive of real estate or financing received from the Sub-Licensor or an affiliate.

*[Signature pages follow]*

Trademark Sub-License Agreement

*ATL 18,212,122v2 8-12-11*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**MARGARITAVILLE OF**
**BOSSIER CITY, LLC**
By: Margaritaville Enterprises, LLC,
Its Sole Manager

By: _____
     Name: John Cohlan
     Title:  Chief Executive Officer

**BOSSIER CASINO VENTURE, LLC**
By: Silver Slipper Gaming, LLC,
Its Co-Managing Member

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

MARGARITAVILLE OF
BOSSIER CITY, LLC
By: Margaritaville Enterprises, LLC,
Its Sole Manager

By: _____

    Name: John Cohlan
    Title:  Chief Executive Officer

BOSSIER CASINO VENTURE, LLC
By: Silver Slipper Gaming, LLC,
Its Co-Managing Member

By: _____

    Name: PAUL R. ALANIS
    Title: CO- MANAGING MEMBER

## EXHIBIT A

## LICENSE AGREEMENT

This **LICENSE AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of the _17_ day of August, 2011, by and between **Jimmy Buffett** ("<u>Buffett</u>") and **Bossier Casino Venture, LLC** ("<u>Licensee</u>") (each, a "<u>Party</u>" and collectively, the "<u>Parties</u>").

## RECITALS

WHEREAS, pursuant to that certain Trademark Sub-License Agreement by and between Margaritaville of Bossier City, LLC ("<u>Licensor</u>") and Licensee, of even date hereof (the "<u>Trademark Sub-License Agreement</u>"), which is incorporated herein by reference, Buffett has agreed to license the Buffett IP Rights (as defined below) to Licensee;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

All capitalized terms used in this Agreement, but not otherwise defined herein, shall have the meaning set forth in the Trademark Sub-License Agreement.

## ARTICLE 2

## LICENSE OF BUFFETT IP RIGHTS

2.1   **Buffett Publicity Rights.**   Buffett hereby licenses to Licensee a non-exclusive, non-transferable right and license during the Term to use his name, image, likeness, signature, photograph, gestures, distinctive appearances and mannerisms (collectively, the "<u>Buffett Publicity Rights</u>"), solely in connection with the Project in the same manner and subject to the same approvals as the Margaritaville Intellectual Property pursuant to the Trademark Sub-License Agreement (including, without limitation, Section 3.1(f) thereof).

2.2   **Buffett Music Material.**   Buffett hereby licenses to Licensee a non-exclusive, non-transferable limited right and license during the Term to use the Buffett Music Material, solely in connection with the Project in the same manner and subject to

Buffett Agreement

- 1 -

the same approvals as the Margaritaville Intellectual Property pursuant to the Trademark Sub-License Agreement.

**2.4** **Third-Party Consents and Payments.**

(a) Any use of any element of the Buffett Publicity Rights and Buffett Music Material (collectively, the "Buffett IP Rights") by Licensee pursuant to the terms of the Trademark Sub-License Agreement, including but not limited to the use by Licensee of any element of any book, short story or other literary property authored or co-authored by Jimmy Buffett and the use by Licensee of any element of any musical composition recorded by Jimmy Buffett such as music, lyrics, song titles or concert videos (collectively, "Buffett Other Use") shall be subject to Licensee's obligation to:

(i) obtain the consent of all appropriate third parties, including but not limited to publishers, record companies, unions, guilds, and public performance societies; and

(ii) pay all third-party license fees, royalties and other costs in connection therewith;

provided, however, that, if such Buffett Other Use is otherwise approved by Licensor (and/or any entities Controlled by Licensor) pursuant to the Trademark Sub-License Agreement, Buffett (and/or his Affiliates) shall grant or cause his Affiliates to grant to Licensee the requested consent for such Buffett Other Use to the extent that Buffett (and/or his Affiliates) controls such Buffett Other Use, and Buffett (and/or his Affiliates) shall use commercially reasonable efforts to facilitate Licensee's attempts to obtain third-party consents for such Buffett Other Use to the extent that Buffett (and/or his Affiliates) does not control such Buffett Other Use.

(b) Buffett (and/or his Affiliates) shall not receive any compensation for their consent to the Buffett Other Use pursuant to this Agreement other than the Sub-License Fee described in the Trademark Sub-License Agreement.  For avoidance of doubt, no additional consideration will be due hereunder to Buffett or his Affiliates for the use of Buffett Music Material (or portion thereof) which is wholly owned by Buffett or his Affiliates.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Each of the Parties hereto represents and warrants to the other that: (i) it has the requisite capacity and authority to execute, deliver and perform this Agreement; and (ii)

Buffett Agreement

- 2 -

its entry into this Agreement is not and would not, with the passage of time, be in material breach or violation of any governmental order or law or the contractual rights of any other person or entity.

## ARTICLE 4

## INDEMNIFICATION

Each of the Parties hereto shall indemnify and hold harmless the other Party ("Indemnifying Party") and any entity owned or controlled by, or under common ownership or common control by the Indemnifying Party (collectively, "Affiliated Entities"), and their respective shareholders, members, partners, officers, directors, employees, agents and representatives (individually, an "Indemnitee," and collectively, the "Indemnitees") from and against any and all third-party claims, orders, damages, liabilities, costs and expenses, including commercially reasonable attorneys' fees, caused by any negligent or more culpable acts or omissions by an Indemnifying Party or its Affiliated Entities. Each Party hereto shall promptly notify the other Party of any claim or litigation to which the indemnity set forth in this paragraph applies. Each Party agrees to defend all actions to which such indemnity applies and to conduct the defense thereof at its expense and by qualified counsel, which counsel shall be commercially reasonably satisfactory to the Indemnitee. These indemnity obligations shall survive the termination or expiration of this Agreement.

## ARTICLE 5

## MISCELLANEOUS

**5.1**   **Notices.**  All notices required to be sent to a party shall be in writing to the following addresses unless notification of a new address is properly provided in accordance herewith, All notices shall be delivered by facsimile and a nationally recognized overnight courier service that obtains written acknowledgment of receipt by the addressee. Notice shall be deemed given upon receipt.

<div style="margin-left:2em;">

To Buffett:

Jimmy Buffett
c/o HK Management
10866 Wilshire Blvd.
Suite 200
Los Angeles, CA 90024
Attention:  Howard Kaufman

</div>

Buffett Agreement

ATL 18,212,122v2 8-12-11

and

Jeffrey M. Smith
Greenberg Traurig, LLP
3290 Northside Pkwy., Suite 400
Atlanta, Georgia 30327
Facsimile: 678-553-2212
Attention: Jeffrey M. Smith

To Licensee:

Bossier Casino Venture, LLC
P.O. Box 92610
Lafayette, LA 70509
Facsimile: (337) 266-2167
Attention: Paul Alanis

and

McGlinchey Stafford PLLC
601 Poydras Street
12th Floor
New Orleans, LA 70130
Facsimile: (504) 596-2800
Attention: Deborah Harkins

and

Silver Slipper Gaming, LLC
150 S. Los Robles Ave., #665
Pasadena, CA 91101

**5.2    Independent Contractor.**    Buffett's status hereunder is that of an independent contractor and not an employee of Licensee.

**5.3    Modification and Changes.**    This Agreement cannot be changed or modified except by another agreement in writing signed by the Parties.

**5.4    Severability.**    If any provision of this Agreement is determined to be invalid, illegal or unenforceable as written, such provision shall be enforced to the maximum extent permitted by Applicable Law.

**5.5    Headings.**    The section headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement.

**5.6    Applicable Law and Jurisdiction.**    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed in Delaware and cannot be modified without the express written consent of all of the Parties. Any and all claims, demand, controversies,

Buffett Agreement

ATL 18,212,122v2 8-12-11

disputes, actions or causes of action of any nature or character arising out of or in connection with this Agreement, whether legal or equitable, known or unknown, contingent or otherwise shall be resolved in accordance with the Dispute Resolution procedures set forth in the Sub-License Agreement (subject to Section 5.7 hereof).

**5.7    WAIVER OF JURY TRIAL.**    EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY OF ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**5.8    LIMITATIONS ON LIABILITY.**    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, IN ANY LAW SUIT, LEGAL ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING FROM OR RELATING TO THIS AGREEMENT, THE PARTIES UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW ALL RIGHTS TO ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES (EXCEPT FOR A CLAIM FOR RECOVERY OF ANY SUCH DAMAGES THAT THE CLAIMING PARTY IS REQUIRED BY A COURT OF COMPETENT JURISDICTION OR AN ARBITRATION PANEL TO PAY TO A THIRD PARTY) AND ACKNOWLEDGE AND AGREE THAT THE RIGHTS AND REMEDIES IN THIS AGREEMENT, AND ALL OTHER RIGHTS AND REMEDIES AT LAW AND IN EQUITY, WILL BE ADEQUATE IN ALL CIRCUMSTANCES FOR ANY CLAIMS THE PARTIES MIGHT HAVE WITH RESPECT THERETO.

**5.9    Waivers.**    The failure by any Party to insist upon the strict performances of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall not constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**5.10    Counterparts.**    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and which shall together constitute one and the same agreement. This Agreement may be delivered by either Party by facsimile and, if so executed and delivered, shall be legally valid and binding on the Party executing in such manner.

**5.11    Further Assurances.**    The Parties shall do and cause to be done all such acts, matters and things and shall execute and deliver all such documents and instruments

Buffett Agreement

as shall be required to enable the Parties to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

    **5.12**  **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral. No undertaking, promise, duty, obligations, covenant, term, condition, representation, warranty, certification or guaranty shall be deemed to have been given or be implied from anything said or written in negotiations between the Parties prior to the execution of this Agreement, except as expressly set forth in this Agreement.

       IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

<div style="margin-left:40%">

**BOSSIER CASINO VENTURE, LLC**
By: Silver Slipper Gaming, LLC,
Title: Its Co-Managing Member

By: PAUL R ALAIN
Title: Co MANAGING MEMBER


JIMMY BUFFETT

</div>

Buffett Agreement

*ATL 18,212,122v2 8-12-11*

as shall be required to enable the Parties to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

   5.12   **Entire Agreement.**   This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral. No undertaking, promise, duty, obligations, covenant, term, condition, representation, warranty, certification or guaranty shall be deemed to have been given or be implied from anything said or written in negotiations between the Parties prior to the execution of this Agreement, except as expressly set forth in this Agreement.

   IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

                              **BOSSIER CASINO VENTURE, LLC**
                              By: Silver Slipper Gaming, LLC,
                              Title: Its Co-Managing Member


                              By: _____
                              Title:


                              JIMMY BUFFETT
                              _____


Buffett Agreement

ATL 18,212,122v2 8-12-11

## EXHIBIT B

## TRADEMARK LICENSE AGREEMENT

This **TRADEMARK LICENSE AGREEMENT** (this "<u>Agreement</u>"), dated as of this \7 day of August, 2011, is entered into by and between **MARGARITAVILLE ENTERPRISES, LLC**, a Delaware limited liability company ("<u>Licensor</u>"), and **MARGARITAVILLE OF BOSSIER CITY, LLC**, a Delaware limited liability company ("<u>Licensee</u>").

**WHEREAS**, Licensor is the exclusive owner of the Margaritaville Intellectual Property;

**WHEREAS**, in conjunction the execution of this Agreement, Licensee shall enter to that certain Trademark Sub-License Agreement, of even date hereof, by and between Licensee and Bossier Casino Venture, LLC, a Louisiana limited liability company ("<u>Bossier Casino Venture</u>") (hereinafter, the "<u>Trademark Sub-License Agreement</u>"), for the sublicense of the Margaritaville Intellectual Property; and

**WHEREAS**, subject to the terms and conditions hereof, Licensor is willing to grant to Licensee the right to use the Margaritaville Intellectual Property for the purpose of sublicensing such Margaritaville Intellectual Property to Bossier Casino Venture, as set forth in the Trademark Sub-License Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions contained herein, it is hereby agreed as follows:

1. **Definitions**.

All capitalized terms used in this Agreement, but not otherwise defined herein, shall have the meaning set forth in the Trademark Sub-License Agreement.

2. **License and Sublicense Grant**.

a.    Licensor hereby grants to Licensee, and Licensee hereby accepts, upon the terms and conditions stated herein, for the Term (as defined below), a non-exclusive license to sublicense the Margaritaville Intellectual Property as set forth in the Trademark Sub-License Agreement and all rights necessary to enter into and fully perform the Trademark Sub-License Agreement (the "<u>Sublicense</u>").

b.    Licensee shall not denigrate, knowingly permit, or cause the denigration of the Margaritaville Intellectual Property and shall not take any other action not approved by Licensor as provided herein that is harmful or potentially harmful to or which

License Agreement

- 1 -

disparages, ridicules or demeans the goodwill and reputation of Licensor (or its Affiliates) or the Margaritaville Intellectual Property.

      c.    Licensor shall assist Licensee, shall duly execute and deliver, or cause to be duly executed and delivered, any and all such other documents and/or instruments, and do and cause to be done such further acts and things, in each case, as Licensee may reasonably request in connection with the Trademark Sub-License Agreement or as may be necessary for the Licensee to fully comply with its obligations under the Trademark Sub-License Agreement.

**3.**    **Representations and Warranties**. Licensor represents and warrants to Licensee as follows and acknowledges that Licensee is relying on such representations and warranties in entering into this Agreement:

      a.    <u>Organization and Authority</u>. Licensor is a limited liability company validly existing under the laws of the State of Delaware and has the power to own, license or lease its property (including, as of the date hereof, the Margaritaville Intellectual Property), to carry on its business as now being conducted by it, to enter into this Agreement and to perform its obligations hereunder.

      b.    <u>Authorization</u>. This Agreement has been duly authorized, executed and delivered by Licensor and is a legal, valid and binding obligation of Licensor, enforceable against Licensor by Licensee in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency and similar laws affecting the rights of creditors generally and except that equitable remedies may be granted only in the discretion of a court of competent jurisdiction;

      c.    <u>No Conflict</u>. The execution, delivery and performance of this Agreement or the Trademark Sub-License Agreement by Licensor shall not, directly or indirectly (with or without notice or lapse of time):

        (i)    contravene, conflict with or result in a violation of (A) any provision of the charter or bylaws of Licensor or any Affiliate of Licensor, (B) any resolution or other action adopted or taken by the board of directors, managing members, members, owners, partners or the shareholders of Licensor or any Affiliate of Licensor, or (C) any Applicable Law applicable to Licensor or any Affiliate of Licensor;

        (ii)    contravene, conflict with or result in a violation of, or give any Governmental Authority or other Person the right to challenge any of the transactions contemplated by this Agreement, or to exercise any remedy or obtain any relief under, any Applicable Law;

License Agreement

(iii)   contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify, any permit that is held by Licensor or any Affiliate of Licensor or that otherwise relates to the Project; or

(iv)   contravene, conflict with or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any contract to which Licensor or any Affiliate of Licensor is a party or by which it or any of the Margaritaville Intellectual Property is bound.

d.   <u>Rights to Margaritaville Intellectual Property</u>.  Licensor represents that, as of the date hereof, it:

(i)   has the exclusive right, title and interest in, in each case free and clear of all Encumbrances except for the Guggenheim Security Interest, and subject to the disclosures summarized in Schedule 2 of the Trademark Sub-License Agreement, it has a valid license to use, and (in either case) to license to Licensee the right to use the Margaritaville Intellectual Property in accordance with this Agreement; and

(ii)   except as disclosed in Schedule 2 of the Trademark Sub-License Agreement, has no knowledge of any past or continuing infringement, misappropriation or violation, alleged or otherwise, in the United States, against or upon the Margaritaville Intellectual Property by any Person.

4.   **<u>Assignability and Sublicensing</u>**.

a.   Licensor hereby grants to Licensee all rights necessary to enter into and fully perform the Trademark Sub-License Agreement.  Licensee covenants and agrees to enforce and diligently prosecute its rights under the Trademark Sub-License Agreement and the obligations of Bossier Casino Venture under the Trademark Sub-License Agreement.

b.   Except as expressly set forth in this Section 4, Licensee shall not assign, transfer, or sublicense any of its rights hereunder without the consent of Licensor, which consent may be withheld in Licensor's sole discretion.

License Agreement

*ATL 18,212,122v2 8-12-11*

**5.    Term**.

The term (the "Term") of this Agreement shall commence on the date hereof and shall terminate upon the expiration or the earlier termination of the term of the Trademark Sub-License Agreement.

**6.    Ownership of Margaritaville Intellectual Property.**

a.    Licensee acknowledges that, as between it and Licensor, Licensor is the owner of all rights in the Margaritaville Intellectual Property and Margaritaville Artwork and the goodwill associated therewith within the United States and throughout the world.

b.    Licensee agrees, during the Term and thereafter, never to attack the rights of Licensor in and to the Margaritaville Intellectual Property or the Margaritaville Artwork or the validity of the License being granted herein.

c.    Licensee agrees that its use of the Margaritaville Intellectual Property inures to the benefit of Licensor and that Licensee shall not acquire any rights whatsoever in the Margaritaville Intellectual Property or Margaritaville Artwork other than the rights expressly provided in this Agreement.

d.    All rights of Licensor not expressly granted to Licensee herein are expressly reserved to Licensor.

e.    Licensee agrees and acknowledges that following the expiration or earlier termination of this Agreement, Licensee will not use or license any third parties to use any of the Margaritaville Intellectual Property or Margaritaville Artwork for any purpose without Licensor's consent.

**7.    Trademark and Copyright Protection and Infringements**.

a.    Licensee agrees that it shall not at any time, anywhere in the world, apply for any registration of any copyright, trademark or other designation which would affect the ownership of the Margaritaville Intellectual Property or the Margaritaville Artwork by Licensor or file any document with any governmental authority to take any action which would affect the ownership of the Margaritaville Intellectual Property or Margaritaville Artwork by Licensor.

b.    Licensee agrees that it shall, at no time during the Term or thereafter, use or authorize the use of any trademark, trade name or other designation identical with or confusingly or substantially similar to any of (i) the Margaritaville Intellectual Property, (ii) or any mark uniquely associated with Licensor.

License Agreement

*ATL 18,212,122v2 8-12-11*

c.    When requested by Licensor, Licensee agrees to assist Licensor (and its Affiliates) in connection with any intellectual property claims dealing with the enforcement of Licensor's (and its Affiliates') rights in the Margaritaville Intellectual Property or Margaritaville Artwork that Licensor (and its Affiliates) may choose to bring. Licensor agrees to reimburse Licensee's reasonable out-of-pocket expenses incurred in providing such assistance.  With respect to any intellectual property actions not caused by any breach of this Agreement by Licensee that Licensor may choose to bring, Licensor shall, at Licensor's cost and expense, employ counsel of its own choice to direct the handling of such claims and any settlement thereof.  Licensor shall be entitled to receive and retain all amounts awarded as damages, profits or otherwise in connection with such suits.

## 8.    Indemnification.

a.    Indemnification by Licensee.  Licensee will defend, indemnify, and hold Licensor, and its Affiliates, and their respective officers, directors, employees, agents, attorneys, heirs, members, successors, parents and assigns of the foregoing, harmless against and in respect of: (i) any and all loss, damage, or liability resulting from any breach or claim of breach of any representation or warranty or the nonfulfillment of any covenant, agreement or obligation on the part of Licensee hereunder; and (ii) any and all actions, suits, proceedings, demands, assessments, judgments, costs and expenses (including reasonable attorneys' fees and expenses) instant to the foregoing, or resulting from tort claims or other claims arising out of Licensee's use or sublicense of the Margaritaville Intellectual Property, including, without limitation (A) product liability or similar claims based on sale of merchandise occurring in conjunction with the Trademark Sub-License Agreement, and (B) injury, wrongful death, negligence or battery claims by customers of the Project, except claims by a third party, based on facts or circumstances not otherwise disclosed in Schedule 2 of the Trademark Sub-License Agreement of this Agreement, that use of the Margaritaville Intellectual Property pursuant to the terms of this Agreement infringes or otherwise violates a third party's intellectual property rights.

b.    Indemnification by Licensor.  Licensor will defend, indemnify and hold Licensee and its officers, directors, employees, agents, attorneys, members, successors, parents and assigns harmless against and in respect of: (i) any and all loss, damage, or liability resulting from any breach or claim of breach of any representation or warranty or the non-fulfillment of any covenant, agreement or obligation on the part of Licensor hereunder; (ii) any and all claims, actions, suits, proceedings, demands, assessments, judgments, costs and expenses (including reasonable attorneys' fees and expenses), collectively referred to as "Claims" instant to the foregoing; and (iii) any and all Claims by a third party (including a party to the Trademark Sub-License Agreement) based on facts not otherwise disclosed in Schedule 2 of the Trademark Sub-License Agreement to

License Agreement

this Agreement that use of the Margaritaville Intellectual Property pursuant to this Agreement infringes or otherwise violates such third party's intellectual property rights.

    c.    <u>Notification</u>. If any demand, claim or suit is asserted or instituted with respect to which a party may be entitled to indemnification under the foregoing provisions, such party will give prompt notice thereof to the party who or which may be liable for indemnification, including full details to the extent known.

    d.    <u>Third-Party Intellectual Property Claims</u>. With respect to infringement claims by third parties against Licensee asserting that the License or Sublicense of the Margaritaville Intellectual Property infringes their rights, Licensee will give prompt notice thereof to Licensor and Licensor shall have the sole right to direct and control the defense and settlement of such claims at Licensor's sole expense, unless such claims are based on the breach of this Agreement by Licensee, in which case such costs shall be borne exclusively by Licensee. Such rights shall not be exercised in an arbitrary or capricious manner.

## 9.    **Termination**.

So long as the term of the Trademark Sub-License Agreement is in effect, the Term and this Agreement shall not be terminated by either party and a party's remedy for breach of this Agreement shall be limited to monetary damages and equitable remedies, excluding termination of this Agreement and/or the Term.

## 10.    **Effect of Termination**.

    a.    Licensee acknowledges that, in the event that the Term expires or this Agreement is terminated, all rights in and to the Margaritaville Intellectual Property shall revert immediately back to Licensor.

    b.    Licensee acknowledges that its failure to cease the use of the Margaritaville Intellectual Property at the expiration or earlier termination of this Agreement, will result in immediate and irreparable damage to Licensor and to the rights of any subsequent licensee of Licensor. In that event, Licensee acknowledges and admits that there is no adequate remedy at law and therefore Licensor shall be entitled to injunctive relief and such other relief as any court with jurisdiction may deem just and proper.

## 11.    **Notices**.

All notices required to be sent to a party shall be in writing to the following addresses unless notification of a new address is properly provided in accordance herewith. All notices shall be delivered by facsimile and a nationally recognized overnight courier service that obtains written acknowledgment of receipt by the addressee. Notice shall be deemed given upon receipt.

License Agreement

- 6 -

To Licensor:     Margaritaville Enterprises, LLC
                 256 Worth Avenue
                 Suite Q-R
                 Palm Beach, Florida  33480
                 Attention:     John Cohlan
                 Facsimile:     (561) 835-9584

and              Jeffrey M. Smith
                 Greenberg Traurig, LLP
                 3290 Northside Parkway
                 Suite 400
                 Atlanta, GA  30327
                 Facsimile:     (678) 553-2212

To Licensee:     Margaritaville of Bossier City, LLC
                 256 Worth Avenue
                 Suite Q-R
                 Palm Beach, Florida  33480
                 Attention:     John Cohlan
                 Facsimile:     (561) 835-9584

and              Jeffrey M. Smith
                 Greenberg Traurig, LLP
                 3290 Northside Parkway
                 Suite 400
                 Atlanta, GA  30327
                 Facsimile:     (678) 553-2212

## 12.     **Choice of Laws**.

This Agreement shall be governed by, and its terms and conditions construed in accordance with, applicable common law and statutes of the State of Delaware, without giving effect to the conflict of law rules of that State.

## 13.     **Binding Effect.**

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective Affiliates, Licensees, successors and permitted assigns.

## 14.     **Waiver**.

No waiver by any party of a breach or a default hereunder shall be deemed a waiver by such party of a subsequent breach or default of a similar nature.

License Agreement

*ATL 18,212,122v2 8-12-11*

**15.**   **Severability**.

In the event that any term or provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal or unenforceable, had never been contained therein.

**16.**   **Headings**.

The headings in this Agreement are solely for convenience and shall not be used to interpret or construe this Agreement.

**17.**   **Integration**.

The Agreement represents the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all previous representations, understandings or agreements, oral or written, between the parties with respect to the subject matter hereof and cannot be modified except by a written instrument signed by all of the parties hereto.

**18.**   **Signatures**.

This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.  The signature of a party obtained via facsimile shall be valid and binding for all purposes.

*[Continued on the next page.]*

License Agreement

*ATL 18,212,122v2 8-12-11*

**IN WITNESS WHEREOF**, the parties hereto agree to all of the terms and conditions of this Agreement.

Licensor:

**MARGARITAVILLE ENTERPRISES, LLC**

By: _____

    John Cohlan
    Chief Executive Officer

Licensee:

**MARGARITAVILLE OF BOSSIER CITY, LLC**

**By: Margaritaville Enterprises, LLC, its Sole Manager**

By: _____

    John Cohlan
    President and Chief Executive Officer

License Agreement

- 9 -

# EXHIBIT C

## Non-Disturbance Agreement

**(see attached)**

*ATL 18,212,122v2 8-12-11*

## NON-DISTURBANCE CERTIFICATE

THIS NON-DISTURBANCE CERTIFICATE (this "Certificate") is delivered by the undersigned on August 17, 2011 (the "Effective Date") in connection with the Trademark Sub-License Agreement (the "Agreement") to which the form of this Certificate is attached. Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Agreement.

The undersigned hereby represents and warrants that, as of the Effective Date, the undersigned is not aware of any breach of or default under (or any facts, circumstances or conditions that, with the passing of time or otherwise, would constitute a breach of or default under) the Trademark License Agreement.

If the Trademark License Agreement and/or the Agreement are assigned or otherwise transferred to the undersigned, or if the undersigned obtains any right, title and/or interest in or to the Trademark License Agreement and/or the Agreement, the undersigned hereby (1) acknowledges Sub-Licensee's sub-license interest under the Trademark License Agreement and Sub-Licensee's right, title and interest under the Agreement as set forth therein, and (2) agrees to be bound by the terms and conditions of the Trademark License Agreement and/or the Agreement as if the undersigned were an original signatory thereto.

Additionally, the undersigned shall not take any action in respect of any security or other interest granted thereto by Sub-Licensor in or to the Trademark License Agreement and/or the Agreement, which would interfere with or disturb the rights and/or remedies granted to Sub-Licensee under the Agreement.

The undersigned hereby warrants and represents that Sub-Licensee and third parties may rely upon this Certificate, and the undersigned shall be estopped from denying the truth of the facts contained herein.

ACKNOWLEDGED AND AGREED:

GUGGENHEIM CORPORATE FUNDING, LLC

By: _____

Name:  William Hagner

Title:   Senior Managing Director

## EXHIBIT D

### Sub-Licensor General Manager Criteria

To the extent quantifiable, the targets for the criteria set forth below will be established as part of the annual business planning process, and will be premised upon certain reasonable baseline assumptions.

A.   **GSAT Scores:   Property will conduct bi-annual GSAT surveys to measure guest satisfaction with a combined top box score not less than the lesser of (i) the average combined top box score achieved during the same period by all other properties and restaurants licensed by Sub-Licensor and Licensor and (ii) 90%.   Questions to include:**

1.   Did your visit deliver on your expectation of the Margaritaville lifestyle?

2.   Please rate each of the below separately:

   o   Atmosphere

   o   Casino

   o   Food/beverage

   o   Decor

   o   Service/staff

   o   Entertainment

   o   Merchandise

3.   If we have failed to deliver on The Margaritaville Lifestyle in any of the above mentioned, please indicate the area:

   o   Atmosphere

   o   Casino

   o   Food/beverage

   o   Decor

   o   Service/staff

    o    Entertainment

    o    Merchandise

4.    Given your experience at The Margaritaville Casino, how likely will you be to:

    o    visit The Margaritaville Casino again

    o    visit a Margaritaville Restaurant in another city

    o    purchase Margaritaville merchandise

    o    purchase Margaritaville food products

    o    purchase Margaritaville beverages

**B.**    **TSAT Scores:  Property will conduct annual TSAT surveys to measure employee satisfaction that must either meet or exceed the average combined top box score achieved during the same period by all other properties and restaurants licensed by Sub-Licensor and Licensor.**

1.    Do you enjoy spending time at work?

2.    Do you believe the members of our management team are role models in practicing the Margaritaville "**FINS**" philosophy of customer satisfaction?

    o    **F** = Fun at work

    o    **I** = Involve the guest

    o    **N** = Navigate the now

    o    **S** = State of Mind

3.    Do you feel the Margaritaville Casino possess a culture that cultivates the Margaritaville lifestyle?

4.    Do you feel our management team emulates the concept of Margaritaville and delivers a sense of escapism?

**C.**    **Staff Evaluations of Managers:   Property will conduct annual staff evaluations of mangers to ensure the management team exemplifies Margaritaville management philosophies of:**

1.    approachability

- 3 -

2.    respect for staff

3.    professionalism

4.    integrity

**D.**    **Management Evaluation:**  **General Manger will be evaluated annually by Margaritaville direct report scoring successful or above.**

**E.**    **Secret Shopper Report:**  **Property will conduct bi-weekly shopper reports that must achieve annual score of not less than the lesser of: (i) the average annual score achieved during the same period by all other properties and restaurants licensed by Sub-Licensor and Licensor; and (ii) 90%.**

**F.**    **Financial Evaluation:**  **Property:**

1.    in the first year of operations, quarterly revisions to the projections for sales and EBITDA; and

2.    thereafter, to achieve 90% of budgeted sales and EBITDA on an annual basis.

**G.**    **Annual quality assurance visits from Margaritaville's Director of Food Safety and Quality:**  **Property must achieve a score of not less than the lesser of: (i) the average score achieved during the same period by all other properties and restaurants licensed by Sub-Licensor; and Licensor and (ii) 90%, using a mutually agreed upon set of factors.  If the parties disagree about the factors, the dispute shall be arbitrated using the procedures set forth in this Agreement.**

ATL 18,212,122v2 8-12-11

# SCHEDULE 1

## List and Description of Sub-Licensed Marks

### Report 10 - TM File - Listing by Reg. Owner, Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|---|---|---|---|---|---|---|
| 101885-020000-0699 | Margaritaville Enterprises, LLC | PEN | 85/076,995 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America<br>CHANGE YOUR LATITUDE | 9 | 02-Jul-2010 | | | |
| 101885-020000-0700 | Margaritaville Enterprises, LLC | PEN | 85/076,997 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America<br>CHANGES IN LATITUDES, CHANGES IN ATTITUDES | 9 | 02-Jul-2010 | | | |
| 101885-020000-0710 | Margaritaville Enterprises, LLC | PEN | 85/085,331 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America<br>FINS | 9 | 15-Jul-2010 | | | |
| 101885-020000-0711 | Margaritaville Enterprises, LLC | PEN | 85/085,332 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America<br>FINS UP | 9 | 15-Jul-2010 | | | |
| 101885-020000-0701 | Margaritaville Enterprises, LLC | PEN | 85/076,998 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America<br>IN SEARCH OF MARGARITAVILLE | 9 | 02-Jul-2010 | | | |

- 1 -

Report 10 - TM File - Listing by Reg. Owner,
Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|---|---|---|---|---|---|---|
| 101885-020000-0422 | Margaritaville Enterprises, LLC | PEN | 77/005,182 | | Gaming machines, in International Class 9. | |
| | United States of America IT´S FIVE O'CLOCK SOMEWHERE | 9 | 22-Sep-2006 | | | |
| 101885-020000-0424 | Margaritaville Enterprises, LLC | PEN | 77/005,176 | | Casinos, in International Class 41. | |
| | United States of America IT´S FIVE O'CLOCK SOMEWHERE | 41 | 22-Sep-2006 | | | |
| 101885-020000-0423 | Margaritaville Enterprises, LLC | PEN | 77/005,170 | | Gaming equipment, namely, poker chips; gaming tables, in International Class 28. | |
| | United States of America IT´S FIVE O'CLOCK SOMEWHERE | 28 | 22-Sep-2006 | | | |
| 101885-020000-0480 | Margaritaville Enterprises, LLC | REG | 77/259,129 | 3,503,870 | Retail store services and mail order and on-line retail services featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, housewares, sound and video recordings, beverage ware and printed materials, in International Class 35. |  |
| | United States of America JIMMY BUFFETT´S MARGARITAVILLE SMUGGLER'S HOLD (and design) | 35 | 20-Aug-2007 | 23-Sep-2008 | | |
| 101885-020000-0366 | Margaritaville Enterprises, LLC | REG | 78/771,957 | 3,117,273 | Restaurant and bar services, in International Class 43. | |
| | United States of America JIMMY BUFFETT´S MARGARITAVILLE | 43 | 13-Dec-2005 | 18-Jul-2006 | | |

- 2 -

ATL 18,212,122v2 8-12-11

## Report 10 - TM File - Listing by Reg. Owner, Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|---|---|---|---|---|---|---|
| 101885-020000-0355 | Margaritaville Enterprises, LLC | REG | 78/771,962 | 3,120,801 | Retail stores, on-line stores and mail order catalogs featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, recordings, beverageware, and printed materials, in International Class 35. | |
| | United States of America | 35 | 13-Dec-2005 | 25-Jul-2006 | | |
| | JIMMY BUFFETT'S MARGARITAVILLE | | | | | |
| 101885-020000-0362 | Margaritaville Enterprises, LLC | REG | 78/764,975 | 3,192,551 | Retail stores, on-line stores and mail order catalogs featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, recordings, beverageware, and printed material, in International Class 35 |  |
| | United States of America | 35 | 01-Dec-2005 | 02-Jan-2007 | | |
| | JIMMY BUFFETT'S MARGARITAVILLE & Design (with Parrot) | | | | | |
| 101885-020000-0055 | Margaritaville Enterprises, LLC | REG | 75/678,384 | 2,463,238 | Restaurant, bar and nightclub services, in International Class 42. |  |
| | United States of America | 42 | 08-Apr-1999 | 26-Jun-2001 | | |
| | JIMMY BUFFETT'S MARGARITAVILLE & Design (with Parrot) | | | | | |
| 101885-020000-0702 | Margaritaville Enterprises, LLC | PEN | 85/077,002 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America | 9 | 02-Jul-2010 | | | |
| | LANDSHARK | | | | | |

- 3 -

### Report 10 - TM File - Listing by Reg. Owner, Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|---|---|---|---|---|---|---|
| 101885-020000-0769 | Margaritaville Enterprises, LLC<br><br>United States of America<br>LANDSHARK BAR & GRILL (and design) | PEN<br><br>43 | 85/276,804<br><br>25-Mar-2011 | | Restaurant and bar services, in International Class 43 |  |
| 101885-020000-0724 | Margaritaville Enterprises, LLC<br><br>United States of America<br>LANDSHARK LANDING | PEN<br><br>43 | 85/126,312<br><br>09-Sep-2010 | | Providing pavilion facilities for concerts, exhibitions and other functions; serving food and drinks, in International Class 43 | |
| 101885-020000-0752 | Margaritaville Enterprises, LLC<br><br>United States of America<br>LANDSHARK SURFSHACK | PEN<br><br>35 | 85/220,140<br><br>18-Jan-2011 | | Retail store services featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, recordings, beverageware, and printed material, in International Class 35 | |
| 101885-020000-0754 | Margaritaville Enterprises, LLC<br><br>United States of America<br>LANDSHARK SURFSHACK (and design) | PEN<br><br>35 | 85/222,008<br><br>20-Jan-2011 | | Retail store services featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, recordings, beverageware, and printed material, in International Class 35 |  |
| 101885-020000-0519 | Margaritaville Enterprises, LLC<br><br>United States of America<br>LICENSE TO CHILL | PEN<br><br>35 | 77/385,379<br><br>31-Jan-2008 | | Retail store services and mail order and on-line retail store services featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, sound and video recordings, beverage ware and printed materials, in International Class 35 | |

- 4 -

ATL 18,212,122v2 8-12-11

## Report 10 - TM File - Listing by Reg. Owner, Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|------|-------------------------------------|------------------|------------------|------------------|-------|-------|
| 101885-020000-0703 | Margaritaville Enterprises, LLC | PEN | 85/077,005 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America<br>UCENSE TO CHILL | 9 | 02-Jul-2010 | | | |
| 101885-020000-0292 | Margaritaville Enterprises, LLC | REG | 74/021,044 | 1,926,809 | Restaurant services, in International Class 42. | |
| | United States of America<br>MARGARITAVILLE | 42 | 22-Jan-1990 | 17-Oct-1995 | | |
| 101885-020000-0525 | Margaritaville Enterprises, LLC | REG | 77/432,027 | 3,501,784 | Bar services, in International Class 43 | |
| | United States of America<br>MARGARITAVILLE | 43 | 26-Mar-2008 | 16-Sep-2008 | | |
| 101885-020000-0546 | Margaritaville Enterprises, LLC | PEN | 77/569,979 | | Gaming machines, in International Class 9;<br>Casinos, in International Class 41 | |
| | United States of America<br>MARGARITAVILLE | 9, 41 | 15-Sep-2008 | | | |
| 101885-020000-0559 | Margaritaville Enterprises, LLC | PEN | 77/628,403 | | Spa services, namely, health spa services for health and wellness of the body and spirit and cosmetic body care services offered at hotels and resort hotels, in International Class 44 | |
| | United States of America<br>MARGARITAVILLE | 44 | 08-Dec-2008 | | | |

- 5 -

ATL 18,212,122v2 8-12-11

## Report 10 - TM File - Listing by Reg. Owner, Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|---|---|---|---|---|---|---|
| 101885-020000-0709 | Margaritaville Enterprises, LLC | REG | 77/980,011 | 3,855,017 | Hotels, in International Class 43 | |
| | United States of America | 43 | 15-Sep-2008 | 28-Sep-2010 | | |
| | MARGARITAVILLE | | | | | |
| 101885-020000-0717 | Margaritaville Enterprises, LLC | PEN | 85/093,772 | | Amusement game machines; bingo game playing equipment; dice; dice cups; dice games; disposable ticket sets for playing games of chance; dominoes; equipment sold as a unit for playing craps games, game tables; gaming equipment, namely, chips, poker chips, game wheels, gaming tables, namely, craps tables; LCD game machines; play money; playing card game accessories, namely, playing card cases, playing card holders, mats for use in connection with playing card games, playing card shuffling devices and dice; playing cards and card games; roulette wheels; tabletop games, in International Class 28 | |
| | United States of America | 28 | 27-Jul-2010 | | | |
| | MARGARITAVILLE | | | | | |
| 101885-020000-0749 | Margaritaville Enterprises, LLC | PEN | 85/193,449 | | Play money, in International Class 28 | |
| | United States of America | 28 | 08-Dec-2010 | | | |
| | MARGARITAVILLE | | | | | |
| 101885-020000-0547 | Margaritaville Enterprises, LLC | PEN | 77/569,980 | | Resort hotels, in International Class 43 | |
| | United States of America | 43 | 15-Sep-2008 | | | |
| | MARGARITAVILLE | | | | | |
| 101885-020000-0544 | Margaritaville Enterprises, LLC | PEN | 77/564,671 | | Retail store services featuring a wide array of merchandise in the nature of novelty items, souvenirs, clothing, headwear, books, recordings, beverageware, and printed material, in International Class 35 | |
| | United States of America | 35 | 08-Sep-2008 | | | |
| | MARGARITAVILLE PASSPORT STATION | | | | | |

- 6 -

ATL 18,212,122v2 8-12-11

## Report 10 - TM File - Listing by Reg. Owner, Country, Trademark (incl. images)

| TMID | Reg. Owner, Country and Trademarks | Status and Class | App No /App date | Reg No /Reg date | Goods | Image |
|---|---|---|---|---|---|---|
| 101885-020000-0545 | Margaritaville Enterprises, LLC | PEN | 77/564,673 | | Restaurant and bar services, in International Class 43 | |
| | United States of America MARGARITAVILLE PASSPORT STATION | 43 | 08-Sep-2008 | | | |
| 101885-020000-0704 | Margaritaville Enterprises, LLC | PEN | 85/077,007 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America PARROTHEAD | 9 | 02-Jul-2010 | | | |
| 101885-020000-0712 | Margaritaville Enterprises, LLC | PEN | 85/085,335 | | Gaming machines; slot machines, in International Class 9 | |
| | United States of America PHINS UP | 9 | 15-Jul-2010 | | | |

- 7 -

ATL 18,212,122v2 8-12-11

# SCHEDULE 2

# List and Description of Pre-Existing Contracts and Infringement Claims Relating to the Margaritaville Intellectual Property

**A.      Trademark Licenses**

**1.      Master Omnibus License Agreement between Jimmy Buffett and Margaritaville Holdings LLC**

Jimmy Buffett entered into a Master Omnibus Agreement dated January 1, 2005 with Margaritaville Holdings LLC (as amended) to grant to Margaritaville Holdings LLC the necessary trademark rights for Margaritaville Holdings LLC to sublicense in the following deals: Jamaica, Shrimp, Tequila, Outback, Sunbeam, Myrtle Beach, Footwear, Sirius and Foods.

Amended and Restated Omnibus Master License Agreement, dated December 20, 2006, by and between Jimmy Buffett, Margaritaville Enterprises, LLC and Margaritaville Holdings LLC. Pursuant to this Agreement, Buffett's trademarks and intellectual property are assigned to Margaritaville Enterprises, LLC (except for his personality rights, including, but not limited to, his name, image, likeness, signature, photograph, gestures, distinctive appearances, and mannerisms, and song titles contained therein (collectively, the "Buffett Personality Rights"), which Buffett Personality Rights shall remain owned by Jimmy Buffett and which Buffett Personality Rights shall be licensed by Jimmy Buffett to Margaritaville Enterprises, LLC pursuant to the terms of this Agreement) and Margaritaville Holdings LLC assigned all of its rights and obligations under the Agreement to Margaritaville Enterprises, LLC.   Therefore, trademarks are no longer licensed under this Agreement.

Amendment, dated May 21, 2007.   Pursuant to this Amendment, Jimmy Buffett grants his approval for Margaritaville Enterprises, LLC to sublicense the Buffett Personality Rights to Margaritaville of Phoenix, LLC in connection with the Phoenix restaurant deal.

Amendment, dated February 12, 2008.   Pursuant to this Amendment, Jimmy Buffett grants his approval for Margaritaville Enterprises, LLC to sublicense the Buffett Personality Rights to Jimmy Buffett's      at      the      Beachcomber,      LLC      in      connection      with      the      Jimmy Buffett's at the Beachcomber restaurant deal.

Amendment, dated May 30, 2008.   Pursuant to this Amendment, Jimmy Buffett grants his approval for Margaritaville Enterprises, LLC to sublicense the Buffett Personality Rights to The Margaritaville Store of Honolulu, LLC in connection with the Margaritaville Store of Honolulu deal.

Amendment, dated June 1, 2008. Pursuant to this Amendment, Jimmy Buffett grants his approval for Margaritaville Enterprises, LLC to sublicense the Buffett Personality Rights to Margaritaville of Connecticut, LLC in connection with the Mohegan Sun restaurant deal.

Amendment, dated March 20, 2009.   Pursuant to this Amendment, Jimmy Buffett grants his approval for Margaritaville Enterprises, LLC to sublicense the Buffett Personality Rights to Margaritaville of Canada, LLC in furtherance of enabling Margaritaville of Canada, LLC to further sublicense the Buffett Personality Rights to 7089813 Canada Ltd., all in connection with the Canada

ATL 18,212,122v2 8-12-11

restaurant deal.

Amendment, dated December 10, 2009.  Pursuant to this Amendment, Jimmy Buffett grants his approval for Margaritaville Enterprises, LLC to sublicense the Buffett Personality Rights to Margaritaville of Nashville, LLC in connection with the Nashville restaurant deal.

### 2.    Key West Restaurant

License Agreement, dated November 1, 1991, by and between James W. Buffett and Jimmy Buffett's Margaritaville Restaurant of Key West, Inc., as amended by Amendment to License Agreement, dated December 20, 2006; such Amendment replaced James W. Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks.  Margaritaville Restaurant of Key West, Inc. was replaced as the licensee with Margaritaville of Key West, LLC on December 22, 2006.

Margaritaville Enterprises, LLC grants to Margaritaville of Key West, LLC, a non-exclusive, non-assignable, non-transferable license, without the right to grant sub-licenses, to use certain trademarks solely in connection with the operation of one restaurant in Key West, Florida.

### 3.    Key West Store

License Agreement, dated November 1, 1991, by and between James W. Buffett and The Margaritaville Store, Inc., as amended by Amendment to License Agreement, dated December 20, 2006; such Amendment replaced James W. Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks.  The Margaritaville Store, Inc. was replaced as the licensee with Margaritaville Store of Key West, LLC on December 22, 2006.

Margaritaville Enterprises, LLC grants to Margaritaville Store of Key West, LLC, a non-exclusive, non-assignable, non-transferable license, without the right to grant sub-licenses, to use certain trademarks solely in connection with the operation of a souvenir store in Key West, Florida.

### 4.    New Orleans Restaurant

License Agreement, dated March 1, 1993, by and between James W. Buffett and Margaritaville Café of New Orleans, Inc., as amended by Amendment to License Agreement, dated December 20, 2006; such Amendment replaced James W. Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks.  Margaritaville Café of New Orleans, Inc. was replaced as the licensee with Margaritaville Café of New Orleans, LLC on December 22, 2005.

Margaritaville Enterprises, LLC grants to Margaritaville Café of New Orleans, LLC a non-exclusive, non-assignable, non-transferable license, without the right to grant sub-licenses, to use certain trademarks solely in connection with the operation of one restaurant at 1104-14 Decatur Street, New Orleans, Louisiana 70116.

### 5.    New Orleans Store

License Agreement, dated May 8, 1992, by and between James W. Buffett and Margaritaville New Orleans, Inc., as amended by Amendment to License Agreement, dated December 20, 2006; such Amendment replaced James W. Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks.  Margaritaville New Orleans, Inc. was replaced as the licensee with Margaritaville New Orleans, LLC on December 22, 2005.

Margaritaville Enterprises, LLC grants to Margaritaville New Orleans, LLC, a non-exclusive, non-assignable, non-transferable license, without the right to grant sub-licenses, to use certain trademarks solely in connection with the operation of a souvenir store at #1 French Market Place, New Orleans, Louisiana.

6. **Charleston Store**

License Agreement, dated December 22, 2006, by and between Jimmy Buffett, Margaritaville Enterprises, LLC and The Margaritaville Store of Charleston, LLC. Margaritaville Enterprises, LLC grants to The Margaritaville Store of Charleston, LLC, a non-exclusive, non-assignable, non-transferable license, without the right to grant sub-licenses, to use certain trademarks solely in connection with the operation of a souvenir store at 282 King Street, Charleston, South Carolina.

Margaritaville Charleston, Inc. previously operated the store with permission from Jimmy Buffett. Written agreements in December 22, 2006 replaced Jimmy Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks and replaced Margaritaville Charleston, Inc. with The Margaritaville Store of Charleston, LLC as licensee.

7. **Las Vegas Store/Restaurant/Casino/Bar**

   a. **Store/Restaurant**

First Amended and Restated Operating Agreement of MP Flamingo, LLC, dated September 5, 2003, by and among Margaritaville Holdings LLC, Margaritaville Las Vegas, LLC and Parball, Inc., as amended on May 7, 2007 and December 21, 2010 ("Vegas Restaurant Agreement"), including a non-exclusive license to use the tradename, service marks, trademarks, logos, recipes, menus, operations manuals, concepts, trade secrets, culinary expertise, training programs, and other intellectual property associated with the Margaritaville restaurants and retail concept, including the right to use the Jimmy Buffett name and sell merchandise bearing the properties. The Agreement restricts Margaritaville Holdings-affiliated restaurants from operating within a 50-mile radius of Parball-owned facilities outside Clark County, excluding the Outback Steakhouse/ Cheeseburger in Paradise restaurants in Clark County, Nevada.

Margaritaville Enterprises, LLC has entered into a master license with Margaritaville Holdings LLC, for purposes of Las Vegas Store/Restaurant.

   b. **Casino/Bar**

Trademark Sub-License Agreement, dated December 21, 2010, by and between Margaritaville of Gaming of Las Vegas, LLC and Flamingo Las Vegas Operating Company, LLC. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Gaming of Las Vegas, LLC grants to Flamingo Las Vegas Operating Company, LLC a license to use the Margaritaville Intellectual Property to operate a "Margaritaville"-themed casino area (with a "Margaritaville"-themed bar operated by or in consultation with MP Flamingo, LLC) located at the Flamingo hotel in Las Vegas (the "Margaritaville Casino Project").

The Term of the Trademark Sub-License Agreement is concurrent with the Term of the Vegas Restaurant Agreement.

The license is exclusive with respect to any other bar or casino reasonably similar to the Margaritaville Bar or the Margaritaville Casino Area, respectively, whether in concept or name, within Clark County, Nevada, except that such restriction shall not apply to: (x) the restaurant concept commonly known as "Cheeseburger in Paradise"; or (y) use of the Margaritaville Intellectual Property on slot machines in non-"Margaritaville"-branded casinos.  The Trademark Sub-License Agreement is also subject to the existing noncompetition obligations of MP Flamingo, LLC as set forth in the Vegas Restaurant Agreement.

### 8.      Caribbean Restaurants

License Agreement, dated April 2001, as amended among Margaritaville Holdings LLC, Jimmy Buffett, and Margaritaville Limited, as amended by:  (1) First Amendment to License Agreement, effective January 1, 2005; (2) Second Amendment to License Agreement, dated December 15, 2006; and (3) that certain letter delivered by Joel Feldman on December 14, 2006, signed by Ian Dear, Authorized Representative of Margaritaville Limited; such letter replaced Jimmy Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks, and replaced Margaritaville Holdings LLC with Margaritaville Enterprises, LLC, with respect to all rights and responsibilities thereof.

Margaritaville Enterprises, LLC grants to Margaritaville Limited., a company incorporated under the laws of Jamaica, an exclusive, non-assignable, non-transferable license to use the MARGARITAVILLE, JIMMY BUFFETT'S MARGARITAVILLE, JIMMY BUFFETT'S, and CHEESEBURGER IN PARADISE marks and other new marks for the development of restaurants and related merchandise in the Caribbean.  The License Agreement specifically provides for the development of restaurants and sale of products in a Territory consisting of: Jamaica, Cayman Islands, St. Lucia, Dominican Republic, Dominica, Barbados, Antigua, Grenada, St. Maarten, Turks & Caicos Islands, British Virgin Islands, U.S. Virgin Islands, and Cuba.

### 9.      Orlando Restaurant

License Agreement, dated September 11, 1997, between Jimmy Buffett and Universal City Restaurant Partners, Ltd. f/k/a JB/Universal City Restaurant Partners, L.P., as amended by:  (1) Amendment No. 1 to License Agreement, dated July 1, 1998; (2) Amendment No. 2 to License Agreement, dated April 18, 2000; (3) Amendment No. 3 to License Agreement, effective as of January 1, 2005; and (4) that certain letter delivered by Joel Feldman on December 1, 2006, signed by Peter Giacalone, Authorized Agent on December 1, 2006; such letter replaced Jimmy Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks.

Margaritaville Enterprises, LLC grants to Universal City Restaurant Partners, Ltd. ("UCRP") an exclusive license to operate a Jimmy Buffett's Margaritaville Café, including the use of certain trademarks and trade secrets, at Universal City Florida CityWalk in Orlando, Florida.  The general partner of UCRP is Margaritaville Holdings LLC and the limited partner is Universal City Development Partners, Ltd.

The license grant is broad enough to include any trademark owned by Margaritaville Enterprises, LLC for any goods and services (with limited exclusions), subject to the approval of Margaritaville Enterprises, LLC; however, Margaritaville Enterprises, LLC may reasonably withdraw its consent upon seven (7) days notice to UCRP. The license grant explicitly contemplates the following uses:

- CHEESEBURGER IN PARADISE for: (1) T-shirts and sweatshirts and (2) sandwiches
- JIMMY BUFFETT'S for restaurant/nightclub and souvenir store services; and

- MARGARITAVILLE and JIMMY BUFFETT'S MARGARITAVILLE marks for restaurant/nightclub and souvenir store services, T-shirts, sweatshirts, polo shirts, outerwear, headwear, beverage glassware and cups.

Under the license agreement, Margaritaville Enterprises, LLC cannot open a competing establishment: (1) within a 150 mile radius of the Universal venue, or (2) at any gated-attraction theme park (or entertainment complex attached to a theme park) in the State of Florida with an annual attendance of at least 500,000 customers.

### 10.   Cancun Restaurant

Services and Sub-License Agreement, dated March 30, 2007, by and between Margaritaville Mexico, LLC, Margaritaville Enterprises, LLC and MV Cancun S.A. de C.V.  Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Mexico, LLC grants to M.V. Cancun S.A. de C.V., an exclusive license to operate a Margaritaville restaurant in the Peninsula of Quintana Roo, Mexico using Margaritaville Enterprises, LLC's trademarks and the trade secrets, recipes, designs, intellectual property, and operating system used at Jimmy Buffett's Margaritaville in Orlando, Florida.  The Agreement was executed on March 30, 2007, for a ten year term, with two ten year renewal periods.

The Agreement explicitly excludes the right to use CHEESEBURGER IN PARADISE as the name of a restaurant, the right to use MARGARITAVILLE as a promotional slogan in connection with the sale of margarita cocktails in restaurants in the U.S., the right to use DON'T STOP THE CARNIVAL for any goods and services, and the right to use A1A & Design for clothing and hats.

### 11.   Cozumel Restaurant

Services and Sub-License Agreement, dated March 30, 2007, by and between Margaritaville Mexico, LLC, Margaritaville Enterprises, LLC and MV Cozumel S.A. de C.V.  Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Mexico, LLC grants to M.V. Cozumel S.A. de C.V., an exclusive license to operate a Margaritaville restaurant in the Peninsula of Quintana Roo, Mexico using Margaritaville Enterprises, LLC's trademarks and the trade secrets, recipes, designs, intellectual property, and operating system used at Jimmy Buffett's Margaritaville in Orlando, Florida.  The Agreement was executed on March 30, 2007, for a ten year term, with two ten year renewal periods.

The Agreement explicitly excludes the right to use CHEESEBURGER IN PARADISE as the name of a restaurant, the right to use MARGARITAVILLE as a promotional slogan in connection with the sale of margarita cocktails in restaurants in the U.S., the right to use DON'T STOP THE CARNIVAL for any goods and services, and the right to use A1A & Design for clothing and hats.

### 12.   Cancun and Cozumel Airport Restaurants

Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Mexico, LLC grants the following exclusive licenses to operate Margaritaville restaurants in the Peninsula of Quintana Roo, Mexico using Margaritaville Enterprises, LLC's trademarks and the trade secrets, recipes, designs, intellectual property, and operating system used at Jimmy Buffett's Margaritaville in Orlando, Florida:

a.     Services and Sub-License Agreement, dated December 20, 2006, by and between Margaritaville Mexico, LLC, Margaritaville Enterprises, LLC and ABT3 S.A. de C.V., regarding a restaurant location at Cancun International Airport Terminal 3.  The Agreement has a term beginning on April 30, 2007, for a five year term (the "Initial Term"), with two five year renewal periods (the

"Renewal Periods"). However, at the option of ABT3 S.A. de C.V., the Initial Term and the Renewal Periods can be either three or four years instead of five years, if the Lease Agreement entered into between ABT3 S.A. de C.V. and ASUR is less than five years for either the Term or the Renewal Period.

The Agreement explicitly excludes the right to use CHEESEBURGER IN PARADISE as the name of a restaurant, the right to use MARGARITAVILLE as a promotional slogan in connection with the sale of margarita cocktails in restaurants in the U.S., the right to use DON'T STOP THE CARNIVAL for any goods and services, and the right to use A1A & Design for clothing and hats.

      c.    Services and Sub-License Agreement, dated September 28, 2010, by and between Margaritaville Mexico, LLC and ABT3 S.A. de C.V., regarding a restaurant location at Cancun International Airport outside of Terminal 3. The Agreement has a term beginning on May 1, 2010, for a five year term (the "Initial Term"), with two five year renewal periods (the "Renewal Periods"). However, at the option of Mera Aeropuertos S.A. de C.V., the Initial Term and the Renewal Periods can be either three or four years instead of five years, if the Lease Agreement entered into between Mera Aeropuertos S.A. de C.V. and ASUR is less than five years for either the Term or the Renewal Period.

The Agreement explicitly excludes the right to use CHEESEBURGER IN PARADISE as the name of a restaurant or food/menu item, the right to use MARGARITAVILLE for bottled and prepackaged liquors, liqueurs, and spirits, and the right to use DON'T STOP THE CARNIVAL for any goods and services.

      c.    Services and Sub-License Agreement, dated September 28, 2010, by and between Margaritaville Mexico, LLC, Margaritaville Enterprises, LLC and Mera Aeropuertos S.A. de C.V., regarding a restaurant location located outside of Terminal 2 at the Cancun International Airport. The Agreement has a term beginning on May 1, 2010, for a five year term (the "Initial Term"), with two five year renewal periods (the "Renewal Periods"). However, at the option of ABT3 S.A. de C.V., the Initial Term and the Renewal Periods can be either three or four years instead of five years, if the Lease Agreement entered into between ABT3 S.A. de C.V. and ASUR is less than five years for either the Term or the Renewal Period.

The Agreement explicitly excludes the right to use CHEESEBURGER IN PARADISE as the name of a restaurant or food/menu item, the right to use MARGARITAVILLE for bottled and prepackaged liquors, liqueurs, and spirits, and the right to use DON'T STOP THE CARNIVAL for any goods and services.

      d.    Services and Sub-License Agreement, dated September 28, 2010, by and between Margaritaville Mexico, LLC, Margaritaville Enterprises, LLC and Mera Aeropuertos S.A. de C.V., regarding a restaurant location at Cozumel International Airport. The Agreement has a term beginning on November 1, 2009, for a five year term (the "Initial Term"), with two five year renewal periods (the "Renewal Periods"). However, at the option of Mera Aeropuertos S.A. de C.V., the Initial Term and the Renewal Periods can be either three or four years instead of five years, if the Lease Agreement entered into between Mera Aeropuertos S.A. de C.V. and ASUR is less than five years for either the Term or the Renewal Period.

The Agreement explicitly excludes the right to use CHEESEBURGER IN PARADISE as the name of a restaurant or food/menu item, the right to use MARGARITAVILLE for bottled and prepackaged liquors, liqueurs, and spirits, and the right to use DON'T STOP THE CARNIVAL for any goods and services.

ATL 18,212,122v2 8-12-11

### 13.    Myrtle Beach Restaurant

Sub-License Agreement, dated March 21, 2004, by and between Margaritaville Holdings LLC and Margaritaville of Myrtle Beach, LLC. Pursuant to the Agreement, Margaritaville Holdings LLC granted a perpetual license to Margaritaville of Myrtle Beach, LLC to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of a Margaritaville Restaurant in Myrtle Beach, South Carolina. The Agreement explicitly excludes the right to use MARGARITAVILLE as a promotional slogan in connection with the sale of margarita cocktails in restaurants in the U.S., and the right to use A1A & Design for clothing and headwear.

Margaritaville Enterprises, LLC has entered into a master license with Margaritaville Holdings LLC, for purposes of Myrtle Beach Restaurant. The March 21, 2004 Sub-License Agreement will not change.

### 14.    Phoenix Restaurant

Trademark License Agreement, dated May 21, 2007, by and between Margaritaville Enterprises, LLC and Margaritaville of Phoenix, LLC. Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Margaritaville of Phoenix, LLC a non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of a Margaritaville Restaurant in Maricopa County, Arizona. The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant.

### 15.    Panama City Restaurant

Trademark License Agreement, dated January 29, 2007, by and between Margaritaville Enterprises, LLC and Margaritaville of Panama City, LLC. Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Margaritaville of Panama City, LLC a non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of a Margaritaville Restaurant in Panama City, Florida. The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant.

### 16.    Biloxi Casino/Hotel/Restaurant

Trademark Sub-License Agreement, dated May 7, 2007, by and between Margaritaville of Biloxi, LLC and Grand Casinos of Mississippi, Inc. - Biloxi ("Grand Casinos"), as amended on January 22, 2008. Pursuant to this Agreement, Margaritaville grants to Grand Casinos (a subsidiary of Harrah's Casinos) a license to use Margaritaville's intellectual property in connection with a gaming, retail, restaurant, entertainment and resort complex on certain portions of the Biloxi, Mississippi real estate where the projects commonly known as "Grand Biloxi" and "Casino Magic" are located or were formerly located.

This Agreement has been terminated, pursuant to discussions between the parties.

### 17.    Jimmy Buffett's at the Beachcomber Restaurant

Trademark License Agreement, dated February 12, 2008, by and between Margaritaville Enterprises, LLC and Jimmy Buffett's at the Beachcomber, LLC d/b/a Jimmy Buffett's at the Beachcomber ("Beachcomber"). Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Beachcomber a non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of a Margaritaville Restaurant in Honolulu, Hawaii. The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant. The term of the Agreement is perpetual, unless terminated pursuant to certain termination provisions.

Notwithstanding the license grant or any other provision of the Agreement, Beachcomber agrees to operate the Restaurant, including all signs and advertising therefor, under the trade name "Jimmy Buffett's at the Beachcomber"; provided, however, that the parties shall use commercially reasonable efforts to secure the right to use the trade name "Margaritaville" as the name of the Restaurant and, if successful, shall within a commercially reasonable time (not to exceed one-hundred-eighty (180) days after having secured said right) change the name of the Restaurant from "Jimmy Buffett's at the Beachcomber" to either "Jimmy Buffett's Margaritaville Café", "Margaritaville Café" or "Margaritaville" (with corresponding changes to Beachcomber's signage, advertising, promotional materials and all other items reflecting the "Jimmy Buffett's at the Beachcomber" name or logo).

## 18.   Honolulu Store

Trademark License Agreement, dated May 30, 2008, by and between Margaritaville Enterprises, LLC and Margaritaville Store of Honolulu, LLC ("Honolulu"). Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Honolulu a non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, in connection with the operation of a Margaritaville retail store in Honolulu, Hawaii, including the sale of branded products at the store. The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant. The term of the Agreement is perpetual, unless terminated pursuant to certain termination provisions.

## 19.   Atlantic City Casino/Hotel/Restaurant/Logo Store

No negotiations are actively being pursued, but Margaritaville is looking for new partners with which to do a deal for a Margaritaville-themed casino in Atlantic City, New Jersey.

## 20.   United Arab Emirates Restaurants

Trademark Sub-License Agreement, dated July 10, 2008, by and between Margaritaville of Dubai, LLC and Seven Tides Limited. Margaritaville grants to Seven Tides a license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of Margaritaville Restaurants in all countries of the United Arab Emirates (except Oman, for which Seven Tides has a right of first refusal) (each country, a "Territory"; and collectively, the "Territories"). Subject to Margaritaville's right to terminate the Agreement with respect to certain Territories, the Agreement is exclusive as to the Territories The Term of the Agreement is ten years, with two, five-year renewals at the option of Seven Tides, if Seven Tides is in full compliance with all materials terms and conditions then applicable pursuant to the Agreement; and the Agreement is not

- 8 -

otherwise terminated. As a material condition of the grant of the license, Seven Tides agrees that the Dubai Location will open by July 10, 2011.

This Agreement has been terminated.

### 21.   Mohegan Sun Restaurant

Trademark License Agreement, dated June 1, 2008, by and between Margaritaville Enterprises, LLC and Margaritaville of Connecticut, LLC.  Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Margaritaville of Connecticut, LLC a non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of a Margaritaville Restaurant in New London County, Connecticut.  The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant.

### 22.   Canada Restaurants

Trademark Sub-License Agreement, dated June 21, 2011, by and between Margaritaville of Canada, LLC and Latitudes North Dining and Entertainment, Inc.  Margaritaville grants to Latitudes North Dining and Entertainment, Inc. a license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of Margaritaville Restaurants in Canada (each restaurant location, a "Venue").  Subject to Margaritaville's right to partially terminate the Agreement with respect to certain Venues and future Venues, the Agreement is exclusive in Canada.  The Term of the Agreement is ten years, with consecutive ten-year renewals at the option of Latitudes North Dining and Entertainment, Inc., if Latitudes North Dining and Entertainment, Inc. is in full compliance with all material terms and conditions then applicable pursuant to the Agreement; and the Agreement is not otherwise terminated.

The "Intellectual Property" is defined as, collectively, the "Trademarks" and the "Concept".  The "Trademarks" include the MARGARITAVILLE mark and other marks as used "in direct relation to restaurant services".  The "Concept" is the name and approved likeness of Jimmy Buffett and other intellectual property of Margaritaville as used in the Margaritaville restaurant in Orlando, Florida.  The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant.

### 23.   License Agreement between Cheeseburger Holding Company, LLC and Paradise Restaurant Group, LLC

Trademark Sublicense Agreement, dated September 15, 2009, between Cheeseburger Holding Company, LLC and Paradise Restaurant Group, LLC ("Trademark Sub-License Agreement"). Cheeseburger Holding Company, LLC ("CHC") is a wholly-owned and licensed subsidiary of Margaritaville Enterprises, LLC.

The Trademark Sublicense Agreement replaces the Amended and Restated Sublicense Agreement between Cheeseburger Holding Company, LLC and Cheeseburger in Paradise, LLC, dated January 1, 2005 ("Outback Agreement"). Paradise Restaurant Group, LLC ("PRG") purchased 100% of OS Tropical's interests in Cheeseburger in Paradise, LLC, pursuant to a Purchase and Sale Agreement dated September 15, 2009 between OS Tropical, LLC ("Outback") and Cheeseburger in Paradise, LLC, on the one hand, and Paradise Restaurant Group, LLC, on the other hand. Prior to this transaction, the

CHEESEBURGER IN PARADISE restaurants were operated by Cheeseburger in Paradise, LLC pursuant to the Outback Agreement.

CHC grants to PRG an exclusive license to use the CHEESEBURGER IN PARADISE mark for the name of the Restaurants, to develop, advertise and promote the Restaurants, and to sell Products at the Restaurants on the Web Site and in any additional channels of trade that are approved in advance by CHC.

CHC also grants to PRG a non-exclusive license to use the Buffett IP Rights (i.e., the Publicity Rights and "Cheeseburger in Paradise" song) to design, manufacture, package and promote the Products, and to advertise, promote and market the Products and Restaurants.

For purposes of the Agreement, "Restaurants" is defined as the combined restaurant and bar locations branded with the CHEESEBURGER IN PARADISE trademark. "Products" is defined as Merchandise, Food, Alcoholic Beverages, Menu Items (as such terms are defined in the Agreement) and promotional products therefor.

The exclusive license grant is subject to exceptions which allow Margaritaville, Jimmy Buffett and/or its controlled entities to use the mark:

    (i)    in existing and future Margaritaville Restaurants and retail stores in a manner materially consistent with current use of the mark as of August 31, 2009;

    (ii)    on tour merchandise and merchandise sold through the Coconut Telegraph in a manner materially consistent with current use of the mark; and

    (iii)    in connection with music and literary compositions.

Margaritaville, and its controlled entities are expressly forbidden from using or granting licenses to third parties to use the CHEESEBURGER IN PARADISE mark for any other goods or services without prior approval.

The exclusive license grant is subject to exclusions which prohibit PRG from:

    (i)    manufacturing any Alcoholic Beverages;

    (ii)    using the MARGARITAVILLE mark as the name of any Food or Alcoholic Beverage; and

    (iii)    manufacturing, marketing or selling any Products that are the subject of prior agreements between third parties and Enterprises or its Affiliates.

The Territory covered by the Agreement is worldwide with the express exclusion of Japan, Hawaii and Mexico. The term of the Agreement is perpetual subject to express termination provisions set forth in the Agreement.

The parties acknowledge that the Agreement does not create a franchise relationship. The Agreement provides PRG with an option to request that PRG become a franchisor of the Restaurants in the future. Any such Request must be made by the tenth anniversary of the Effective Date (i.e., September 15, 2019). CHC can reject any Request in its sole discretion, and shall reject any Request, unless it receives an unqualified written opinion from legal counsel for PRG that CHC has no liability under any franchise or franchise-related laws for any conduct by PRG as a franchisor.

### 24.  Nashville Restaurant

Trademark License Agreement, dated December 10, 2009, by and between Margaritaville Enterprises, LLC and Margaritaville of Nashville, LLC.  Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Margaritaville of Nashville, LLC a perpetual, non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of a Margaritaville Restaurant in Nashville, Tennessee.

### 25.  License Agreement between Margaritaville Enterprises, LLC and Mott's, Inc.

Trademark License Agreement, dated September 30, 2000, by and between Margaritaville Holdings LLC, Mott's Inc. and Jimmy Buffett, as amended by:  (1) First Amendment to Trademark License Agreement, effective January 1, 2005; and (2) that certain letter delivered by Joel Feldman on December 6, 2006, signed by Georg Rasinski, Authorized Representative and Director of Mott's Inc.; such letter replaced Jimmy Buffett with Margaritaville Enterprises, LLC as the licensor of trademarks, and replaced Margaritaville Holdings LLC with Margaritaville Enterprises, LLC, with respect to all rights and responsibilities thereof.

Margaritaville Enterprises, LLC grants to Mott's, Inc., an affiliate of Cadbury Schweppes Americas, an exclusive license agreement to manufacture, label, package, distribute and sell non-alcoholic cocktail mixes and alcoholic cocktail mixes containing no more than 1% alcohol by volume within the United States, Canada and Mexico under the MARGARITAVILLE mark and variations thereof. The license was entered into on September 30, 2000, for a term of four years, with an option to renew for additional terms of two years each.

The Territory of the Agreement is the United States; provided, however, that if Margaritaville obtains trademark registrations for marks incorporating MARGARITAVILLE for cocktail mixes in Canada, Mexico or the U.S. possessions or territories, such areas shall automatically become part of the Territory.

Per an amendment dated October 10, 2009, Mott's is granted a license to use the Licensed Marks on the website margaritavillemix.com, and the Territory is expanded to confirm inclusion of Canada.

### 26.  License Agreement Between Margaritaville SPI, LLC and Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions

License Agreement, dated July 14, 2004, between Margaritaville SPI, LLC and Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions, as amended by that certain letter delivered by Joel Feldman on December 14, 2006, signed by Alejandro Pena, Authorized Representative of Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions; such letter replaced Margaritaville Holdings LLC with Margaritaville Enterprises. LLC as sublicensor of trademarks.  The license was again amended on March 1, 2007 and December 1, 2008.

Margaritaville SPI, LLC ("SPI"), a wholly-owned and licensed subsidiary of Margaritaville Enterprises, LLC, grants an exclusive sub-license to Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions for use of the MARGARITAVILLE design mark including the Hemisphere Dancer Cartouche Design, for blenders, coolers, and grills, with provisions in the License Agreement for expansion of the products to include small appliances for food and beverage preparation and cooking, and indoor and outdoor cookware, indoor and outdoor tabletop accessories, indoor and outdoor tableware and indoor and

*ATL 18,212,122v2 8-12-11*

outdoor gas and electric lighting products. The license was entered into on July 14, 2004, for a term expiring on December 31, 2013, with options to renew for three additional terms of five years each.

The Territory of this Agreement is worldwide.

### 27. License Agreement Between Margaritaville Footwear, LLC and ACI International

Amended and Restated License Agreement, dated July 19, 2004, between Margaritaville Footwear, LLC and ACI International, Inc., as amended by: (a) that certain letter delivered by Joel Feldman on December 2, 2006, signed by Scott Coble, Authorized Representative of ACI International, Inc.; such letter replaced Margaritaville Holdings LLC with Margaritaville Enterprises, LLC as sublicensor of trademarks; and (b) Amendment to License Agreement dated January 1, 2008.

Margaritaville Footwear, LLC, a wholly-owned and licensed subsidiary of Margaritaville Enterprises, LLC, grants an exclusive license to ACI International to advertise, merchandise, promote, publicize, and sell footwear under the mark MARGARITAVILLE or CARIBBEAN SOUL to mid-tier retailers (such as department stores, family footwear stores, sporting goods stores, specialty retailers and surf shops), clubs (such as Costco, Sam's, Price Club, etc.), and price retailers (such as T.J. Maxx, Ross, etc.), in any location where the mark is registered. The license was entered into on July 19, 2004, for a term expiring on December 31, 2007. Pursuant to the December 21, 2010 amendment, the term has been extended through December 31, 2013.

The Territory of this Agreement is the geographical areas where the marks MARGARITAVILLE and CARIBBEAN SOUL are registered.

### 28. License Agreement between Margaritaville Enterprises, LLC and Sirius XM Radio Inc.

License Agreement, dated July 12, 2011, between Sirius XM Radio, Inc. and Margaritaville Enterprises, LLC. This License Agreement replaces a prior License Agreement, dated April 27, 2005, between Sirius Satellite Radio, Inc., Margaritaville Holdings LLC and Jimmy Buffett, as amended on December 5, 2006, July 14, 2008, May 29, 2009 and June 9, 2011.

Margaritaville Enterprises, LLC grants Sirius XM a royalty free license to use: (1) the Margaritaville name and trademarks, (2) the Parrothead name and trademarks, and (3) Jimmy Buffett's name, voice, likeness and image in connection with distributing, marketing, publicizing and promoting a 24-hour, seven-day-a-week, commercial-free audio service entitled "Radio Margaritaville", as part of Sirius XM's multi-channel audio entertainment service, however distributed in any and all media now known or hereafter devised, including satellite radio service (including transmissions through non-satellite infrastructure to enhance signal delivery where satellite signal is limited or unavailable), internet streaming and downloads, cable and satellite television and mobile telephones. The License Agreement was executed on July 12, 2011 for a term of three years.

### 29. License Agreement between Margaritaville Malt Beverages, LLC and Anheuser-Busch, Incorporated

Margaritaville Malt Beverages, LLC, a wholly-owned and licensed subsidiary of Margaritaville Enterprises, LLC, grant to Anheuser-Busch, Inc. an exclusive, non-assignable license to use and exploit the marks LANDSHARK and LANDSHARK LAGER (and on a non-exclusive basis, the MARGARITAVILLE mark) to manufacture, label, package, distribute, advertise, market, promote and sell malt beverage products.  License Agreement is dated March 1, 2007 for a term expiring on December 31, 2026 (the "Initial Term"), and shall automatically renew for a subsequent 20-year term (the "First Renewal Term").  Upon completion of the First Renewal Term, the License Agreement shall automatically renew for one additional subsequent 20-year term (the "Second Renewal Term"). However, neither the First Renewal Term nor the Second Renewal Term shall not be automatically renewed if certain performance standards are not met.

The Territory of this Agreement is the United States and its possessions.  In addition, Anheuser-Busch has the right to negotiate for an expanded Territory.  Also, in the event that Margaritaville expands its trademark rights in the LANDSHARK LAGER mark to other countries, such countries shall become part of the Territory.  The mark is currently pending in Canada.

The Agreement also provides that, during the Term and for 6 months thereafter, neither Margaritaville nor its affiliates will authorize or permit the use of the Licensed Properties to manufacture, advertise or promote any malt beverages other than the Malt Beverage Products.  "Licensed Properties" includes the trademark MARGARITAVILLE, Jimmy Buffett's name, voice, image, identity and likeness to the extent associated with the "Margaritaville" lifestyle concept and provided by Margaritaville for Sublicensee's use, and musical compositions and sound recordings featuring Jimmy Buffett.

### 30.    Garden Fresh Salsa

Trademark Sublicense Agreement, effective as of December 10, 2007, by and between Margaritaville Foods, LLC and Garden Fresh Salsa Company, Inc.  Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to Garden Fresh an exclusive license in the United States and Canada (and their territories), to provide, label, package and distribute under the MARGARITAVILLE mark corn-based tortilla chips and pre-packaged, refrigerated (not shelf-stable) dips, spreads, hummus, guacamole and salsa that use avocadoes, cheese, chickpeas, and/or tomatoes as a primary ingredient in food products manufactured for human consumption.  The Agreement is effective as of December 10, 2007, for a three-year term, with successive renewal periods of two years each, subject to Garden Fresh's compliance with certain performance criteria.

### 31.    Tampa Maid Foods, Inc.

Trademark Sublicense Agreement, effective as of October 1, 2008, by and between Margaritaville Foods, LLC and Tampa Maid Foods, Inc.  Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to Tampa Maid an exclusive license in the United States and Canada (and their territories), to sell, provide, label, package, distribute, advertise, market and promote pre-packaged, frozen food products that use any of shrimp, crab, crab cakes, calamari, breaded calamari strips and breaded calamari rings, as a primary ingredient that are manufactured for human consumption.  The Agreement is effective as of October 1, 2008 through December 31, 2010, with two 2-year renewal terms, subject to Tampa Maid's compliance with certain performance criteria.

The Agreement was amended on January 1, 2010 to adjust certain minimum royalties and add trademarks.

### 32.    Wayne Farms, LLC

ATL 18,212,122v2 8-12-11

Trademark Sublicense Agreement, effective as of December 18, 2008, by and between Margaritaville Foods, LLC and Wayne Farms, LLC. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to Wayne Farms an exclusive license in the United States and Canada (and their territories), to provide, label, package, sell and distribute food that has chicken as a primary ingredient and is manufactured for human consumption. The Agreement is effective as of December 18, 2008 through December 31, 2011, with five (5) successive renewal periods of two (2) years each, subject to Wayne Farm's compliance with certain performance criteria.

### 33.    Taco Bell Corp.

Trademark License Agreement, effective as of February 5, 2009, by and between Margaritaville Enterprises, LLC and Taco Bell Corp. Margaritaville Enterprises, LLC grants to Taco Bell Corp. the right to use the mark VOLCANO NACHOS in connection with nachos in its Taco Bell-branded restaurants within the United States of America, including its territories and possessions. Taco Bell shall be permitted to delegate and sub-license the license grant to any or all of its Taco Bell-brand franchisees, sublicensees and/or delegees. Margaritaville will not grant any other party the right to use the VOLCANO NACHOS mark in the United States, its territories or possessions, during the Term of the Agreement. Notwithstanding the preceding sentence, nothing in the Agreement prevents Margaritaville from using the VOLCANO NACHOS mark in connection with its Margaritaville brand restaurants and retailing.

The Initial Term of the Agreement is January 29, 2009 to January 29, 2010. During the Initial Term, Taco Bell shall have the option, in its sole discretion, to convert the Term from one year to perpetual. Taco Bell shall exercise its option by giving written notice to Margaritaville of its intention to exercise such option and paying a required fee on or before the expiration of the Initial Term. Taco Bell exercised its option in January 2010 and the Term was converted to perpetual.

### 34.    Twang Partners, Ltd.

Trademark Sublicense Agreement, effective as of June 11, 2009, by and between Margaritaville Foods, LLC and Twang Partners, Ltd. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to Twang Partners an exclusive license in the United States (and its territories), to sell, provide, label, package, distribute, advertise, market and promote salt rimmers consisting of salt, sugar or salt-and-sugar blends, to be used in connection with salt when drinking margaritas. The Agreement is effective as of June 11, 2009 through December 31, 2012, with two 2-year renewal terms, subject to Twang Partners' compliance with certain performance criteria.

Per an amendment dated September 8, 2009, Twang is also granted exclusive use of the mark LOST SHAKER OF SALT for advertising and promotion of the Products.

### 35.    Tervis Tumbler Company

Trademark License Agreement, dated as of July 1, 2009, by and between Margaritaville Enterprises, LLC and Tervis Tumbler Company. Margaritaville Enterprises, LLC grants to Tervis a non-exclusive license to use: (a) the marks IT'S FIVE O'CLOCK SOMEWHERE, LICENSE TO CHILL and CHANGES IN LATITUDES, CHANGES IN ATTITUDES on plastic tumblers and ice buckets; and (b) the MARGARITAVILLE mark to package and promote plastic tumblers and ice buckets. The Term of the Agreement is July 1, 2009 through December 31, 2009.

- 14 -

The parties previously entered into a Settlement Agreement dated as of June 1, 2007, as amended on December 15, 2008 and February 28, 2009 (see below). The Trademark License Agreement supersedes only those parts of the Settlement Agreement that are expressly changed by the Trademark License Agreement, specifically, the provisions regarding: (a) cessation of use; (b) the Royalty; (c) an unenforceability ruling; (d) indemnification; (e) assignment; and (f) dispute resolution.

On November 3, 2009, the parties entered into an Amendment to Trademark License Agreement to allow Tervis to use the marks: (a) MARGARITAVILLE; (b) NO SHOES NO SHIRT NO PROBLEM; (c) GROWING OLDER, NOT UP; (d) BLEW OUT MY FLIP FLOP; and (e) WASTIN' AWAY AGAIN IN MARGARITAVILLE on plastic tumblers and ice buckets. The Term of the Agreement was also extended through December 31, 2011.

On January 11, 2010, the parties entered into the Second Amendment to Trademark License Agreement to amend the Territory to the United States, its territories and possessions, Canada and the Caribbean. The payment address to Margaritaville was also updated.

On August 25, 2010, the parties entered into the Third Amendment to Trademark License Agreement to add additional marks to the license grant to Tervis.

On October 27, 2010, the parties entered into the Fourth Amendment to Trademark License Agreement to amend the Territory of the Agreement to add worldwide military bases and amend the definition of the Caribbean.

### 36.    9th Street Beverages, LLC

Agreement, dated September 1, 2009, by and between Margaritaville Foods, LLC and 9th Street Beverages, LLC. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to 9th Street Beverages an exclusive license throughout the world to use the PARADISE KEY mark to name, manufacture, label, package, distribute, advertise, market, promote and sell NA Beverage Products. Margaritaville Foods, LLC also grants to 9th Street Beverages a non-exclusive license throughout the world to use the MARGARITAVILLE mark to manufacture, label, package, distribute, advertise, market and sell the NA Beverage Products and Promotional Products. The NA Beverage Products are defined as tea and tea-based beverages, coconut water and coconut-water-based beverages, premium sodas and premium-soda-based beverages, and non-sparkling and sparkling juices and non-sparkling and sparkling-based beverages. Promotional Products are defined as t-shirts and the like.

The Initial Term of the Agreement is September 1, 2009 through December 31, 2029, with two automatic, successive 20-year Renewal Terms, unless 9th Street Beverages notifies Margaritaville Foods in writing of its intent to terminate the agreement at least 180 days prior to the expiration of the Initial Term.

The Agreement also provides that, during the Term and for 6 months thereafter, neither Margaritaville nor its affiliates will authorize or permit the use of the Licensed Properties to manufacture, advertise or promote any non-alcohol beverages other than the NA Beverage Product(s). "Licensed Properties" includes the trademark MARGARITAVILLE, Jimmy Buffett's name, voice, image, identity and likeness to the extent associated with the "Margaritaville" lifestyle concept and provided by Margaritaville for Sublicensee's use, and musical compositions and sound recordings featuring Jimmy Buffett.

### 37.    Schou USA, LLC

Trademark Sublicense Agreement, effective as of November 20, 2009, by and between Margaritaville Furniture, LLC and Schou USA, LLC.   Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Furniture, LLC grants to Schou USA an exclusive license in the Territory to manufacture, advertise, promote, market, distribute and sell: (a) outdoor casual furniture and beach furniture (excluding indoor and outdoor gas and electric lighting products); and (b) outdoor furniture-related accessories and beach-furniture related accessories (excluding indoor and outdoor tabletop accessories and indoor and outdoor tableware).   Schou is also given an exclusive license to manufacture such products in China and such other manufacturing territories as may be approved by Margaritaville Furniture, LLC.

The Territory is defined as the United States, Canada, Europe, South Africa, Jamaica, Turks & Caicos, Cayman Islands and Mexico and such other countries as may be approved in writing by Margaritaville Furniture, LLC, such approval not to be unreasonably withheld.

The Agreement is effective as of November 20, 2009 through December 31, 2013, with one 5-year renewal term at Schou's option, subject to Schou's payment of certain annual minimum royalties.

The Agreement was amended on July 15, 2010 to adjust the minimum royalties.

### 38.    Orange 21 Inc.

Trademark Sublicense Agreement, effective as of February 19, 2010, by and between Margaritaville Eyewear, LLC and Orange 21 Inc., as amended on June 3, 2011.  Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Eyewear, LLC grants to Orange 21 an exclusive license to: (a) design develop, produce and manufacture Sublicensed Products anywhere in the world; and (b) advertise, promote, market, distribute and sell Sublicensed Products in the Territory.

The Sublicensed Products are defined as all eyewear, including, without limitation, non-prescription and prescription sunglasses, prescription glasses and other related products (such as goggles, sunglass cases, straps, sunglass cleaning supplies, and other eyewear accessories) that bear or have any label, packaging or other distinguishing characteristic that bears the MARGARITAVILLE mark and such other marks as may be added pursuant to the terms of the Agreement.

The Territory is defined as the United States, Canada, Australia, Jamaica, Grand Cayman, Turks & Caicos and such other countries and jurisdictions as may be approved in writing by Margaritaville pursuant to the terms of the Agreement.

The Agreement is effective as of February 19, 2010 through December 31, 2019.

### 39.    Sazerac Company, Inc.

Trademark License Agreement, effective as of April 30, 2010, by and between Margaritaville Enterprises, LLC and Sazerac Company, Inc., as amended on January 26, 2011, February 25, 2011 and March 30, 2011.  In connection with an Asset Purchase Agreement between Margaritaville Spirits, LLC and Sazerac Company, Inc., in which the assets of the Margaritaville Spirits business were sold to Sazerac, Margaritaville Enterprises, LLC granted to Sazerac: (1) an exclusive license to use the Exclusive Marks on and in connection with the Licensed Products in the Territory; and (2) a non-exclusive license

to use the Non-Exclusive Marks in connection with the marketing and promotion (and, in some cases, the sale and distribution) of the Licensed Products.

The Exclusive Marks are the marks MARGARITAVILLE and the marks used for flavors of tequila, such as TROPICAL TANGERINE. The Non-Exclusive Marks consist of certain slogans used with alcohol beverage products. The Licensed Products are bottled and prepackaged liquors, liqueurs and spirits, but excluding malt-based beverages in Class 33, wine, alcohol beverages in Class 32 and other exclusions.

The Term of the Agreement is perpetual, with certain termination rights. The Territory is worldwide.

**40.    Change Five Group, LLC (True Name: Change Five, LLC
d/b/a Margaritaville Apparel Group)**

Trademark Sublicense Agreement, effective as of May 17, 2010, by and between Margaritaville Wholesale Apparel, LLC and Change Five Group, LLC. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Wholesale Apparel, LLC grants to Change Five Group a license, during the Term in the United States, Canada and Mexico, to use the Sublicensed Marks for the Sublicensed Products, namely to manufacture, advertise, promote, market, distribute and sell the Sublicensed Products, on a wholesale basis only, to the Authorized Distribution Channels.

The Sublicensed Marks are defined as MARGARITAVILLE, LICENSE TO CHILL, LANDSHARK, and the TBD Mark. The TBD Mark is a mark to be determined by Margaritaville in its sole discretion. The Sublicensed Products are: (i) all categories of apparel for men, women, children and infants, including knit and woven tops, t-shirts, sweaters, active wear, outer wear, knit and woven bottoms, including long pants and shorts, swimwear, loungewear, sleepwear and underwear; and (ii) apparel-related accessories, specifically, hats and bags, which are approved by Margaritaville pursuant to the Agreement and manufactured by, or on behalf of, and sold or promoted by Change Five Group under one or more of the Sublicensed Marks. Sublicensed Products expressly exclude footwear, eyewear and eyewear accessories.

The Authorized Distribution Channels are: (i) better department stores, such as Dillard's and Macy's; (ii) mid-tier department stores, such as Kohl's, JC Penney and Sears; (iii) mass market stores, such as Wal-Mart and Target; (iv) wholesale clubs, such as Costco and Sam's Club; (v) Margaritaville-branded retail stores; (vi) off-price retailers, such as Marshall's, T.J. Maxx, Ross Stores and Burlington, as long as the overall quality of goods and type of operations continue to be at the same or a more upscale level; (vii) better specialty stores, such as Gary's, Mitchell's and Fred Segel; and (viii) resorts and hotels.

The license is exclusive regarding wholesale distribution of the Sublicensed Products, with three exceptions: (i) Margaritaville (and/or its affiliates) can continue to distribute Sublicensed Products on a wholesale basis for "road show" sales in Costco stores until August 2010; (ii) Margaritaville (and/or its affiliates) can continue to distribute Sublicensed Products on a wholesale basis to Wal-Mart until June 2010, and thereafter, if Margaritaville meets certain specified conditions of entering into a new agreement with Wal-Mart; and (iii) Margaritaville (and/or its affiliates) may purchase Sublicensed Products from other wholesalers or manufacture Sublicensed Products itself for sale in Margaritaville-branded retail stores. Margaritaville is not required to purchase Sublicensed Products from Change Five Group for sale in Margaritaville-branded retail stores, but may do so in its sole discretion.

The Agreement is effective as of May 17, 2010 through December 31, 2014, with three (3) consecutive, three (3) year renewals at Change Five Group's option, if Change Five Group is in compliance with the Agreement, including certain minimum royalty obligations.

**41.    Puerto Rico / Panama Restaurants**

Trademark Sub-License Agreement, dated August 9, 2010, by and between Margaritaville Enterprises, LLC and Margaritaville of Puerto Rico, LLC, on one hand, and Airport Shoppes Corp. d/b/a International Meal Company Caribe ("IMC Caribe"), on the other.  Margaritaville of Puerto Rico, LLC grants to IMC Caribe a license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of restaurants and bars in Puerto Rico and Panama (each location, a "Venue").  Specifically, the parties intend for IMC Caribe to open AIR MARGARITAVILLE-branded restaurant Venues at the Puerto Rico Airport and the Panama Airport, LANDSHARK-branded bar Venues at the Puerto Rico Airport, and other locations as may be mutually agreed upon.

Subject to Margaritaville's right to partially terminate the Agreement with respect to certain Venues and future Venues, the Agreement is exclusive in Puerto Rico and Panama. The Term of the Agreement is ten years from the date of that the first Venue opens for business, with one ten-year renewal at the option of IMC Caribe, if IMC Caribe is in full compliance with all material terms and conditions then applicable pursuant to the Agreement; and the Agreement is not otherwise terminated. As a material condition of the grant of the license, IMC Caribe has a contractual duty to begin construction on the first Venue within six months of the Effective Date (*i.e.*, by February 9, 2011).  Margaritaville may terminate the Agreement if the Puerto Rico Airport Location does not open within two years of the Effective Date (*i.e.*, by August 9, 2012) or if IMC Caribe does not obtain the required approvals to open by February 9, 2012.

The Agreement explicitly excludes the right to use the mark DON'T STOP THE CARNIVAL for any goods and services and CHEESEBURGER IN PARADISE as the name of a restaurant.

The "Intellectual Property" is defined as, collectively, the "Trademarks" and the "Concept".  The "Trademarks" include the marks MARGARITAVILLE, AIR MARGARITAVILLE and LANDSHARK. The "Concept" is the name and approved likeness of Jimmy Buffett and other intellectual property of Margaritaville as used in the Margaritaville restaurant in Orlando, Florida.

**42.    THQ**

Trademark Sublicense Agreement, effective as of August 31, 2010, by and between Margaritaville Videogames, LLC and THQ Inc., as amended on June 6, 2011. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Videogames, LLC grants to THQ an exclusive license for the Term and in the Territory to use the Sublicensed Property in connection with the manufacture, development, publication, exhibition, distribution, promotion, marketing, sale and advertisement of the Sublicensed Products on the Platforms in the Distribution Channels. Jimmy Buffett also grants a separate license to THQ to use his personality rights and certain music material in the same manner and subject to the same approvals as the Sublicensed Property in the Sublicense Agreement.

The Sublicensed Property is defined as: (a) the trademark MARGARITAVILLE; and (b) solely if embodied in Jimmy Buffett's Margaritaville Café in Orlando, FL, those certain characters, story lines, settings, locations, trademarks, trade dress, copyrighted materials, other intellectual property and the

Buffett personality rights and music material, which Margaritaville: (i) owns or is authorized to sublicense to THQ; and (ii) approves in writing in advance for use with the Sublicensed Products, in Margaritaville's sole discretion.

The Sublicensed Products are defined as interactive game products that operate so that the user may interact with the product on the Platform(s). The Platforms include various types of videogame platforms including social media websites. The Distribution Channels are those certain channels of distribution now known or later devised that commonly carry products like the Sublicensed Products, including wholesalers, retailers, e-tailers, broadband, internet, streaming, mail order, and video rental stores.

The Territory is defined as the United States in the English language, and such other countries and languages as may be approved in writing by Margaritaville in its sole discretion.

The Term of the Agreement is August 31, 2010 through five years after the initial commercial release of the first Sublicensed Product. The initial commercial release of the first Sublicensed Product shall occur by December 31, 2011.

### 43. Mississippi Casino/Restaurant

Trademark Sub-License Agreement, dated October 26, 2010, by and between Margaritaville of Mississippi, LLC and MVB Holding, LLC. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville of Mississippi, LLC grants to MVB Holding, LLC a license to use the Margaritaville Intellectual Property to operate a "Margaritaville"-branded casino and marina, and develop and construct a "Margaritaville"-branded restaurant and retail store in Biloxi (the "Project").

The Term of the Agreement is twenty years. The Territory is Harrison County, Mississippi, Hancock County, Mississippi, and the area within a twenty-five (25) mile radius from the Project.

The license is exclusive with respect to: (i) other combined casino/restaurant/retail store facilities reasonably similar to the Project in concept or name within the Territory; and (ii) any other casino reasonably similar in concept or name to the Casino within the Territory, except that such restrictions shall not apply to: (x) the restaurant concept commonly known as "Cheeseburger in Paradise"; or (y) use of the Margaritaville Intellectual Property on slot machines in non-"Margaritaville"-branded casinos.

MVB Holding has a right of first refusal regarding: (i) a hotel incorporating the Margaritaville Intellectual Property or a Jimmy Buffett-related theme (other than Cheeseburger in Paradise) within the Territory; and (ii) a casino incorporating the Margaritaville Intellectual Property or a Jimmy Buffett-related theme (other than Cheeseburger in Paradise) within the Territory.

### 44. Pensacola Hotel

Franchise and Lease Agreement, dated [_____], 20[__], by and between Margaritaville of Pensacola Hotel, LLC and Margaritaville of Pensacola, LLC, on the one hand; and Little Sabine, Inc., on the other hand. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville of Pensacola Hotel, LLC grants to Little Sabine a non-exclusive license to use the Intellectual Property in connection with the operation of a hotel in Pensacola, Florida. Little Sabine also leases space to Margaritaville of Pensacola, LLC for Margaritaville of Pensacola, LLC to provide certain food, beverage and retail services within the hotel. The term of the agreement is ten years. [PLEASE NOTE THIS AGREEMENT IS STILL PENDING.]

In connection with the Franchise and Lease Agreement, Margaritaville of Pensacola, LLC entered into a License Agreement dated July 31, 2010 with Jeweler's Trade Shop, Inc., to permit Jeweler's Trade Shop to produce jewelry items with the MARGARITAVILLE mark and other song lyrics to be sold on consignment by Margaritaville at the retail shop of the hotel.

### 45.   Chicago - Navy Pier Restaurant

Trademark License Agreement, dated November 29, 2010, by and between Margaritaville Enterprises, LLC and Margaritaville of Chicago, LLC.  Pursuant to the Agreement, Margaritaville Enterprises, LLC grants to Margaritaville of Chicago, LLC a perpetual, non-exclusive, non-transferable license to use certain trade names, service marks and trademarks, the Margaritaville Restaurant concept and operating system and all elements thereof including (without limitation) recipes, and operating technologies in connection with the operation of an Air Margaritaville Restaurant at Navy Pier in Chicago, Illinois.

### 46.   The Walking Company Holdings, Inc. / Big Dogs Sportswear

Trademark License Agreement, dated December 1, 2010, by and between Margaritaville Enterprises, LLC and The Walking Company Holdings, Inc.  Under the Agreement, Margaritaville Enterprises, LLC grants to The Walking Company Holdings, Inc. a perpetual, non-exclusive, assignable, and sublicenseable license to use IT'S FIVE O'CLOCK SOMEWHERE for clothing, headwear, sleepwear, stationery, mugs, towels, bottle openers, and wall clocks.

### 47.   Hollywood Resort

Operating agreement of Margaritaville Hollywood Beach Resort, LLC ("MHBC"), dated February 9, 2011, by and between Margaritaville of Hollywood, Florida, LLC ("Hollywood") and Hollywood Resort Partners, L.P., for developing, leasing, financing, constructing, owning, maintaining and operating a Margaritaville-themed resort, restaurant, bar, retail, entertainment and marina complex in Hollywood, Florida (the "Project").  The Operating Agreement includes a Trademark Sub-License Agreement by and between Hollywood and MHBC. Pursuant to this Trademark Sub-License Agreement, Hollywood grants to MHBC a license to use certain Margaritaville intellectual property in connection with the Project as follows:

    (i)    the mark MARGARITAVILLE HOLLYWOOD BEACH RESORT shall be used as the name of the hotel and the overall name of the Project;

    (ii)    the mark MARGARITAVILLE shall be used for the purpose of developing, decorating, advertising, promoting and operating the Margaritaville-branded restaurant and the Margaritaville-branded retail store located within the Project, and in connection with Products (as defined in such Trademark Sub-License Agreement) related thereto; and

    (iii)    the mark 12-VOLT BAR shall be used for the purpose of developing, decorating, advertising, promoting and operating a bar area within the Project, and in connection with Products related thereto.

During the period of the Ground Lease for the Project, as those capitalized terms are defined in the Operating Agreement, Margaritaville agrees not to:

(i)    license or operate any other Margaritaville-themed restaurants within a 10-mile radius of the Project;

(ii)    license or operate a Margaritaville-branded hotel or other lodging establishment in Palm County, Florida for five (5) years from the date on which the City of Hollywood, Florida issues the Certification of Final Completion, as that term is defined in the aforementioned Ground Lease; and

(iii)    license or operate a Margaritaville-branded hotel or other lodging establishment in Broward County, Florida or Miami-Dade County Florida during the term of such Ground Lease;

provided, however, the restrictions set forth above shall not apply to one (1) food or beverage business or hotel or other lodging establishment, not including the food and beverage establishment(s) and lodging establishment(s) incorporated within the Project, located at an existing, non-oceanfront pari-mutual licensed location.

## 48.    Vita Food Products, Inc.

Trademark Sublicense Agreement, effective as of December 6, 2010, by and between Margaritaville Foods, LLC and Vita Food Products, Inc.. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to Vita Food an exclusive license to sell, provide, label, package, distribute, advertise, market, and promote barbeque sauces, marinades, spices, salad dressings, hot / wing sauce, relish, pickles, and agave nectar, each of an unrefrigerated, shelf-stable variety (the "Products") using the MARGARITAVILLE and Hemisphere Dancer Logo marks. The Territory of the agreement is the United States (and its territories and possessions) and Canada, with provisions for the parties to expand such Territory as set forth in Agreement. The Agreement further provides a right of first refusal for Vita Foods, should Margaritaville wish to distribute the Products under other marks, with the exception of the CHEESEBURGER IN PARADISE mark.

The Agreement is effective as of December 6, 2010 through December 6, 2012, with two (2) successive renewal periods of one (1) year each, subject to Vita Food's compliance with certain performance criteria.

## 49.    Spartan Foods of America, Inc.

Trademark Sublicense Agreement, effective as of December 10, 2010, by and between Margaritaville Foods, LLC and Spartan Foods of America, Inc. Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville Foods, LLC grants to Spartan an exclusive license to sell, provide, label, package, distribute, advertise, market, and promote pre-packaged pizza and pizza appetizers, each of a frozen or refrigerated variety; and pre-packaged pizza crust or dough, each of a frozen, refrigerated, or shelf-stable variety (the "Products") using the MARGARITAVILLE and Hemisphere Dancer Logo marks. The Territory of the agreement is the United States (and its territories and possessions) and Canada, with provisions for the parties to expand such Territory as set forth in Agreement. The Agreement further provides a right of first refusal for Spartan, should Margaritaville wish to distribute the Products under other marks, with the exception of the CHEESEBURGER IN PARADISE mark.

The Agreement is effective as of December 6, 2010 through December 31, 2014, with two (2) successive renewal periods of one (1) year each, subject to Spartan's compliance with certain performance criteria.

**50.      Designs by Lolita and Santa Barbara Design Studios**

Manufacturing and Co-Branding Agreement, effective as of March 25, 2011, by and between Margaritaville Enterprises, LLC, Designs by Lolita, Inc. and Santa Barbara Design Studios, Inc.  Pursuant to the Agreement, SBDS will manufacture limited edition wine glasses, shot glasses, and margarita glasses, all made out of glass and developed by Lolita, for distribution by Margaritaville at its Margaritaville-branded stores and online.  The Products shall all be co-branded with: (1) MARGARITAVILLE, LANDSHARK, and/or IT'S FIVE O'CLOCK SOMEWHERE; and (2) LOLITA and/or DESIGNS BY LOLITA.  Both parties will retain individual trademark/and or copyright ownership of all pre-existing designs, brands, and artwork created by such party under the Agreement.  The Agreement prohibits use of any derivative works created under the Agreement after the expiration or termination of the Agreement.

The Agreement is effective as of March 25, 2011 through December 31, 2011.  Unless terminated by either party as set forth in the Agreement, the Agreement will automatically renew for successive renewal periods of one (1) year each.

**51.      Landshark Beer Garden**

Trademark Sublicense Agreement, effective as of May 15, 2011, by and between Margaritaville of Chicago, LLC and Pier 1996, Inc.  Pursuant to a license from Margaritaville Enterprises, LLC, Margaritaville of Chicago, LLC grants to Pier 1996, Inc. an exclusive license to use the marks LANDSHARK, LANDSHARK LAGER, and the Fin Island Design for the naming, advertising and promotion of the Beer Garden located at Navy Pier in Chicago, Illinois, during the Term and in the Territory.

The Territory is defined as Chicago, Illinois.  The Agreement is effective as of May 15, 2011 through October 15, 2012.

**52.      Sun & Skin Care Research, Inc.**

Trademark Sublicense Agreement, effective as of June 1, 2011, by and between Margaritaville Foods, LLC and Sun & Skin Care Research, Inc.  Pursuant to a license from Margaritaville Enterprises, LLC (as amended), Margaritaville Foods, LLC grants to SSCR an exclusive license to sell, provide, label, package, distribute, advertise, market, and promote suncare products, namely suntan lotions, creams, gels and oils; after-sun products, namely, after-sun milks, gels, oils, after-sun creams and after-sun lotions; and sunless tanning products (the "Products") using the marks "MARGARITAVILLE" and "PARROTHEAD" as part of the name.  The Territory of the agreement is the United States of America, its territories and possessions, Canada, Central America, South America, the Caribbean, and on cruise ships through cruise ship chandlers or other specialty ship provisioners. The Agreement further provides a right of first refusal for SSCR, should Margaritaville wish to distribute the Products under other marks, with the exception of the CHEESEBURGER IN PARADISE mark.

The Agreement is effective as of June 1, 2011 through December 31, 2014, with nine (9) consecutive calendar-year renewal terms of two (2) years each, subject to SSCR's compliance with certain performance criteria.

**53.      Myrtle Beach SkyWheel**

Cross Licensing Agreement, dated April 15, 2011, by and between LandShark of Myrtle Beach, LLC and Myrtle Beach SkyWheel, LLC. Pursuant to a license from Margaritaville Enterprises, LLC, LandShark of Myrtle Beach, LLC grants to Myrtle Beach SkyWheel, LLC a royalty-free license to use the marks LANDSHARK BAR & GRILL and LANDSHARK SURFSHACK solely in connection with the promotion of the Project. Myrtle Beach SkyWheel, LLC grants to LandShark of Myrtle Beach, LLC a royalty-free license to use the SKYWHEEL mark solely in connection with the promotion of the Project. The Project consists of a SkyWheel observation ride, common areas and a LANDSHARK-branded restaurant and retail store.

The Term of the Cross Licensing Agreement is concurrent with the Lease between the parties. The Lease begins on the earlier of June 15, 2011 or the date on which LandShark of Myrtle Beach, LLC opens to the public for business and the SkyWheel is fully licensed and operational. The Lease expires on August 31, 2025.

B.     **Settlement/Coexistence Agreements**

### ARTICLE 161.     Cheeseburger In Paradise, Inc. Hawaii Settlement License Agreement (United States, Mexico, Japan)

The owners of a restaurant in Hawaii (CIPI) own U. S. Registration No. 1,765,057 for CHEESEBURGER IN PARADISE and Design for restaurant and bar services; Registration No. 2,418,610 for CHEESEBURGER IN PARADISE for restaurant and bar services; Application Serial No. 75/553,387 for CHEESEBURGER IN PARADISE & Design for restaurant and bar services; and Application Serial No. 75/978,135 for CHEESEBURGER IS A STATE OF MIND for restaurant and bar services.

Pursuant to a confidential Settlement License Agreement and Court Order issued by the United States District Court for the Central District of California, Western Division, on June 3, 1999, CIPI has limited its use of the CHEESEBURGER IN PARADISE marks within the United States to (1) the name of no more than one restaurant in Lahaina, Maui, Hawaii and one restaurant in Waikiki, Oahu, Hawaii; (2) menu items at each of the two restaurants; and (3) promotion of the restaurants. Outside of the U.S., CIPI has limited its use of the CHEESEBURGER IN PARADISE marks to Mexico and Japan.

Pursuant to that same Settlement License Agreement and Court Order, Jimmy Buffett or any company in which Jimmy Buffett is a majority shareholder or controlling party, has the right to use the CHEESEBURGER IN PARADISE mark anywhere in the world, except that in Hawaii, Mexico and Japan only, Buffett shall not use the mark on, in connection with or as a name of a bar, casino, restaurant, nightclub, lodging or resort services; as a food item; or on a food menu:

> other than either in an ornamental manner with at least, and no more prominently than one other song, book or play title or other word mark of [Buffett]; or as a mark for or in connection with merchandise items, provided other merchandise items without that mark also appear or are mentioned in the same section of the menu. ¶7.a.(ii).

This restriction affects Buffett's Reg. Nos. 2,790,010, 3,137,800 and 2,468,644, which cover the entire United States, except Hawaii.

*ATL 18,212,122v2 8-12-11*

The License Agreement expressly states that CIPI shall not be limited in the number of restaurants it may open in Hawaii bearing the CHEESEBURGER IN PARADISE mark. Additionally, CIPI has limited rights to sell merchandise bearing the CHEESEBURGER IN PARADISE mark.

Buffett may not use or display the CHEESEBURGER IN PARADISE mark anywhere in the world in the manner specifically depicted in CIPI's Registration No. 1,765,057 (below):



(CIPI Design)

Buffett is permitted to use the CHEESEBURGER IN PARADISE song title or mark "anywhere in the world in conjunction with the promotion, advertising or marketing of any goods, merchandise, services or businesses in any media, including via the Internet, mass mailings of catalogs or any other means, provided that . . .within the U.S., such marketing, advertising or promotion is not disseminated primarily to Hawaii," and "within Mexico and/or Japan, such advertising, marketing or promotion is not primarily targeted to areas where Defendants [CIPI] have provided [Buffett] with written notice . . . that [CIPI] . . . or any other company of which any one or more of the Defendants [CIPI] is a majority shareholder or controlling party, owns or operates a restaurant under the name 'Cheeseburger in Paradise'."

Despite this Settlement License Agreement, CIPI opposed Licensor's use of the CHEESEBURGER IN PARADISE & Design marks for jewelry, beverage glassware, clothing and nightclub services in the U.S. (Single Palm Design and Multiple Palm Design) on July 15, 2004. The Board dismissed the oppositions with prejudice on July 21, 2006.

On March 9, 2005, Jimmy Buffett filed a lawsuit against CIPI in federal court in California for violations of the Settlement License Agreement. On April 11, 2006, the parties entered into a confidential Supplemental Settlement License Agreement and Court Order issued by the United States District Court for the Central District of California, Southern Division, ("Supplemental Settlement License Agreement").

The Supplemental Settlement License Agreement clarifies the terms of CIPI's right to use the Mark. Further, CIPI confirms in the Supplemental Settlement License Agreement that Jimmy Buffett's use of the CHEESEBURGER IN PARADISE & Design marks outside of Hawaii, Mexico and Japan does not violate the Settlement License Agreement. In all other respects, the Supplemental Settlement License Agreement does not change the provisions of the Settlement License Agreement with respect to Jimmy Buffett's use of the Mark.

2.    **Co-Existence License Agreement between Jimmy Buffett and Tropic Isle Foods, Inc. (United States)**

Tropic Isle Foods, Inc. opened a Margaritaville restaurant in Capitola, California in 1985, and subsequently opened Margaritaville restaurants in Sausalito and Walnut Hill, California. A cease and desist letter was sent to the owners in 1990; but the owners refused to change the name. When further

- 24 -

negotiations failed, a lawsuit was filed against Tropic Isle.  However, Tropic Isle's use of the mark pre-dated Jimmy's use.  In October, 1994, the parties entered into a settlement License Agreement.

Pursuant to the settlement License Agreement, Tropic Isle will not object to use or registration of MARGARITAVILLE by Buffett for any goods, services and business throughout the world, including Northern California and Hawaii, except Buffett cannot use MARGARITAVILLE as the name of a restaurant in Northern California or on the four main Hawaiian islands.

Tropic Isle can use MARGARITAVILLE in the name of three existing restaurants in Northern California, up to 15 additional restaurants in Northern California (defined as "north of a line running entirely through California from east to west along the southernmost limits of a city of San Luis Obispo") and one restaurant on each of the four Hawaiian islands of Hawaii (main island), Maui, Oahu and Kauai. As a minor sideline to the restaurant, Tropic Isle can manufacture, sell or give away, in their MARGARITAVILLE restaurants in Northern California and Hawaii, certain souvenir items at a cashier's counter or another small counter in the restaurant or in response to unsolicited remote orders.  Tropic Isle retains state registrations for MARGARITAVILLE in California and Hawaii.

### 3.    License Agreement between Jimmy Buffett and Kukai Caliente (United States)

On July 31, 1990, Jimmy Buffett and Kukai Caliente, Inc. entered into a settlement License Agreement as a result of Kukai Caliente's use of MARGARITAVILLE as the name of a chain of Mexican restaurants in Connecticut, Massachusetts and Maine.  Pursuant to the License Agreement, Kukai Caliente agreed to immediately and permanently cease all use of the MARGARITAVILLE mark and within 60 days file express abandonments or cancellations of any federal, state or foreign trademark or service mark registrations including the term MARGARITAVILLE.  The License Agreement further provided for phase-out of various forms, menus, and promotional items, with the longest phase-out period not to exceed thirty-six months.

Jimmy Buffett agreed to release Kukai Caliente from all claims contingent upon full performance of the License Agreement by Kukai Caliente.  Further, Jimmy Buffett agreed not to object to Kukai Caliente's use or registration of MARGARITA or MARGARITA'S as the new name of its restaurants.

### 4.    License Agreement between Jimmy Buffett and Chi-Chi's, Inc.

In 1988, Jimmy Buffett and Chi-Chi's, Inc. entered into a perpetual exclusive License Agreement granting Jimmy Buffett a license to use Margaritaville as "all or part of the name of restaurants in the United States," based upon Chi-Chi's prior use and registration for Margaritaville for restaurant services. Pursuant to this License Agreement, Chi-Chi's agreed to use the Margaritaville mark only as the name of particular rooms or areas within restaurants and/or as promotional slogans and advertising in restaurants operated by it or its affiliates.  Jimmy Buffett further agreed not to use Margaritaville "as a promotional slogan in connection with the sale of margarita cocktails in restaurants."  Pursuant to a purchase License Agreement executed in November 2004, Buffett purchased all of Chi-Chi's worldwide right, title and interest and to all of its "Margaritaville" marks and the 1988 License Agreement was terminated.

### 5.    Bajo Cabo Asesores S.A. de C.V. (Mexico)

This entity is the owner of Mexican trademark Registration No. 566217 for MARGARITA VILLA in International Class 42 and Mexico trademark Registration No. 566218 for DOÑA MARGARITA VILLA in International Class 42, which were cited against Licensor's applications for MARGARITAVILLE and JIMMY BUFFETT'S MARGARITAVILLE in International Class 42.

ATL 18,212,122v2 8-12-11

Investigation by local counsel in Mexico suggested that the MARGARITA VILLA restaurant was actually being operated in Cabo St. Lucas, Mexico by Turistica Bajo Cabo, S.A. de C.V., a related entity. Further investigation suggested that a License Agreement to this effect had not been recorded with the Mexican Trademark Office.

A nullity action and cancellation action against Registration No. 566217 for MARGARITA VILLA was initiated with the Mexican Trademark Office on September 28, 2001. Bajo Cabo signed a Settlement Agreement with Licensor in May 2002. On November 19, 2002, we filed withdrawals of the nullity and non-use cancellation actions Licensor's registration for MARGARITA VILLA. Proceedings are now officially concluded and our registrations for MARGARITAVILLE and JIMMY BUFFETT'S MARGARITAVILLE in Class 42 have issued.

In October 2008, it came to Margaritaville's attention that an entity (believed to be Bajo Cabo) is currently selling Margaritaville t-shirts that may breach the May 2002 Settlement Agreement. The matter has been turned over to Mexican counsel for investigation and further handling.

6.     **Caribbean Restaurant License Agreement**

Margaritaville Limited, a company incorporated under the laws of Jamaica, objected to Jimmy Buffett's use and registration of the MARGARITAVILLE mark in the Caribbean , claiming to be the prior owner of the marks MARGUERITAVILLE and MARGUERITAVILLE & Device in Jamaica, St. Lucia, Barbados, Dominican Republic, Antigua, Bahamas, and Dominica. Jimmy Buffett claimed to be the owner of the MARGARITAVILLE mark in Antigua, Barbados, British Virgin Islands, Cayman Islands, Dominican Republic, Jamaica, St. Lucia, and Turks & Caicos. Rather than dispute the matter, the parties decided to work together.

Jimmy Buffett/Margaritaville Holdings entered into a License Agreement in April 2001 with Margaritaville Ltd., granting an exclusive, non-assignable, non-transferable license to use the MARGARITAVILLE, JIMMY BUFFETT'S MARGARITAVILLE, JIMMY BUFFETT'S, and CHEESEBURGER IN PARADISE marks, and other new marks, as well as the name and approved likeness of Jimmy Buffett, copyrights, songs, play and book titles, song lyrics, trademarks and other intellectual property for the development of restaurants and related merchandise in the Caribbean. The License Agreement specifically provides for the development of restaurants and sale of products in a Territory consisting of: Jamaica, Cayman Islands, St. Lucia, Dominican Republic, Dominica, Barbados, Antigua, Grenada, St. Maarten, Turks & Caicos Islands, British Virgin Islands, U.S. Virgin Islands, and Cuba. Upon the close of the Guggenheim transaction, Buffett shall assign his interest in all trademarks and intellectual property to Margaritaville Enterprises, LLC. Further, Margaritaville Holdings, LLC is assigning all of its rights and obligations under the License Agreement to Margaritaville Enterprises, LLC. Buffett will remain as licensor with respect to his name and likeness, copyrights, songs, plays and book titles, and song titles.

7.     **Fish Brewing Co.**

On July 27, 2007, Margaritaville Enterprises, LLC entered into a settlement and coexistence agreement with Fish Brewing Co. The Agreement provides that, as between the parties, (a) Margaritaville is the worldwide owner of the LANDSHARK mark for beer, ale, porter, stout, lager, non-alcoholic beer and brewed malt-based alcoholic beverage in the nature of beer; distilled liquors, liqueurs, rum, gin, vodka, tequila, wine, wine coolers, prepared wine cocktails, and alcoholic punches; and ancillary items related to such goods, including printed items, clothing and beverageware; and (b) Fish Brewing Co. is the worldwide owner of the MUDSHARK mark for a dark, medium-bodied, chocolate-

- 26 -

flavored porter, and ancillary items related to such goods, including printed items, clothing and beverageware. The term of the Agreement shall continue in force so long as either party, or either party's heirs, successors, affiliates, licensees, or assigns (as permitted) is using such party's respective marks.

### 8. Stephens Transfer, Inc.

On July 31, 2007, Margaritaville Enterprises, LLC entered into a settlement agreement with Stephens Transfer, Inc. and Changing Your Latitude, LLC (as amended on June 30, 2009). The Agreement provides that Margaritaville is the sole and exclusive owner of the mark CHANGES IN LATITUDES, CHANGES IN ATTITUDES for any and all goods and services. Pursuant to the Agreement, Stephens' abandoned its federal applications to register the mark CHANGES IN LATITUDE for business and commercial relocation; business and commercial relocation consulting; personnel relocation; employee relocation and information; arranging for pick-up, delivery, storage, and transportation of packages, parcels, and furniture via ground and air carriers; and moving services, namely local and long distance residential and commercial furniture moving; packing articles for transportation; transportation of furniture of others by trucks; moving van services, namely providing movers and truck for local and long distance moves. Stephens also agreed to discontinue all use of its mark and any similar marks by September 30, 2009 in connection with any and all goods and services and assign its domain name changesinlatitude.com to Margaritaville by September 30, 2009. Under the Agreement, Stephens can continue to use the corporate name Changing Your Latitude, LLC, provided that it is used only as a legal and/or so-called fictitious name. The term of the Agreement shall continue in force so long as either party, or either party's heirs, successors, affiliates, licensees, or assigns (as permitted) is using such party's respective marks.

### 9. Sociedad Anonima Vina Santa Rita

On May 8, 2007, Margaritaville Enterprises, LLC entered into a settlement agreement with Sociedad Anonima Vina Santa Rita. Pursuant to the Agreement, Margaritaville amended the description of goods in its federal application for the mark BIG RITA to expressly exclude "wines" and agreed never expand its use of the BIG RITA mark beyond as the name of a drink item on the menu at Margaritaville restaurants.

### 10. Rancho Cucamonga

Following a lawsuit brought by Jimmy Buffett in the U.S. District Court for the Central District of California (Case No. EDCV 04-00033 SGL), on March 30, 2004, Jimmy Buffett entered into a settlement agreement with Mark Davidson, Rancho Cucamonga Restaurant Ventures, Inc. and Restaurant Ventures S.B., Inc. Pursuant to the Agreement, the Davidson parties agreed to cease using by June 19, 2004 the Margaritaville mark for any and all goods and services, including as the name of nightclubs in Rancho Cucamonga and San Bernardino, California. Pursuant to the Agreement, the case was the dismissed, with the Court retaining jurisdiction to enforce the Agreement.

### 11. Island Endeavors, Inc.

On March 31, 2008, Margaritaville Enterprises, LLC entered into a settlement agreement with Island Endeavors, Inc. The Agreement provides that Island Endeavors will not do or omit to do anything that would prevent, preclude, impede or otherwise hinder or impair Margaritaville's use, registration, ownership and enjoyment of the mark CHANGES IN LATITUDES, CHANGES IN ATTITUDES in connection with any goods and services. Pursuant to the Agreement, Island Endeavors abandoned its federal application for the mark SOME SAY IT'S THE LATITUDE, WE SAY IT'S THE ATTITUDE! in

Classes 35 and 43 (App. No. 78/182,495). Island Endeavors further agreed not to use such mark or any other marks that are likely to cause confusion with or dilute any of Margaritaville's marks in connection with retail seafood market services and restaurant and bar services, including without limitation use on: (i) menus; (ii) signage; (iii) uniforms; (iv) stationery; (v) business cards; (vi) brochures or other promotional materials; (vii) websites; (viii) on or in connection with any goods; (ix) in connection with any services; or (x) any and all other materials on which it appears; and further agreed not to use the mark or any similar marks in the future for any purpose whatsoever.

### 12. Fruit of the Loom, Inc.

On June 10, 2008, Margaritaville Enterprises, LLC entered into a settlement agreement with Fruit of the Loom, Inc. Pursuant to the Agreement, Margaritaville abandoned its federal application to register FRUITCAKES for t-shirts. In addition, the Agreement provides that Margaritaville will not seek federal registration of the FRUITCAKES mark in Classes 24 or 25 and Margaritaville will not use the mark which suggests that FRUITCAKES is a brand or an indication of source for clothing or textiles in the future. Margaritaville can continue to use the FRUITCAKES mark in an ornamental fashion in connection with t-shirts and other clothing items, to promote Margaritaville, Jimmy Buffett, and songs associated therewith.

### 13. Six Flags Theme Parks, Inc.

On March 18, 2008, Margaritaville Enterprises, LLC entered into a settlement agreement with Six Flags Theme Parks regarding Six Flags' application to register the mark CARROTHEAD CLUB for "fan clubs; amusement and theme park services," based on Margaritaville's rights in the mark PARROTHEAD CLUB for fan club services. Pursuant to the agreement, Margaritaville withdrew its opposition without prejudice and Six Flags expressly abandoned its application for CARROTHEAD CLUB without prejudice. Under the terms of the settlement agreement, Six Flags may not refile any application for CARROTHEAD.

### 14. Apple, Inc.

On January 28, 2009, Margaritaville Enterprises, LLC entered into a settlement agreement with Apple, Inc. Pursuant to the Agreement, Margaritaville abandoned its application to register LATITUNES (Serial No. 78/834,214). Apple agreed not to object to Margaritaville's use and registration of the LATITUNES mark for navigation systems, slot machines, food and beverages, restaurant services, clothing or as a radio show name on a differently-named satellite radio channel, provided that Margaritaville permanently refrain from using or registering LATITUNES for software or services for online digital content download, MP3 players or any other portable and handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data, audio and video files (excluding navigation systems and slot machines). Apple agreed not to object to Margaritaville's use and registration of the marks LATITUNER or LATTITUNER.

### 15. George Malamas and Michael Scharlat

On December 2, 2009, Margaritaville Enterprises, LLC entered into a settlement agreement with George Malamas and Michael Scharlat. Under the agreement, George Malamas and Michael Scharlat abandoned their application to register MARGARITA GRILLE (Serial No. 77/405,271). George Malamas and Michael Scharlat also agreed not to apply for or use the terms MARGARITA GRILLE, MARGARITAGRILLE, MARGARITA GRILL, MARGARITAGRILL, or any phonetically-identical phrase.

- 28 -

16. **Grandma's Inc.**

On October 28, 2010, Margaritaville Enterprises, LLC entered into a settlement agreement with Grandma's Inc. Under the agreement, Grandma's Inc. abandoned its application to register FAJITAVILLE (Serial No. 77/820,325) with prejudice.

17. **St. Somewhere Corp.**

On October 31, 2010, Margaritaville Enterprises, LLC and Jimmy Buffett entered into a settlement agreement with St. Somewhere Corp. Under the agreement, Margaritaville and Jimmy Buffett withdrew their oppositions to St. Somewhere Corp.'s application to register ST. SOMEWHERE & Design (Serial No. 77/714,441) with prejudice. Under the agreement, Margaritaville can use "St. Somewhere" and "Saint Somewhere" in graphics for its clothing and other souvenir merchandise.

18. **The Walking Company Holdings, Inc. / Big Dogs Sportswear**

On November 29, 2010, Margaritaville Enterprises, LLC entered into a settlement agreement with The Walking Company Holdings, Inc. Under the agreement, The Walking Company Holdings, Inc. abandoned its applications to register IT'S FIVE O'CLOCK SOMEWHERE (Serial Nos. 78/979,408 and 78/453,043) with prejudice. The Walking Company Holdings, Inc. assigned all of its ownership in the IT'S FIVE O'CLOCK SOMEWHERE mark to Margaritaville. And Margaritaville granted to The Walking Company Holdings, Inc. a perpetual, non-exclusive, assignable, and sublicenseable license to use IT'S FIVE O'CLOCK SOMEWHERE for clothing, headwear, sleepwear, stationery, mugs, towels, bottle openers, and wall clocks.

19. **5 O'clock Stemware LLC**

On January 31, 2011, Margaritaville Enterprises, LLC entered into a settlement agreement with 5 O'clock Stemware LLC. Under the agreement, Margaritaville Enterprises, LLC consents to 5 O'clock Somewhere LLC's use and registration of the mark 5 O'CLOCK for stemware and use of the domain name www.5oclockstemware.com.

20. **Jelly Belly Candy Company**

On May 10, 2011, Margaritaville Enterprises, LLC and Jimmy Buffett entered into a settlement agreement with Jelly Belly Candy Company. Under the agreement, Jelly Belly Candy Company abandoned its application to register IT'S FIVE O'CLOCK SOMEWHERE for candy and agreed to stop using the mark after January 31, 2012.

21. **Zing Brothers, LLC**

On May 11, 2011, Margaritaville Enterprises, LLC entered into a settlement and co-existence agreement with Zing Brothers, LLC. Under the agreement, Margaritaville agreed not to use or attempt to register the marks TIGER BLOOD and TIGERS BLOOD for energy drinks or energy shots and Zing Brothers, LLC agreed not to use or attempt to register the marks TIGER BLOOD or TIGERS BLOOD for vodka.

22. **Matthew Ward**

- 29 -

On June 29, 2011, Margaritaville Enterprises, LLC entered into a settlement agreement with Matthew Ward. Under the agreement, Matthew Ward agreed to abandon his pending application for MARIJUANAVILLE and cease all use of the mark. Mr. Ward also transferred the domain names www.marijuanaville.com and www.marijuanaville.net to Margaritaville. Margaritaville agreed not to use MARIJUANAVILLE as a mark.

**C.      Pending Actions re: Alleged Infringements by Margaritaville (United States)**

     **1.      Reeds, Inc.**

In July 2008, Bob Reed of Reeds, Inc. contacted Anheuser Busch, alleging the Margaritaville cartouche logo and fin design mark on the Landshark Lager bottle label infringes his prior rights in his bottle label for Reed's Premium Ginger Brew. Reed's has not taken any further action.

     **2.      Five O'Clock of Milwaukee, LLC**

On January 18, 2011, Five O'Clock of Milwaukee, LLC filed a notice of opposition against Margaritaville's application to register IT'S FIVE O'CLOCK SOMEWHERE for restaurant and bar services. Five O'Clock of Milwaukee, LLC alleges that Margaritaville's registration of IT'S FIVE O'CLOCK SOMEWHERE for restaurant and bar services is likely to cause confusion with its mark FIVE O'CLOCK STEAKHOUSE for restaurant services. Margaritaville filed an Amended Answer and Counterclaim on March 17, 2011, seeking cancellation of Five O'Clock of Milwaukee, LLC's registration for FIVE O'CLOCK STEAKHOUSE. The proceedings are suspended while the parties discuss settlement. An execution version of the settlement agreement has been exchanged.

**D.      Pending Actions re: Infringements of Margaritaville's Marks by Third Parties (United States)**

     **1.      Jay Diaz**

On June 4, 2009, Jay Diaz applied to register the mark MOJITOVILLE for "Hats; Pants; Shirts; Shoes" in Class 25 and "Restaurant and bar services" in Class 43 (the "25/43 application"); and "Non-alcoholic cocktail mixes" in Class 32 and "Distilled Spirits; Spirits and liqueurs; Wines" in Class 33 (the "32/33 application"). Margaritaville opposed the applications on December 21, 2009. Applicant filed his Answer on March 5, 2010. On March 10, 2011, the Trademark Trial and Appeal Board granted summary judgment in Margaritaville's favor. On April 8, 2011, Applicant filed a Request for Reconsideration, which Margaritaville contested. The Board has not acted on the Request for Reconsideration.

     **2.      Robert Akard Infringements**

Robert Akard is a repeat infringer. Margaritaville is aware of the following websites that have been owned and operated by Mr. Akard:

     www.parrotsofthecaribbean.com
     www.paradiseisntlost.com
     www.nopassportrequired.com
     www.hurricanereef.com
     www.underonehut.com

www.instantstyle.com
www.tropicalchic.com

Such websites, at one time or another, have featured trademarks, logos, photographs, news, musical downloads and information regarding Jimmy Buffett, along with "Buffett-inspired" merchandise.

Margaritaville also believes the following websites are owned and operated by Mr. Akard, but is currently investigating the matter to confirm:

www.margaritasurfteam.com
www.drinkthirty.com

None of Mr. Akard's sites have been authorized. Jimmy Buffett sued Mr. Akard in the Federal District Court for the District of Nevada in 2005 and was granted a temporary restraining order and preliminary injunction. In 2006, Jimmy Buffett sued Mr. Akard in the Federal District Court for the Southern District of Texas, Galveston Division, regarding www.underonehut.com. Jimmy Buffett was granted a temporary restraining order and permanent injunction. Margaritaville is currently investigating whether Mr. Akard has violated this permanent injunction.

### 3. Intellectual Solutions, Inc.

On May 1, 2008, Intellectual Solutions, Inc. filed a federal intent-to-use application (App. No. 77/463,254) to register the mark IT'S 5 O'CLOCK SOMEWHERE for the following goods:

Class 7: Electrical appliances, namely blenders, portable blenders, and machines for making frozen drinks;

Class 11: Kitchen appliances, namely mixers, electric mixers; and

Class 21: Cocktail shakers, cocktail stirrers, cocktail strainers, bottle pourers, bottle openers, corkscrews, wine openers, measuring jigger, shot glasses, coasters, glass rimming sets, and mixing spoons.

The Trademark Office issued an office action against Intellectual Solutions, Inc.'s application on June 27, 2008. On January 13, 2009, the Trademark Office suspended the application based on a potential likelihood of confusion refusal with prior pending applications App. Nos. 78/453,043 (now abandoned third-party application), 77/005,179 (pending Margaritaville application), 78/597,517 (now registered Margaritaville application), 78/602,821 (pending Margaritaville application), and 78/979,408 (now abandoned third-party application). This application remains suspended. Margaritaville will monitor this application and most likely oppose it, if it is published for opposition.

### 4. Colin Levi

On October 26, 2009, Colin Levi filed a federal use-based application (App. No. 77/856,882) to register the mark IT'S 5 O'CLOCK SOMEWHERE! in Class 33 for brandy, brandy spirits, cherry brandy, distilled spirits, French brandy, gin, liqueurs, liquor, spirits, spirits and liqueurs, vodka, whiskey, and whisky. On March 22, 2010, the Trademark Office suspended the application based on a potential likelihood of confusion refusal with pending prior App. Nos. 78/453,043 (now abandoned) and 77/005,179 (owned by Margaritaville Enterprises, LLC and pending). Margaritaville will monitor this application and most likely oppose it, if it is published for opposition.

ATL 18,212,122v2 8-12-11

5.     **PadreRitaVille LLC**

On July 15, 2010, PadreRitaVille LLC filed a federal intent-to-use application (App. No. 85/085,918) to register the mark PADRERITAVILLE in Class 43 for restaurant and bar services. Margaritaville opposed the application on March 2, 2011.  Applicant filed its Answer on April 7, 2011. The opposition is ongoing and the parties are discussing settlement.

6.     **Gary Ward**

On December 3, 2010, Gary Ward filed a federal intent-to-use application (App. No. 85/189,960) to register the mark PARROTHEADLAND in Class 25 for hats, pants, shirts, shorts, sweaters, sweatshirts, tank tops, and underwear.  On March 10, 2011, the Trademark Office issued a likelihood-of-confusion refusal against the application based on Margaritaville's Trademark Reg. Nos. 1,650,089 (PARROT HEAD CLUB) and 3,193,090 (FUTURE PARROTHEAD).  Margaritaville will monitor this application and most likely oppose it, if it is published for opposition.

7.     **McNider Creations**

On February 3, 2011, McNider Creations filed a federal use-based application (App. No. 85/233,324) to register the mark PHINS in Class 25 for hats, hooded sweatshirts, long-sleeved shirts, shirts, short-sleeved shirts, sweat shirts, t-shirts, and visors.  Margaritaville opposed the application on July 15, 2011.  Applicant's Answer is due on August 24, 2011.

8.     **Pfoodman Holdings, L.L.C.**

On May 21, 2010, Pfoodman Holdings, L.L.C. filed a federal use-based application (App. No. 76/703,052) to register the mark PARADISE BURGER GRILL & Design in Class 43 for restaurant services, including sit-down service of food and take-out restaurant services, in a food court and catering services.  The application was published for opposition on June 28, 2011.  Margaritaville filed a request for a 30-day extension of the opposition deadline on July 28, 2011.  Margaritaville has until August 27, 2011 to file an opposition or request an additional 60-day extension of time to oppose.

E.     **Miscellaneous Third-Party Infringements of Margaritaville's Marks**

1.     **United States**

In the U.S., there are unauthorized third party uses of marks or business names that include components of Margaritaville's trademarks, including MARGARITAVILLE, CHEESEBURGER IN PARADISE and PARROTHEAD.  Most are small producers of T-shirts and other merchandise and single-location restaurants and bars.  It can be extremely difficult to detect such small unauthorized users and it is likely that there are other unauthorized users of which Margaritaville is unaware.  The continuing unauthorized uses about which Margaritaville knows, and their status, are identified below.

For purposes of this Exhibit, Margaritaville's knowledge is defined as actual knowledge or the actual knowledge of Margaritaville's principal intellectual property attorneys.  Margaritaville does not regularly survey business databases and the Internet looking for unauthorized uses.  Past infringements that to the best of Margaritaville's (or its attorneys') knowledge have ended are not included in this Exhibit.  Below is an initial summary of existing third party infringements.  If you would like additional information on specific infringements, please request it in writing.

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| The Tiki Stop Moreno Valley / Barry Daniels | Margaritaville It's 5 O'Clock Somewhere | Use of marks on hand painted signs sold on www.thetikistop.com. | Investigation pending. |
| Culbertson Imports / Scott Riddick | Margaritaville | Use of mark on hand painted signs sold on www.tropicaltikis.com | Investigation pending. |
| FajitaVille Grille / Lynn and Patricia Frazier | Margaritaville | Use of Fajitaville in connection with restaurant in Corpus Christi, Texas. | Cease and desist letter sent. Monitoring. |
| Martiniville Liquor Bar & Kitchen / Michael Hynds | Margaritaville | Use of Martiniville in connection with bar/restaurant in Holmes Beach, FL. | Cease and desist letter sent. Opposing counsel disclaimed any infringement. Awaiting confirmation from client that a federal infringement lawsuit should be filed. Monitoring. |
| The Robin's Nest / Teri Robin Burton | Margaritaville Parrothead It's 5 O'Clock Somewhere Jimmy Buffett | Use of marks on hand painted signs sold on www.terirobin.com | Cease and desist letter sent. Monitoring. |
| Carolina Designs Realty / Monica Thibodeau | Margaritaville | Use of mark as the name of rental property in Duck, NC | Cease and desist letter sent. Received written letter of compliance received. Status check docketed to confirm signage has been changed. Monitoring. |
| Miller's Mardi Gras World | Parrot Head Jimmy Buffett Margaritaville | Use of marks in connection with manufacture and sale of infringing signs. | Cease and desist letter sent. Received written letter of compliance received. Status check docketed. Determining whether use of JIMMY BUFFETT as an eBay store category would be confusing to consumers. |
| Dream Creations / Rick and Elyse Froehlich | Margaritaville It's 5 O'Clock Somewhere | Use of marks in connection with the manufacture and sale of wooden signs through eBay, | Cease and desist letter sent. Received e-mail regarding compliance. |

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| | Lost Shaker of Salt | etsy.com and silkfair.com online stores. | Follow up request sent on June 21, 2011 requesting item be removed from eBay. Monitoring. |
| Steve Putnam / Putnamville Signs | Margaritaville Jimmy Buffett | Use of Jimmy Buffett's name in connection with manufacture and sale of MARGARITAVILLE wooden signs on putnamvillesigns.com. | Investigation pending. |
| Dylan Sabine / Rustic Wood Signs | Margaritaville | Use of mark in connection with the manufacture and sale of wooden signs on rusticwoodsigns.com. | Investigation pending. |
| Fran's Country USA Inc. | Margaritaville Parrothead Boat Drinks No Shoes No Shirt No Problem Changes In Lattitude, Changes In Attitude I Blew Out My Flip Flop It's 5 O'Clock Somewhere Lost Shaker of Salt One Particular Harbour | Use of marks on driftwood signs sold on franscountryusa.com, eBay, etsy and Facebook. | Cease and desist letter sent. Received written letter of compliance received. Status check docketed. |
| Twisted Taco / Paul Gibbs | Margaritaville Jimmy Buffett | Use of MARGARITAVILLE mark which is incorporated into artwork at Smyrna, GA location and use of JIMMY BUFFETT as name of menu item. | Investigation Pending. |
| Margaritaville Construction | Margaritaville | Use of mark in connection with single family housing construction company in San Antonio, TX. | Investigation Pending. |
| Copycats Entertainment | Jimmy Buffett | Re-recordings of client songs contained on LP which includes client's name on artwork. | Investigation pending |

ATL 18,212,122v2 8-12-11

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| Seville Quarter / Rosie O'Grady, Inc. | It's Five O'Clock Somewhere Cheeseburger In Paradise | Use of Jimmy Buffett's name, image and likeness and marks in connection with happy hour advertisement. | Cease and desist letter sent.  Received written letter of compliance received.  Status check docketed. |
| Land Shark Tiki Bar & Grill:  Freeport, NY | Land Shark | Possible false association with client and infringing use of mark. | Investigation pending. |
| Scripps Networks LLC / www.recipezaar.com | Margaritaville | Use of mark on www.recipezaar.com in connection with various recipes. | Cease and desist letter sent. |
| The Margarita Grill | Margaritaville | Use of mark in connection with the name of a restaurant in Pelham, Alabama. | Cease and desist letter sent. Agreed to change the name of restaurant to "Margarita Bar and Grill."  Monitoring. |
| Zedd's Online Catalog | It's Five O'Clock Somewhere Margaritaville | Use of marks on neon signs. | Investigation pending. |
| Cruisin' Tunes / Wally Buzz (Buczkowski) | License to Chill | Use of mark in connection with t-shirt sales | Cease and desist letter sent. |
| Hemingway's Port of Call | Margaritaville | Use of Margaritaville seaplane artwork on site.  Use of Volcano Burger, Wastin' Away sandwich. | Investigation pending. |
| Gluug, Inc. / Peter Fetting | Margaritaville | Distribution of 3,000 plastic MARGARITAVILLE shot glasses to Florida Parrothead Fan Clubs.  Infringer has contacted Margaritaville several times and has been told not to distribute. | Investigation pending. |
| Paul Irby:  It's 5 O'Clock Somewhere Martini Bar | It's 5 O'Clock Somewhere | Use of  mark as name of bar in Myrtle Beach, SC | Cease and desist letter sent and refused. Follow up correspondence sent. Currently considering next steps. |
| drinkthirty.com | Margaritaville It's 5 O'Clock Somewhere and Lost Shaker of Salt | Sales of merchandise utilizing marks. | Investigation pending. |

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| Clyde Amerson | Margaritaville Tequila Logo; Margaritaville.com artwork and lyrics | Use of knock off of MARGARITAVILLE Tequila logo in connection with his bar / restaurant called Rumrunners; use of Margaritaville.com artwork on personal MySpace page (myspace.com/woodinnikel) and use of lyrics for "Changes In Latitudes" | Cease and desist letter sent.  Follow up correspondence sent.  Currently considering next steps. |
| Wahoo Willie's & Billfish Bar | Cheeseburger In Paradise | Use of mark as a menu item at restaurant | Cease and desist letter sent. |
| Jonathan S. Gabriel: Margaritaville, LLC | Margaritaville | Formation of Margaritaville, LLC by individual for what appears to be real estate property issues. | Investigation pending. |
| Denise Malefyt:  Coconut Telegraph | Coconut Telegraph | Use of mark as the name of free Key Largo newspaper for dining, entertainment, lodging and shopping.  Registration of coconuttelegraphonline.com | Cease and desist letter sent.  Received decision from National Arbitration Forum transferring coconuttelegraphonline.com to Margaritaville Enterprises, LLC.  Currently using theconchrepublic.com for newsletter.  We are currently considering next steps. |
| Montana's Bar & Grill: Carrie Eubanks | It's 5 O'clock Somewhere | Sales of t-shirts to customers (and worn by staff members) featuring mark | Investigation pending. |
| Margaritaville Airport: Max Moore | Margaritaville | Use of mark as name of private airport in Whitesboro, TX | Investigation pending. |
| Scott Linkletter:  Cows, Inc. | Margaritaville | Use of "Wastin' Away Again In Moogaritaville" on merch with a cow laying on a hammock between 2 palm trees, holding a margarita with a parrot | Investigation pending. |
| Andrew Gainor:  Land Shark Brewing Co. | Land Shark | Use of mark in conjunction with home brewing company. | Investigation pending. |
| Changes In Latitude:  Cindy Sonderup McClelland | Changes In Latitude | Use of mark in connection with luggage / travel store in | Investigation pending. |

- 36 -

ATL 18,212,122v2 8-12-11

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| | | Boulder, CO and 1997 trademark application which has been registered with the USPTO. | |
| Mickie Finnz:  Paul Hennessey | Margaritaville | Custom made artwork utilizing mark (taken from Margaritaville menus) and incorporated into advertising for restaurant | Investigation pending. |
| Jake's Lakeside:  Gerald Solem (Minocqua, WI) | Cheeseburger In Paradise | Use of mark in connection with a menu item. | Investigation pending. |
| Laura Curtis: pursuingholiness.com | Margaritaville | MP3 inspired by Ray Nagin (Mayor of LA) based on the song Margaritaville. | Investigation pending. |
| T. Billy Buffett's Margar-EAT-Aville & Grill | Margaritaville | Variation of MARGARITAVILLE / incorporation of client's last name and use of palm tree in logo for restaurant. | Cease and desist letter sent.  We are currently considering next steps. |
| Kevin Ford / World Wide Webster | Jimmy Buffett Caribbean Soul Flip Flop and Lost Shaker of Salt | internet sales of infringing merchandise | Investigation pending. |
| Custom Décor, Inc. / Bill Scotton | It's 5 o'Clock Somewhere and No Shirt, No Shoes, No Problem | e-Mail solicitation from Gib Caron Associates asking there was interest in purchasing marks for use on flags. | Investigation pending. |
| bomb-mp3.com / Johny Morgan | Jimmy Buffett | Unauthorized MP3s / ringtones and LP artwork for download on site. | Investigation pending. |
| Cecelia Shepherd / It's 5 O'clock Somewhere Flags | It's 5 O'clock Somewhere | Use of mark in connection with sales of merchandise | Investigation pending. |
| Five O'Clock Somewhere: Myrtle Beach, SC / Craig Preston Smith | It's 5 O'clock Somewhere | Use of mark in connection the restaurant | Investigation pending. |
| Jim Gay / www.jimmydreamz.com | Jimmy Buffett | Provides audio/video and radio station; forged VIP passes to concerts and message board for bootleg trading and instructions on how to record Radio Margaritaville | Investigation pending. |
| Paradise Pool & Billiards / | Margaritaville | Use of mark on business sign. | Cease and desist letter |

ATL 18,212,122v2 8-12-11

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| William Todd Harrison | | | sent. Follow up letter sent clarifying client position and demanding use of all TMs be removed immediately. We are currently considering next steps. |
| James Hunter / Parrot-Fan-Alia | It's 5 O'clock Somewhere Party At The End of The Road | Use of marks in connection with the sale of merchandise. | Received written letter of compliance from infringer. Per follow up investigation, site continues to sell infringing merchandise. We are currently considering next steps. |
| Caribbean Trading Co. / Stan Keneitt | Jimmy Buffett "inspired" | Use of client's name on website. | Cease and desist letter sent. Despite willingness to comply with cease and desist letter, infringer has returned to using clients IP on website in connection with Hawaiian shirt sales. We are currently considering next steps. |
| Rick Garner / Yahoo! Group BuffettMP3 | Jimmy Buffett | Yahoo! Group created for the transfer of client MP3s (including concert recordings). | Investigation pending. |
| Nick Kuklinski: Holylands FTP Server | Jimmy Buffett | Site used for transfer of client MP3s (including concert recordings). | Investigation pending. |
| Margarita Villas, LLC / Greg Pecoraro: Fire Island, NY | Margaritaville | Name of corporate entity and Fire Island, NY vacation rentals. | Investigation pending. |
| Margaritaville Grille in Long Beach, CA | Margaritaville | Use of mark in restaurant name. | Investigation pending. |
| Rizzo's Margaritaville (Pittsburgh, PA) | Margaritaville | Use of mark in restaurant name. | This restaurant pre-dates Margaritaville's trademark registration priority. Cease and desist letter sent. |
| Kenny B's: Pittsburgh, PA | Cheeseburger In | Use of Cheeseburger In | Investigation pending. |

ATL 18,212,122v2 8-12-11

| Infringer Name | Mark | Wrongful Conduct | Current Status |
|---|---|---|---|
| | Paradise | Paradise as a menu item. | |
| Margaritaville (Sandusky, OH) | Margaritaville | Use of mark in restaurant name. | This restaurant pre-dates Margaritaville's trademark registration priority. Cease and desist letter sent. |

## 2.    Online

There are a number of online infringers, who utilize eBay, CafePress, or their own domain names to sell unauthorized merchandise. Margaritaville regularly polices and shuts down these infringers. If you would like information on specific online infringements, please request it in writing. The following is a list of internet and domain name infringements of which Margaritaville is currently aware:

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| margaritaville.net | Margaritaville | Loren C. Stocker Softline Studios 401 E. Ontario, Suite 3605 Chicago, IL 60611 858 792-5000 500 443-8283 (fax) domain@800.net | April 16, 2012 | Domain defaults to search engine. Monitoring. |
| jimmybuffett.com | Jimmy Buffett | Centre For Educational Progression, Inc. Development Director Box W584 Woods Centre St Johns, Antigua AG 509 696-9882 (phone) dd@cfep.com | February 24, 2012 | Can not be found on server. Registration info now privatized. Monitoring. |
| jollymonsailing.com | Jolly Mon | Deborah Adao Jolly Mon Sailing 47-815 Via Nice La Quinta, CA 92253 760 564-7724 775 703-8397 (fax) jmsailing@aol.com | May 29, 2013 | Appears to be a charter yacht booking agency. Monitoring. |
| lastmangoinparadise.com | | Kenton Adams Changing Planet 5941 Atkinson Road New Hope, PA 18938 602 430-1255 kda@zahyin.com | September 8, 2011 | Working site. Test page is up for "Hawaii by Mail." No infringing references. Monitoring. |

ATL 18,212,122v2 8-12-11

| nfringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| lostshakerofsalt.com | Margaritaville | Ronald P. LeVrier 11 East Sunflower McAllen, Texas 78504 956 493-1110 (phone) 956 686-8174 (fax) cptpablo@aol.com | December 22, 2011 | Domain defaults to Under Construction page (search engine). Monitoring. |
| margaritavill.com | Jimmy Buffett | FIG Vietnam Thuan Kieu Plaza #1604 190 Hong Bang Str, District 5 HCMC Vietnam | May 4, 2012 | Domain defaults to http://quizstopinterne t.com/d/m5a6r24. Determining next steps. Monitoring. |
| margaritiville.com | Margaritaville | Popular Enterprises LLC 5201 Kingston Pike Knoxville, TN  37919 US 877 291-4823 (phone) 877 291-4823 (fax) Administrator@PopularEnter prises.com | August 30, 2011 | Domain defaults to a search engine and Who Is information is now "privatized." Monitoring. |
| margarittaville.com | Margaritaville | Standard Bearer Standard Bearer Enterprises Limited Box W165 Friars Hill Road Woods Center St Johns AG 403 1226-3809 standardbearerltd@gmail.co m | May 23, 2012 | Domain defaults to a search engine.  Who Is information is now "privatized." Monitoring. |
| parrothead.net | Parrothead | Kristopher Hill P.O. Box 200 Newburyport, MA 01950 | March 3, 2012 | Domain defaults to http://preregistereddo mains.com/?Domain =parrothead.net which shows registration is for sale. Registration info is now privatized. Monitoring. |
| parrotheads.com | Parrothead | Jeffrey Wiggers Domain Names Daily 610 Southshore Dr Oxford, MI 48371 586 914-6277 domainanmesdaily@yahoo.c om | June 7, 2016 | Defaults to search engine.  Monitoring. |

ATL 18,212,122v2 8-12-11

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| boatdrinks.net | Boat Drinks | Michael Latham<br>Boat Drinks, LLC<br>101 Golden Hills Ct.<br>Danville, CA 94526<br>510 838-2236<br>650 377-7440 | February 24, 2013 | Domain defaults to "console page" to update the page. Monitoring. |
| margaritavillas.com | Margaritaville | Private Registration | October 6, 2011 | Defaults to search engine. Monitoring. |
| buffettickets.com | Jimmy Buffett | Jeff Erdmier<br>JumpingTrout, Inc.<br>7125 Windsor Lake Parkway<br>Loves Park, Illinois 61111<br>815 636-4516<br>domains@jumpingtrout.com | April 14, 2012 | Cease and desist sent. Site can not be found on the server. Monitoring. |
| havanadaydreaming.net | Havana Day Dreaming | Bill Ferguson<br>12935 Veterans Memorial<br>Houston, Texas 77014<br>maryloucallihan@algxmail.com | February 6, 2012 | Domain name defaults to search engine. Monitoring. |
| margaritaville.name | Margaritaville | Private Registration | November 20, 2011 | Defaults to "User page unknown." Monitoring. |
| margarittaville.net | Margaritaville | Linkz Internet Services<br>30369 Seven Mile Beach<br>Grand Cayman<br>Cayman Islands B.W.I. | April 28, 2013 | Domain defaults to http://domainnamesales.com/domain/margarittaville.net and shows that it is currently for sale. Monitoring. |
| margaritaville.net.au | Margaritaville | Nigel Poole | unknown | Matter being actively pursued by local counsel in Australia. |
| margaritaville.eu | Margaritaville | SNNS Ltd<br>Safenames House<br>Sunrise Pkwy Linford Wood<br><br>Milton Keynes,  MK14 6LS<br>44 1908206780 | November 23, 2012 | Defaults to search engine. Monitoring. |
| margaritavillesucks.com | Margaritaville | SNCG<br>1048 Irvine Avenue #707<br>Newport Beach, CA 92660<br>512 682-0706 | June 22, 2012 | Website contains "Contact us" link for VWorld.com marketing and media. |

- 41 -

| nfringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | | | Monitoring. |
| headedtomargaritaville.com | Margaritaville | Debra Albinson<br>21 Niven Way<br>Larkspur, CA  94939<br>415-945-9692<br>dalbinson@mac.com | June 26, 2012 | Website appears to be personal blog. Monitoring. |
| margaritavillepools.com | Margaritaville | Steven Anderson<br>6245 East Desert Vista Trail<br>Cave Creek, AZ 85331<br>480 473-0635<br>poolsmile@hotmail.com | June 6, 2012 | Working site. Domain defaults to ecobluepools.com. Determining next steps.  Monitoring. |
| margaritasville.com | Margaritaville | Oksana Heck<br>2870 Rocky Point Road<br>Malabar, FL 32950<br>sunny_heck@yahoo.com | August 6, 2013 | Static website for "Russ and Sunny." Monitoring. |
| margaritavilleac.com | Margaritaville | Private Registration | August 8, 2011 | Defaults to standard search engine. Monitoring. |
| iimmybuffett.me | Jimmy Buffett | Nick Loeser<br>CustomerFriendly.org<br>33 Sherman Lane<br>Hamden, CT 06514<br>203 314-7171<br>info@customerfriendly.org | July 24, 2012 | Domain could not be found on server. Monitoring. |
| margaritavillage.com | Margaritaville | Ernie Carlson<br>17837 1st Avenue S # 244<br>Seattle, WA 98148-1728<br>(801) 859-4653<br>(801) 808-0529 (fax)<br>Margaritavillage@AOL.COM | February 9, 2013 | Defaults to search engine.  Monitoring. |
| parrotheadconnection.com | Parrothead | David Zoffer<br>45 Karemark Dr<br>Burlington, NJ 08016<br>215 387-2412<br>dzoffer@netscape.net | July 16, 2012 | Working website used by Jimmy Buffett fans to network. Monitoring. |
| margaritavilleatthemarina.com<br>acmargaritaville.com<br>acmargaritavillehotel.com<br>casinomargaritaville.com<br>coastalmargaritaville.com | Margaritaville | Private Registration | November 19, 2011 | Defaults to search engine.  Monitoring. |

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| marinamargaritaville.com | | | | |
| xmmargaritaville.com | Margaritaville | Ira Stanley<br>158 Signature Drive South<br>Xenia, Ohio 45385<br>937 604-2932<br>irastanley335@yahoo.com | December 11, 2011 | Defaults to search engine.  Monitoring. |
| margaritavilleonline.com | Margaritaville | Pulsifer Investments<br>PO 5343<br>Whitefish, Montana 59937<br>406 250-5822<br>thanppc73@gmail.com | October 29, 2011 | UDRP filed on July 22, 2011. Monitoring. |
| margaritavilleorbust.com | Margaritaville | Carrie Haney<br>Salt Shaker Foundation<br>50 Oakview Ave<br>Cherry Hill, New Jersey 08002<br>(856) 662-2274<br>carpheatt13@yahoo.com | August 2, 2012 | Inactive website for a non-profit organization called Salt Shaker Foundation with bicycling team called "Margaritaville or Bust."  Determining next steps. Monitoring. |
| margaritavilletailgategrill.com<br>margaritavilletailgater.com<br>margaritavilletailgatergrill.com (1)<br>margaritavilletailgating.com (2) | Margaritaville | Salter Consulting<br>Scott Salter<br>12010 Oakview Way<br>San Diego, CA 92128<br>858 513-8332<br>scott@greedomgrill.com | April 18, 2012 / July 17, 2011 (1) / and September 1, 2011 (2) | Domains can not be found on server. (2) defaults to standard search engine. Monitoring. |
| margaritavillecasualfurniture.com<br>margaritavillelife.com<br>margaritavillepatiofurniture.com | Margaritaville | Casey Shingary<br>Super Duper Stores, Inc.<br>P.O. Box 8801<br>Jupiter, FL 33468<br>772 812-2416<br>crshingary@hotmail.com | December 22, 2011 | Defaults to search engine.  Monitoring. |
| videomargaritaville.com | Margaritaville | Ryan Chace<br>121 Cooper Lane<br>Oxford, PA 19363<br>wastinawayagain@videomargaritaville.com | April 7, 2012 | Domain resolves to working "coming soon" page for Coconutvision. Monitoring |
| themargaritavillestore.com | Margaritaville | Brent Morris<br>4481 Kings Lake Drive<br>Marietta, Georgia 30067<br>(404) 312-3663<br>brent@formula1ga.com | April 23, 2012 | Working site which sells the Margaritaville Frozen Concoction Makers. |

ATL 18,212,122v2 8-12-11

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| foxmargaritaville.com | Margaritaville | Richard Fox<br>PO Box 923<br>Scottsdale, Arizona 85252<br>(602) 502-8550<br>red356@gmail.com | June 22, 2012 | Defaults to www.takenoteamerica.com. Monitoring. |
| u-runiversityofmargaritaville.com | Margaritaville | Luis Pons<br>D-Labs<br>4040 NE 2nd Avenue - Suite 312<br>Miami, FL 33137<br>vincent@luisponsd-lab.com<br>305 576-1787 | June 15, 2012 | Static blank white page. Monitoring. |
| universityofmargaritaville.com | Margaritaville | Thomas Pimentel<br>TNT Ltd. Productions<br>39 Emerald Court<br>Tewksbury, MA 10876<br>781 718-0326<br>take12tom@yahoo.com | July 5, 2012 | Redirects to "Under Construction" page found at www.take12tom.com Monitoring. |
| margaritavillebuds.com | Margaritaville | Terry Garcia<br>Telgar, Inc.<br>1321 Ashby Street<br>Key West, FL 33040<br>305 923-5124<br>terry@kwflagler.com | July 19, 2013 | Defaults to search engine. Monitoring. |
| margaritavilleconcoctionmaker.com | Margaritaville | Debby Banning<br>217 Bayou Vista Street<br>DeBary, FL 32713<br>386 742-6609<br>debby@debbyphillips.com | July 18, 2012 | Defaults to search engine. Monitoring. |
| margaritavillenews.com | Margaritaville | Private Registration | August 2, 2012 | Defaults to search engine. Monitoring. |
| margaritavilleblender.com | Margaritaville | Private Registration | September 5, 2011 | Defaults to search engine. Monitoring. |
| margaritavillebeachbar.com<br>margaritavilletailgate.com<br>margaritavilletailgatebar.com<br>margaritavilletailgatebeachbar.com<br>margaritavilletailgaterbar.com<br>margaritavilletailgatingbar.com | Margaritaville | Joshua Wyman<br>244 North Street #9<br>Hyannis, MA 02601<br>josh_wyman@yahoo.com<br>(774) 836-7121 | November 2, 2011 | Defaults to search engine. Monitoring. |
| margaritavillecarribean.com | Margaritaville | Private Registration | November | Domain is currently |

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | | 5, 2011 | "parked" with registry. Monitoring. |
| jimmybuffetsmargaritaville.com | Margaritaville Jimmy Buffett | Private Registration | November 18, 2011 | Domain is currently "parked" with registry. Monitoring. |
| leftatmargaritaville.com | Margaritaville | Private Registration | March 12, 2012 | Defaults to coming soon page. Monitoring. |
| margaritavillemachine.com | Margaritaville | Paul Kiefert Data Boy Design, LLC 1155 Riverside Walk Xing Sugar Hill, GA 30518 (678) 521-9853 paul@networldusa.com | January 6, 2012 | Working website to purchase various Margaritaville Concoction Maker machines through amazon.com. Determining next steps. Monitoring. |
| visitmargaritaville.com | Margaritaville | Bonnie Wheatley PO Box 547 Littleton, NH 03561 603 259-3070 bwheatley03@gmail.com | January 22, 2012 | Domain defaults to static blank screen. Monitoring. |
| margaritavilledm1000.com margaritavilledm2000.com (1) margaritavilledm0500.com (2) | Margaritaville | Rudy Irawan Jl Daud Beureauh 161 Banda Aceh NAD 23121 India | March 2, 2012 / May 23, 2011 (1) / June 17, 2011 (2) | Working site for Margaritaville Concoction Maker. (1) and (2) Default to standard search engine. Determining next steps. Monitoring. |
| margaritavilleblender.info | Margaritaville | Donovan McMaham 10527 Perrin Beitel Apt. C212 San Antonio, TX 78217 512 704-6014 donovanmcmahan@hotmail.com | March 8, 2012 | Domain can not be found on server. Who Is information now privatized. Monitoring. |
| lostinmargaritaville.com | Margaritaville | Chuck Muir 341 W. Vallecito Creek Rd. Bayfield, Colorado 81122 United States (951) 282-5758 chuckmuir@gmail.com | April 7, 2012 | Domain defaults to search engine. Monitoring. |

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| margaritavilleblender.net | Margaritaville | Douglas Manning 1207 Red Bud Drive Orange, TX 77632 aviatorno1@yahoo.com 409 670-3574 | May 23, 2012 | Working website which contains links to purchase various Margaritaville blenders on amazon.com and contains links to blog reviews. Determining next steps. Monitoring. |
| margaritavilleblender.org | Margaritaville | Private Registration | May 23, 2012 | Defaults to standard search engine. Determining next steps. Monitoring. |
| hollywoodbeachmargaritaville.com | Margaritaville | Timothy Reid 1335 Jefferson Street Hollywood, FL 33019 954 559-1810 tugmate@aol.com | June 5, 2012 | Defaults to search engine. Monitoring. |
| margaritavillefrozenconcoctionmaker.com | Margaritaville | Private Registration | June 6, 2012 | Working blog which contains amazon.com reviews and YouTube videos various Margaritaville blenders. Determining next steps. Monitoring. |
| margaritavilleparot.com | Margaritaville | Private Registration | June 8, 2011 | Defaults to search engine. Monitoring. |
| margaritavillemaker.com | Margaritaville | Private Registration | June 10, 2012 | Working website containing review of Margaritaville DM1000 blender. Determining next steps. Monitoring. |
| margaritavilleparrott.com | Margaritaville | Private Registration | June 22, 2012 | Defaults to search engine. Monitoring. |
| margaritavilledm1000frozenconcoctionmaker.com | Margaritaville | Alex Fediaev 8320 Garden City Rd Richmond, British Columbia V6Y 2P2 Canada (778) 288-1325 | June 23, 2012 | Defaults to search engine. Monitoring. |

ATL 18,212,122v2 8-12-11

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | afediaev@hotmail.com | | |
| margaritavillemachine.us | Margaritaville | Ben Marcel 6Z Constantineau Mont - tremblant Quebec J8E 3G8 Canada 819 425-5304 september31st@hotmail.com | June 29, 2011 | Domain can not found be found on server.  Monitoring |
| margaritavillewedding.com | Margaritaville | David Cartwright 1428 Sound Forest Drive Gulf Breeze, FL 32563 dcvaader@mac.com 703 989-9910 | June 29, 2011 | Domain can not be found on server. Monitoring. |
| wwwmargaritaville.com | Margaritaville | Private Registration | June 27, 2012 | Defaults to static white page. Monitoring. |
| margaritavilleblender.biz | Margaritaville | Private Registration | July 4, 2011 | Working site containing recipes and reviews of Margaritaville blenders. Monitoring. |
| jimmybuffettmargaritavillehotel.com | Jimmy Buffett's Margaritaville | Team Gulf Coast John Gardener 3500 Willow Lane Gulf Breeze, FL 32563 workwithjon@gmail.com | July 5, 2012 | Defaults to http://jongardner.mylightyear.net/tour3.htmlwhich contains a video on earning residual income. Determining next steps. Monitoring. |
| margaritavillealabama.com margaritavillealabama.net | Margaritaville | Kenny Wright 1651 Ora Drive Pensacola, FL 32506 (850) 554-0592 kww190@live.com | July 11, 2012 | Defaults to search engine. Monitoring. |
| margaritavilledm1000.net | Margaritaville | Aomdaun Tapa 261/78 Charansanitwong29/1 Bangkunsi Bangkoknoi Bangkok, 10700 Thailand (085) 552-1227 thapha.wg@gmail.com | July 29, 2011 | Working website which contains specifications for the Margaritaville DM1000 blender. |
| margaritavillefrozenconcoctionmaker.org | Margaritaville | Private Registration | July 27, 2012 | Defaults to search engine. Monitoring. |

ATL 18,212,122v2 8-12-11

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| margaritavilleDM1000frozenconcoctionmaker.net | Margaritaville | Wee Ching Tnah<br>PO Box 8278<br>Kelana Jaya<br>Petaling Jaya 46786 Malaysia<br>12 280-6548<br>vivientnah@gmail.com | August 17, 2011 | Working site which lists Margaritaville blenders for sale through amazon.com and contains reviews. Monitoring. |
| margaritavilledm0500.net | Margaritaville | Walter Corona<br>963 Old House Drive<br>Rathbone, OH 43015<br>740 881-0827<br>affguru2011@hotmail.com | August 11, 2011 | Working site which lists Margaritaville blenders for sale through amazon.com and contains reviews. Monitoring. |
| margaritavilledm2000.net | Margaritaville | Jemma Christiansen<br>39 Murray Street<br>Sydney NSW 2024 Australia<br>jemmachris@hotmail.com | August 9, 2011 | No content found. Error page. Monitoring. |
| margaritatequilaville.com | Margaritaville | Steve Ralston<br>PO Box 939<br>Hobe Sound, FL 33475<br>561 705-3258<br>ralston.steve@gmail.com | August 12, 2011 | Defaults to standard search engine. Monitoring. |
| margaritavilledm1000.org | Margaritaville | Private Registration | August 24, 2011 | Working site for sale of Margaritaville blender through amazon.com and contains specs of model. Monitoring. |
| mobilemargaritaville.com | Margaritaville | Steve Ralson<br>126 Sand Pine Drive<br>Jupiter, FL 33477<br>ralston.steve@gmail.com | August 27, 2011 | Defaults to standard search engine. Monitoring. |
| margaritavilleg1000.com | Margaritaville | Aomdaun Tapa<br>261/78 Charansanitwong 29/1<br>Bangkunsi Bangkoknoi<br>Bangkok, Bangkok 10700<br>Thailand<br>(085) 552-1227<br>thapha.wg@gmail.com | September 9, 2011 | Working website for Margaritaville G1000 Grill for sale through amazon.com. Contains reviews and specs. Monitoring. |
| margaritavillesmiles.com | Margaritaville | Meer Stanisai, DDS<br>Murietta Springs Family Denistry | September 17, 2012 | Domain defaults to www.murrietafamilydentist.com. Stanisai |

- 48 -

| nfringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | Murietta, CA 92562<br>951 696-8200<br>domainsbilling@prosites.com | | has complied with all demands to rebrand dental practice. Monitoring. |
| margaritaville-blender.com (1)<br>margaritavillefrozenconcoctionmaker.net (2) | Margaritaville | Mark Leenheer<br>1698 Port Sheldon<br>Jenison, MI 49428<br>616 773-8296<br>bigmark1972@yahoo.com | September 19, 2011 (1) and (2) September 21, 2011 | (1) Defaults to search engine.  (2) Domain can not be found on server.  Monitoring. |
| margaritavilleband.com | Margaritaville | Rick Craig<br>PO Box 264<br>6229 South Hall Drive<br>Flowery Branch, GA 30542<br>deals2004@yahoo.com | September 21, 2011 | Working website for Jimmy and the Margaritaville Band. C&D being sent. Monitoring. |
| margaritavilleshirts.com | Margaritaville | Chadd Chustz<br>938 N Collier Blvd<br>Marco Island, Florida 34145<br>(239) 234-1575<br>cdchustz@gmail.com | November 2, 2011 | Defaults to standard search engine. Monitoring. |
| margaritavilletv.com | Margaritaville | Private Registration | October 29, 2011 | Defaults to standard search engine. Monitoring. |
| margaritavilleshops.com | Margaritaville | Eristhee<br>40575 California Oaks Road D2-224<br>Murrieta, CA 92562<br>951 973-8887 | October 12, 2011 | Domain is in the process of being transferred from current registrant. Monitoring. |
| margaritavillemachine.org | Margaritaville | Joshua Jarvis<br>4961 Country Wood Trail<br>Hoschton, GA 30548<br>770 374-4667<br>jarvisteam@gmail.com | November 24, 2011 | Working site which contains blender specs, recipes and reviews.  Monitoring. |
| ecsmargaritaville.com | Margaritaville | Private Registration | November 30, 2011 | Domain defaults to static blank screen. Monitoring. |
| margaritavillesworld.info | Margaritaville | Margarita Viera<br>PO Box 47<br>New York, NY 10032<br>646 744-7651<br>margaritaviera@gmail.com | December 4, 2011 | Domain can not be found on server. Monitoring. |
| margaritavillepcbeach.com | Margaritaville | White Directory Publishers<br>Beke Acomb | December 20, 2011 | Working website which lists Overview, |

- 49 -

| nfringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | 1945 Sheridan Drive<br>Buffalo, NY 14223<br>866 872-9327<br>sysadmin@localedge.com | | reviews and directions to Margaritaville in Panama City Beach. Determining next steps. Monitoring. |
| margaritawrestlingville.com | Margaritaville | David Williamson<br>7056 Mosswood Road<br>Richmond, VA 23231<br>804 795-2572<br>dew_2002@hotmail.com | January 1, 2012 | Defaults to standard search engine. Monitoring. |
| themargaritaville.com | Margaritaville | David Durick<br>654 W. Shore Drive<br>Belgrade, MO 59714<br>303 859-0813<br>davidjdurick@gmail.com | January 8, 2013 | Working site as a portal for Joomla! Appears owner is using Joomla! software to create a "Margarita community." Appears to be in beginning stages of creation. Determining next steps. Monitoring. |
| hollywoodbeachmargaritaville.info<br>hollywoodbeachmargaritaville.net<br>hollywoodbeachmargaritaville.org | Margaritaville | Jeffrey Kuschner<br>20401 NE 30th Avenue<br>North Miami, FL 33180<br>305 936-9726 | January 16, 2012 | Domains default to "Coming Soon" page. Monitoring. |
| margaritavillebeachresort.com (1)<br>hollywoodmargaritaville.com (2) | Margaritaville | Steven Alig<br>450 North Park Rd, Suite 803<br>Hollywood, FL 33021<br>domains@soflaweb.com<br>954 962-4708 | January 25, 2013 | (1) Domain can not be found on server (2) WordPress.com blog with "Welcome" entry. Monitoring. |
| margaritavilleconcoctionmaker.org<br>margaritavillefrozenconcoctionmakers.com | Margaritaville | Private Registration | January 23, 2013 | Domains default to "Coming Soon" page. Monitoring. |
| ourmargaritavillewedding.com | Margaritaville | Thresa McFarland<br>641 NE 17th Ter #7<br>Fort Lauderdale, FL 33304<br>(954) 444-0922 | February 4, 2012 | Personal website for couple who live in Fort Lauderdale. Wedding to be casual |

ATL 18,212,122v2 8-12-11

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | tamcfarland@hotmail.com | | (i.e., Margaritaville-style). Monitoring. |
| margaritavillebaja.net | Margaritaville | Linda Shepherd 6 Wetherly Drive Bakersfield, CA 93309 530 477-6293 | February 11, 2012 | Defaults to standard search engine. Monitoring. |
| margaritavillepoolhome.com | Margaritaville | Dana Parks ClearwaterbeachFUNvacatio nRentals.com 11961 W Locust Lane Columbus, Indiana 47201 (812) 343-5365 danalynnparks@comcast.net | February 13, 2016 | Defaults to standard search engine. Monitoring. |
| margaritaville2.net | Margaritaville | Debbie Taugher 29938 33 Mile Road Richmond, MI 48062 586 727-8669 debbie.taugher@yahoo.com | February 22, 2014 | Defaults to standard search engine. Monitoring. |
| cheeseburgerinparadise.ca | Cheeseburger In Paradise | Unknown. | January 4, 2012 | Defaults to standard search engine. Matter turned over to foreign counsel for additional investigation. Monitoring. |
| casamargaritaville.com | Margaritaville | Gary King PO Box 108 Mountain Home, TX 78058 830 640-3536 butch@wildmanlodge.com | March 10, 2012 | Defaults to standard search engine. Monitoring. |
| margaritavillefiredept.org | Margaritaville | Michael Rogers Margaritaville Fire Dept. 532 York Street Freeport, IL 61032 847 296-0964 prospectdive@comcast.net | February 23, 2012 | Domain name disabled and redirected to Facebook page http://www.facebook. com/pages/Margarita ville-Fire-Department/4793168 7654. Monitoring. |
| margaritavilleretirement.com | Margaritaville | Brad Kolstoe Cembra Financial 5132 Augusta Circle Fort Collins, CO 80528 | February 25, 2012 | Personal WordPress blog with 1 entry. Monitoring. |

ATL 18,212,122v2 8-12-11

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | 970 310-5162 bkolstoe24@aol.com | | |
| margaritavilletigerblood.com margaritavilletigerblood.biz margaritavilletigerblood.info margaritavilletigerblood.mobi margaritavilletigerblood.net margaritavilletigerblood.org margaritavilletigerblood.us | Margaritaville | Leslie Cooper 1824 Loida Court North Las Vegas, NV 89031 702 339-8910 ajlk@cox.net | March 22, 2012 | Domains currently parked with GoDaddy.com. Monitoring. |
| myrtlebeachmargaritaville.com | Margaritaville | Dan Fry Clear Eyes Media, LLC 9621 Shore Drive # B112 Myrtle Beach, SC 29572 301 537-0088 cleareyesmedia@gmail.com | March 24, 2012 | Domain is currently parked with GoDaddy.com. Monitoring. |
| wastingawayinmargaritaville.ca waistingawayinmargaritaville.ca | Margaritaville | Robert Katz ATGC Group PO Box 42 Stn A Richmond Hill, Ontario L4C 4X9 Canada robertatgc@sympatico.ca 905 770-0334 | April 8, 2012 | Domains could not be found on server. Foreign counsel advised us of ownership in connection with infringing registration. Monitoring. |
| margaritavillemachinex.com | Margaritaville | Michael Kliem Woodcourt Productions 51 Woodcourt Road Berowra Heights Sydney, New South Wales 2082 Australia 6-141-721-3250 admin@woodcourt.com.au | April 12, 2012 | Working site for various blenders (provides product specifications, reviews, etc.) Monitoring. |
| wastinawayinmargaritaville.com wastingawayinmargaritaville.com | Margaritaville | Robert Katz ATGC Group PO Box 42 Stn A Richmond Hill, Ontario L4C 4X9 Canada robertatgc@sympatico.ca 905 770-0334 | April 8, 2012 | Domains could not be found on server. Determining next steps as infringer registered similar domains in Canada (.ca). Monitoring. |
| margaritavilleblenderreviews.com | Margaritaville | Private Registration | April 21, 2012 | Domain defaults to Under Construction page. Monitoring. |

ATL 18,212,122v2 8-12-11

| nfringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| margaritavilleexpress.com margaritaville-express.com (*) margaritaville-xpress.com (*) margaritavillexpress.com (*) | Margaritaville | Shane Vadnais 5700 Lasaine Avenue Encino, CA 91316 shanevadnais@sbcglobal.net 818 770-9591 | April 27, 2012 April 29, 2012 (*) | Domains currently parked with GoDaddy.com. Monitoring. |
| tahitimargaritavillefrozenconcoctionmakerwithfreedrinkwareset.com tahitimargaritavillefrozenconcoctionmakerwithfreedrinkwareset.net (*) tahitimargaritavillefrozenconcoctionmakerwithfreedrinkwareset.org (*) | Margaritaville | Gary Pool 326 Weldon Street South Houston, TX 77587 713 948-5765 713 948-5766 (fax) garypool@gmail.com | April 29, 2012 | tahitimargaritavillefrozenconcoctionmakerwithfreedrinkwareset.com is a working site which contains specifications and review of the Margaritaville DM3000. Domains denoted with (*) are currently parked with GoDaddy.com. Monitoring. |
| margaritavillegame.com | Margaritaville | Private Registration | May 26, 2013 | Domain can not be found on server. Monitoring. |
| margaritavillefrozenconcotionmakers.org | Margaritaville | Private Registration | May 24, 2012 | Domain can not be found on server. Monitoring. |
| margaritaville-online.com | Margaritaville | Private Registration | May 27, 2012 | Domain can not be found on server. Monitoring. |
| margaritavillepalmbeach.com margaritavillewestpalmbeach.com margaritavillewpb.com | Margaritaville | Private Registration | June 16, 2012 | Domain can not be found on server. Monitoring. |
| margaritavilledm1050.info | Margaritaville | Private Registration | June 15, 2012 | Domain can not be found on server. Monitoring. |
| margaritavilledm2000.us margaritavilledm2000buy.com | Margaritaville | Tassani Thephinlap 88/158 Patrarin Kubanglaung Ladlumkaew Phatumtani 12140 Thialand tassanaithe@gmail.com | June 10, 2012 | Working sites which contains amazon.com reviews for various Margaritaville blenders (both domains go to same site content). |

- 53 -

| Infringing Name | Mark | Registrant | Expiration Date | Status |
|---|---|---|---|---|
| | | | | Monitoring. |
| margaritavilledm900.info | Margaritaville | Private Registration | June 14, 2012 | Working site which lists where you can buy Margaritaville blenders at cheaper prices. Monitoring. |
| margaritavillefragrances.com | Margaritaville | Richard Barrie Performance Brands International LLC 922 Indian Beach Drive Sarasota, Florida 34234 (941) 587-3292 rbinfl@comcast.net | June 12, 2012 | Domain can not be found on server. Monitoring. |
| margaritavilledm2000sale.com | Margaritaville | Budi Restianto Tebet Barat IIA No.15 Jakarta, DKI 12810 Indonesia budi.restianto@gmail.com +62.81905026207 | June 21, 2012 | Working blog which contains reviews about the M2000 blender. Monitoring. |
| margaritavillelive.com | Margaritaville | Donald Kleinhans The Kleinhans Group, Inc. 920 Clearwater-Largo Rd. N. Largo, Florida 33770 727 585-5554 Don@FullThrottleMidwest.com | June 25, 2012 | Domain can not be found on server. Monitoring. |
| margaritavillefrozenconcoctionmakerreview.info | Margaritaville | Chayada Welliaipet 49/1 Moo 11 Tlunpaya Banlan Nakhonpathom 73103 Thailand chayadawell@yahoo.co.th | June 1, 2012 | Working site which contains reviews about various blenders. Monitoring. |

3.      **Foreign**

In foreign countries, there are unauthorized third party uses of marks or business names that include components of Margaritaville's trademarks, including MARGARITAVILLE, CHEESEBURGER IN PARADISE and PARROTHEAD.  It can be extremely difficult to detect all international unauthorized users and it is likely that there are other unauthorized users of which Margaritaville is unaware.  The continuing international unauthorized uses about which Margaritaville knows, and their status, are identified below.

*ATL 18,212,122v2 8-12-11*

For purposes of this Exhibit, Margaritaville's knowledge is defined as actual knowledge or the actual knowledge of Margaritaville's principal intellectual property attorneys.  Margaritaville does not regularly survey international business databases and the Internet looking for unauthorized uses.  Past infringements that to the best of Margaritaville's (or its attorneys') knowledge have ended are not included in this Exhibit.  Below is an initial summary of existing third party infringements:

| Infringer Name | Mark Infringed | Wrongful Conduct | Current Status |
|---|---|---|---|
| Gethin Coles / Bill and Monica Murrie:  Australia Issues | Margaritaville | Registration of margaritaville.com.au by company called Gethin Coles in Australia.  Site is active for bed and breakfast in Coffs Harbour, Australia owned by Bill and Monica Murrie. | Matter reinitiated with foreign counsel (Sprusons) for handling. margaritaville.com.au being transferred to client. |
| Bajo Cabo Asesores SA de CV | Margaritaville | Sales of t-shirts which breach settlement agreement entered into with infringer in May 2002. | Per foreign counsel's investigation, restaurant has been under construction and there has been no commercial activity found at restaurant. Per construction manager, did not think restaurant would open soon. |
| Margaritavilla Sand Bar: Bahamas | Margaritaville and Cheeseburger In Paradise | Use of Margaritaville in connection with bar / restaurant. Use of Cheeseburger In Paradise with respect to menu item. | Matter turned over to foreign counsel for handling. |
| Brett Dryland / Hog's Breath Café (Australia) | Cheeseburger In Paradise | Infringing menu item. | Foreign counsel recommended against sending cease and desist letter because client's CIP mark in Australia does not cover hamburgers and the CIP mark is not currently being used there.  In the event a C&D is sent, Hog's Breath Café could challenge our mark and cancel it.  Matter put on hold pending further developments of client's use in territory. |

ATL 18,212,122v2 8-12-11

| Infringer Name | Mark Infringed | Wrongful Conduct | Current Status |
| --- | --- | --- | --- |
| Margarita's Ville / Margarita Guiterrez Trujillo | Margaritaville | Name of resort in Mexico called Margarita's Ville (on the Yucatan). | Investigation pending. |

ATL 18,212,122v2 8-12-11